**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:13-cv-00884-PAB-KMT

ABBY MARTIN,

Plaintiff,

v.

BOARD OF COUNTY COMMISSIONERS OF PARK COUNTY, CO,

Defendant.

---

PLAINTIFF'S FIRST AMENDED COMPLAINT WITH DEMAND FOR JURY TRIAL

---

Plaintiff, Abby Martin, by and through her attorney, Ralph E. Lamar, files this her first Amended Complaint, alleging as follows:

## I. NATURE OF THE CASE

1. This employment discrimination and civil rights action is brought against Defendant Board of County Commissioners of Park County, Colorado ("Park County"), by Plaintiff Abby Martin for equitable relief and monetary damages to redress the deprivation of civil rights secured to her by Title VII of the Civil Rights Act of 1964, as amended.

Specifically, she alleges that while she was an employee of the Park County Sheriff's Office she was subjected to a discriminatory comment by Corporal Kelley Reynolds. After complaining about gender discrimination by a Park County Sheriff's deputy, she was subjected to a campaign of retaliatory actions by members of the sheriff's department which ultimately resulted in her constructive discharge. She alleges that the defendants' actions caused her mental distress and humiliation, and loss of employment and compensation. Plaintiff seeks back pay,

1

reinstatement or front pay, compensatory damages, and attorneys fees and costs of this action from Defendant Park County.

Plaintiff files this first amended complaint as a matter of right pursuant to the federal rules of civil procedure as Defendant has not filed a responsive pleading.

## II.   JURISDICTION AND VENUE

2. This action is initiated pursuant to Title VII of the Civil Rights Act of 1964 as amended. This Court has subject matter jurisdiction for this claim under 28 U.S.C. §§ 1331 and 1343, because it arises under the laws of the United States and is brought to recover damages for deprivation of plaintiff's civil rights. This Court may properly maintain personal jurisdiction over Defendant because Defendant's contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendant to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in *International Shoe Co. v. Washington,* 326 U.S. 310 (1945) and its progeny.

3. Venue is proper in this judicial District under 28 U.S.C. § 1391(b),(c) and 42 U.S.C. § 2000e-5(f)(3), because defendant Park County has offices, conducts business, and can be found in this District, and the causes of action arose and the acts and omissions complained of occurred therein.

## III.   EXHAUSTION OF ADMINISTRATIVE REMEDIES

4. Plaintiff has complied with all statutory prerequisites to her Title VII claims, having filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on January 3, 2012 (#541-2012-01025), and having obtained a Notice of Right to Sue letter from the EEOC which was mailed to her on January 8, 2013.

## IV.   PARTIES

2

5. Plaintiff Abby Martin is a citizen of the U.S. currently residing in Lakewood, CO and is subject to the jurisdiction of this court.

6. Park County, Colorado was the employer who terminated plaintiff's employment. At all relevant times Park County has had at least 15 employees and is capable of being sued under Title VII and is subject to the jurisdiction of this court under that statute. Park County's offices are located at 501 Main Street, in Fairplay, Colorado. Defendant Board of Commissioners of Park County, Colorado is the proper named Defendant for an action against Park County, CO. Defendant is therefore subject to the jurisdiction of this court.

### V.  STATEMENT OF FACTS

7. Plaintiff is a female and thus a member of the class of persons protected by Title VII of the Civil Rights Act of 1964, as amended.

8. Defendant Park County, is an employer within the meaning of Title VII during all relevant time periods.

9. On November 2, 2009, plaintiff became employed by Park County as a Sheriff's Deputy.

10. Defendant Corporal Kelley Reynolds was the first field training officer ("FTO") plaintiff was assigned to after plaintiff was hired. Shortly after she became employed by Park County, Mr. Reynolds blurted out in front of plaintiff and other Park County employees that "Park County does not need to be hiring any more female deputies."

11. Plaintiff interpreted the comment to mean that Corp. Reynolds did not believe females should be deputies, and did not want to train her because she was a female deputy. She thus reported his blatantly discriminatory comment to Deputy Kolby Martin. Deputy Martin reported the complaint to Master Sergeant Mike Brown.

12. In mid-November, 2009, Captain Mark Hancock of the Park County Sheriff's Office, (PCSO) approached plaintiff and asked if she was offended by Corp. Reynolds' comment. She responded that she was offended because she was as qualified as any male deputy and had spent a lot of time training with the SWAT team as a Reserve Deputy prior to becoming a full time employee

13. Immediately after a staff meeting on November 18, 2009, Master Sgt. Mike Brown and PCSO FTOs, including Corp. Reynolds, Corporal Dean Morgan and Corporal Rick Paige, pulled plaintiff aside, called her a "traitor" because she had reported Corp. Reynolds' comment, then belittled her and began to harass her whenever an opportunity arose.

14. Although Corp. Reynolds was removed from the FTO position in November 2009 Park County later reinstated him to the FTO position.

15. After Corp. Reynaldo was removed from the FTO position, Corp. Paige was assigned as plaintiff's FTO trainer. Corp. Paige thereafter retaliated against plaintiff for her complaint against Corp. Reynolds by reminding her about it every week, and taking every opportunity to humiliate and/or harass her. For example, he would call dispatch and instruct them to disregard plaintiff's requests. Likewise, Corp. Paige was rude, yelled, and degraded her on the radio for the rest of the department to hear, then would instruct plaintiff to change radio channels to our "tac" channel, where he would continue to harass her. He was so rude that, in June 2010, another deputy commented on it and asked plaintiff what was going on with Paige.

16. Corp. Paige would further call plaintiff at home after work to harass her. For instance, on plaintiff's birthday, Friday, July 9, 2010, Corp. Paige called her at home to tell her, that she was in "big trouble" for making a mistake at the jail. When she returned to work three

days later, plaintiff asked what she had done wrong and was advised that the jail staff had failed to train her on jail protocols during her field training.

17. Corp. Paige further tried to preclude plaintiff from participating with the other officers on PCSO "burrow days," for example, by providing assignments to her off site so that she would not be present.

18. After several months of constant harassment from Corp. Paige, plaintiff began experiencing gastrointestinal problems, for which medical treatment was required.

19. In the early summer months of 2010, plaintiff reported Corp. Paige's retaliation and harassment to Master Patrol Deputy Jeff. DeBerry, and requested to be assigned a new supervisor. Master Patrol Deputy DeBerry reported this up through his chain of command, but nothing was done, and plaintiff was not assigned a new supervisor.

20. In further retaliation for her complaint of gender discrimination," in June 2010, plaintiff was denied a shift for which she had bid, while all of the other deputies were granted the shifts for which they had bid. On or about June 23, 2010, plaintiff met with Sgt. Glenn Hardey about the denial of her shift bid. In violation of PCSO policy and procedure, Sgt. Hardey told plaintiff "you do not have seniority here and you will work where we tell you to work."

21. Plaintiff was further denied overtime shifts that summer while other similarly situated PCSO deputies were given overtime shifts.

22. On or about June 30, 2010, plaintiff had a meeting with Master Sgt. Mike Brown, Corp. Greg Flint, Sgt. Hartley, and Corp. Paige, during which she attempted to get assistance to stop Corporal Paige's retaliatory harassment, and disputed the denial of her bid for a different shift. Rather than address Corp. Paige's harassment, as required by law and PCSO policy and

procedure, Master Sgt. Mike Brown told plaintiff during this meeting that if she raised any more concerns, she would not make it through her probationary period.

23. In retaliation for her complaints about discrimination and retaliation, Master Sgt. Brown denied training opportunities plaintiff had requested during the latter half of 2010. For example, Sgt. Brown denied her long gun training that was free to the PCSO. This was a safety issue in that plaintiff was denied a shotgun or rifle for almost two years, until Corp. Greg Flint finally noticed she did not have a long gun and insisted that plaintiff be certified in October. 2010.

24. On or about August 11, 2010, plaintiff was in the squad room talking to Deputy Shawn Olivett when Sgt. Brown walked out of-his office, looked at her, and said, "Can't you go somewhere else and leave? You are annoying!"

25. In or about October 2010, PCSO hired a new deputy, Welles Tonjes. Deputy Tonjes was quickly promoted to corporal, then to sergeant.

26. After Corp. Paige left the PCSO, Sgt. Hardey was assigned as plaintiff's direct supervisor. Sgt. Hardey demonstrated hostility and retaliated against plaintiff by refusing to communicate directly with her, and forwarding all orders through other PCSO staff.

27. In December 2010, Sgt. Hardey wrote plaintiff up for three all alleged incidents none of which was determined to be founded, in an attempt to subject her to disciplinary action and termination. This was in retaliation for her previous complaint against Corp. Reynolds.

28. In or about December 2010, Sgt. Hardey told Park County Detective Yoshi Goto, "I'm going to do everything I can to get [Abby Martin] back on probation and out of here."

29. In or about December 2010 plaintiff had a meeting with Captain Mark Hancock regarding the hostile and abusive working environment and harassment by Corp. Hardey. During

this meeting, plaintiff advised Captain Hancock that she had consulted a Fraternal Order of Police attorney, and requested that he do something to stop the ongoing retaliation and harassment. In violation of federal law and Park County policy and procedure, Captain Hancock advised her that if she sought legal assistance and sued the department it would be detrimental to her career in law enforcement.

30.     In or about March 2011, PCSO assigned plaintiff to a School Resource Officer ("SRO") position. She received no training for the SRO position, and was required to wear full uniform, including a bullet proof vest and duty belt, whenever she was on duty.

31.     On or about May 10, 2011, while speaking to students for a "Career Day" event at Fitzsimmons Middle School, Park County Commissioner John Tighe asked plaintiff to stand in front of each of the classes to show off the uniform and do the "Barbie dance" which involved putting one hand on her head, one on her hip, shaking her hips and saying "hubba, hubba, hubba." Afterwards, she filed a sexual harassment complaint with the PCSO, and requested a transfer back to her original position as a patrol deputy.

32.     After Park County granted the transfer request and a replacement was hired for the SRO position, the new SRO received training which plaintiff had been denied.  The new SRO was not required to wear full uniform, bullet proof vest and duty belt whenever he was on duty. PCSO instead provided the new SRO a modified uniform, while plaintiff's requests for a modified uniform had been denied.

33.     In retaliation for her protected conduct in complaining about gender discrimination, retaliation and harassment during the period from October 2010 through May 2011, Corp. Reynolds, Sgt. Hardey and other PCSO officers failed to communicate and/or provide backup in circumstances in which backup was required for plaintiff's safety.

34. For example, on or about October 27, 2010, dispatch reported a call concerning a man who was walking on Highway 285, south of Fairplay, possibly waiving a shotgun. Plaintiff was in the area at the time, and notified dispatch that she would contact the individual and tell them what she found. Plaintiff promptly contacted dispatch to confirm that the man appeared to be waiving a shotgun, then contacted the suspect.

35. Corp. Reynolds was supposed to have reported to the scene as backup and advised dispatch that he was en route from the Sheriff's office. However, when Sergeant Tonjes arrived and asked where plaintiff's backup was, she told him that Corp. Reynolds was her backup and she did not know where he was.

36. Plaintiff later learned that, rather than provide backup, Corp. Reynolds was at the Sheriff's office surfing the internet, in violation of PCSO policy and procedure. To her knowledge, Corp, Reynolds was never disciplined for his failure to provide backup in what could have been an extremely dangerous situation.

37. By way of further example, prior to plaintiff's transfer back to a patrol position, on the last day, of school in May 2011, while she was still serving as SRO, a call was received that students at Platte Canyon High School planned to spray other students with a substance identified as carbonated urine.

38. Although, Corp. Reynolds was to be plaintiff's backup that morning, in retaliation for her protected conduct in reporting his discriminatory statement, he failed to respond, and failed to advise plaintiff that he was even en route until thirty minutes after school ended.

39. On or about May 10, 2011 plaintiff reported Corp. Reynolds' retaliatory conduct in failing to provide backup to her supervisor, Sgt. Welles Tonjes, and further advised Sgt. Tonjes about the discriminatory comment Reynolds had made in November 2009.

40. On or about May 26, 2011, Corp. Reynolds told Detective Yoshi Goto, "I don't care what it takes, I'm going to get Officer Abby Martin out of here." When plaintiff reported this threat to Sgt. Tonjes and Sgt. Brown, they responded "why should we do anything about it?"

41. During the time that she served as SRO, plaintiff suffered an off-duty back injury. She repeatedly reported to Sgt. Mike Brown that wearing 50 lbs. of gear, including a duty belt, was aggravating her back injury, and requested an accommodation of working without the full uniform on Friday's as the school staff had advised that other deputies had done previously. This accommodation was denied and plaintiff was not allowed to remove the duty belt while on duty.

42. Plaintiff's back injury worsened and, on or about June 21, 2011, she advised. Sgt. Tonjes that she needed to have back surgery. Sgt. Tonjes immediately responded: "Well, you might as well plan on getting your walking papers because command staff is not going to put up with you having surgery."

43. On or about July 1, 2011, plaintiff underwent microdiscectomy surgery for her back injury. Pursuant to the ADA and Family and Medical Leave Act ("FMLA"), she requested a medical leave of absence. She was later released to light duty effective August 1, 2011.

44. When she returned to light duty on August 1, 2011, Sgt. Tonjes told plaintiff that her husband, fellow Deputy Kolby Martin, could drive her to the office, but he was not allowed to set foot in the office while she was working, even though other married county employees were allowed to be in the office together.

45. After plaintiff returned to light duty, Deputy Brandon Strehl began harassing her because she had a disabling medical condition for which she had taken a leave of absence, in violation of the FMLA and PCSO policy and procedure. For example, he made a sarcastic remark that "it must be nice to have a month off for vacation."

46. Subsequently, on or about August 14, 2011, Deputy Strehl came to the Fairplay sheriff's office where plaintiff was working on a large, child abuse case. Plaintiff had several piles of papers organized on her desk. Deputy Strehl flipped her off, then knocked the files off her desk onto the floor, in violation of PCSO policy and procedure. When she asked him to pick them up, he refused stating that he was not, a "fucking cheeto." When plaintiff reported Deputy Strehl's discriminatory and harassing conduct to her supervisor, Sgt. Tonjes, he laughed and told, plaintiff Deputy Strehl is "like a little brother" who just likes to "pick on you" or "get under your skin."

47. On or about August 17, 2011, at approximately 5:45 p.m., after a PCSO staff meeting was held at the Jefferson/Como Fire Station, plaintiff approached Sgt. Tonjes and complained that she did not think she was being treated fairly since other couples were not prohibited from being in the office together. Sgt. Tonjes advised Master Sgt. Brown and they then walked plaintiff into the kitchen and closed the door.

48. When plaintiff tried to explain why she felt this was unfair, she was told to "shut up." When she then complained that Sgt. Tonjes did not take her complaint about Deputy Strehl seriously, Sgt. Tonjes exploded in a rage and began screaming "this is BULLSHIT!" while slamming his fists on the kitchen table approximately 6 inches from her chair. This closed door meeting was so hostile and abusive that plaintiff became afraid for her physical safety.

49. During this incident on August 17, 2011 Sgt. Tonjes threatened to make plaintiff work nights where she would not come into contact with the officer(s) who were harassing her. Master Sgt. Brown and Sgt. Tonjes then began arguing in front of plaintiff about who she would report to, and ultimately decided she would work a Monday through Friday shift under Master

Sgt. Mike Brown. Plaintiff was then advised that her husband could no longer drive her to the office.

50. The shift change and added restrictions were retaliatory in response to plaintiff's complaints of gender discrimination, harassment and retaliation. Because plaintiff had been driven to work by her husband she had been able to take the pain medications prescribed by her doctor, which aided in her recovery. After Sgt. Brown forbade plaintiff's husband from driving her to work in his patrol car, she was no longer able to take the pain medications during the workday and her condition worsened. Due to the schedule change, she also had to use up accrued sick leave in order to attend physical therapy, rather than scheduling therapy on one of her days off.

51. In further retaliation, Sgt. Tonjes forbade everyone in the office from talking to plaintiff. On or about August 23, 2011 plaintiff was working in the front office chatting with Brenda Green while scanning reports, when Sgt. Tonjes walked in and asked in a very loud voice if plaintiff was "bothering Brenda." Although. Ms. Green said "no," Sgt. Tonjes pulled her aside and told her that plaintiff was not to be talking to anyone.

52. After the August 17, 2011 incident, plaintiff's back pain was exacerbated and she could no longer perform daily activities as she had done prior to August 17, 2011. By August 29, 2011, she was so anxious and stressed out due to the hostile work environment, and in so much physical pain that her doctor excused her from work.

53. On or about September 21, 2011, plaintiff's doctor advised her that the prior surgery had failed, and scheduled her to undergo, a lumbar fusion. The following day, she notified Sgt. Tonjes that she would require a second surgery.

54. On or about September 23, 2011, in response to notice that plaintiff would require an additional medical leave of absence, Sgt. Tonjes falsely notified her that PCSO no longer had any light duty work available.

55. Sgt. Tonjes and the PCSO forced plaintiff to go on medical leave so that she would use up all of her paid sick leave and FMLA time with the goal of either inducing her to quit or setting up a pretext to fire her. On or about October 13, 2011, Sgt. Brown pulled plaintiff's Husband aside and told him that they were hiring for plaintiff's position.at the end of November 2011.

56. When plaintiff learned that PCSO was hiring for her position, she immediately requested a reasonable accommodation of a six week medical leave of absence under the ADA.

57. Plaintiff underwent lumbar fusion surgery on October 18, 2011, and was again released from work through November 28, 2011.

58. On or about October 31, 2011, plaintiff learned that PCSO was hiring for a detective position for which she was qualified and applied.

59. On or about November 15, 2011 a Park County Human Resources Coordinator informed plaintiff that she needed a doctor's note stating that she could sit all day for the open detective position test. Two days before the test, Park County Human Resources Coordinator, Cindy Gharst, reminded plaintiff via e-mail that PCSO required a doctor's note stating that she could sit all day for the test. A doctor's note was unnecessary given the fact that plaintiff's doctor had already released her to light duty. Despite her efforts to get a note from her doctor, plaintiff was unable to get a note before the test day. Because of this, PCSO prohibited plaintiff from testing for the open detective position.

60. Park County's refusal to allow plaintiff to test was retaliatory in response to my previous complaints of gender discrimination and retaliation and thus discriminatory in violation of Title VII.

61. When plaintiff returned to light duty on November 29, 2011, she was ostracized by PCSO staff, who were ordered not to talk to her. Upon seeing her on her first day back in the office Sgt. Tonjes went into his office and slammed the door so hard that it shook the pictures on the walls.

62. As a result of all that had transpired and the prospect of continuing to work in the hostile environment plaintiff's physical and emotional were at risk. Given the fact that Park County was in the process of hiring for plaintiff's position, and its refusal to allow her to sit for the detective exam, which made her continued employment as a Deputy extremely uncertain, and the fact that the work environment has been hostile for several years plaintiff submitted her resignation effective January 5, 2012.

## FIRST CAUSE OF ACTION
## VIOLATION OF TITLE VII FOR RETALIATION

63. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

64. Through her complaints of gender discrimination and retaliation, plaintiff engaged in protected activity.

65. Plaintiff was subjected to unlawful harassment as a direct result of her protected activity. The harassment by Park County employees was materially adverse in that it was designed to end plaintiff's employment and/or such that it would have dissuaded a reasonable person from making or supporting a charge of discrimination. Ultimately plaintiff was

constructively discharged as a result of Defendant's retaliatory harassment in violation of Title VII.

66. Plaintiff has been injured by the actions of Defendant which injuries include lost pay and benefits and emotional distress.

**WHEREFORE**, Plaintiff prays that this Court enter an order providing that:

A. Defendant Park County is to be permanently enjoined from discriminating or retaliating against Plaintiff on any basis which is forbidden applicable federal and state law;

B. Defendant Park County is to promulgate and adhere to a policy prohibiting unlawful gender discrimination and retaliation;

C. Defendant is to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for all Defendant's illegal actions, including but not limited to back pay, front pay, salary, pay increases, bonuses, insurance, benefits, training, promotions, reinstatement, and seniority;

D. Plaintiff is to be awarded actual damages, as well as damages for the pain, suffering, and humiliation caused by all Defendant's actions;

E. Plaintiff is to accorded other equitable and legal relief as the Court deems just;

F. Plaintiff is to awarded the costs and expenses of this action and reasonable attorney's fees and as provided by applicable federal and state law against Defendant Park County;

## **JURY DEMAND**

Plaintiff demands a trial by jury on all claims properly triable by a jury.

Dated this 9th day of April, 2013.

                 Respectfully submitted,

By: <u>*s/Ralph E. Lamar, Esq.*</u>
Ralph E. Lamar, Esq.
Attorney I.D. No.  44123
8515 Braun Loop
Arvada, CO 80005
(303) 345-3600
ralphlamar@ymail.com

Attorney for Plaintiff