Exhibit 4 - Plaintiff Dep

Page 1

1                 IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLORADO
2

   Civil Action No. 13-cv-00884-PAB-KMT
3    _____

4  DEPOSITION OF ABBY N. MARTIN
   EXAMINATION DATE:  NOVEMBER 22, 2013
5    _____

6  ABBY MARTIN,

7  Plaintiff,

8  v.

9  FRED WEGENER, IN HIS OFFICIAL CAPACITY AS SHERIFF OF
   PARK COUNTY, CO.,
10

   Defendant.
11   _____

12

            PURSUANT TO NOTICE, the deposition of
13  ABBY N. MARTIN was taken at 9:00 a.m. on November 22,
   2013, at 1700 Broadway, Suite 1020, Denver, Colorado,
14  before Nathan Stormo, Registered Professional Reporter
   and Notary Public in and for the State of Colorado, said
15  deposition being taken pursuant to the Federal Rules of
   Civil Procedure.

16

17

18                    Nathan Stormo
               Registered Professional Reporter
19

20

21

22

23

24

25

Page 74

1  dinners.
2      Q    Do you trust Mr. Flint?
3      A    Absolutely.
4      Q    Did you believe him to be honest?
5      A    Yes.
6      Q    Did you make any complaints to Dean Morgan that
7  you thought you were being treated differently?
8      A    No.
9      Q    Why not?
10     A    Because I felt like it would have been further
11  detrimental because of a situation that happened after
12  my complaint against Kelley Reynolds, and I didn't feel
13  like I trusted him.
14     Q    What was the situation that you believed would
15  be detrimental?
16     A    Basically after I filed the complaint about
17  Kelley Reynolds' comment about not believing that Park
18  County would be hiring any female deputies, at the next
19  staff meeting on a Wednesday that had taken place after
20  the investigation was complete, they asked me to stay
21  back after everyone was dismissed.
22     Q    Who is "they"?
23     A    All of the FTO officers and Sergeant Brown.
24  They asked me to stay back after everybody was
25  dismissed, and I had already felt like it was a very

Page 75

1  awkward situation because they were set up such like a
2  panel.
3          And Kelley was allowed to confront me on the
4  complaint that I had made, and at which point he had
5  belittled me and told me how disappointed he was, and
6  felt like he was stabbed in the back; that he was angry
7  that it had come to this point. You know, he had
8  trained me and this is how I repay him. At which point
9  every single person that was sitting on that panel was
10  allowed to give their two cents' worth as to their
11  thoughts of how bad it was that I had filed my
12  complaint.
13         Corporal Morgan had at one point basically told
14  me, I don't know what you think goes in Golden, but this
15  isn't Golden, and we don't file complaints here. You're
16  a traitor, and at this point I don't know if I can trust
17  you.
18     Q    Who else was present in that meeting? You said
19  it was all the FTOs and Brown?
20     A    It was Corporal Paige who was involved in that
21  meeting; Kelley was there; Dean Morgan was there; Mike
22  Brown was there. And that was I think the extent of
23  everyone I can remember sitting there that was part of
24  the FTOs.
25     Q    So Brown, Reynolds, Morgan, and Paige, right?

Page 76

1      A    Uh-huh.
2      Q    Yes?
3      A    Yes.
4      Q    And what did Brown say?
5      A    Nothing. He sat there and watched the whole
6  thing take place.
7      Q    What was his rank compared to the others?
8      A    He was a master sergeant at that time.
9      Q    Who asked you to stay?
10     A    I believe it was Sergeant Brown.
11     Q    Did Corporal Paige say anything?
12     A    No. He just made comments -- he made
13  expressions on his face that made me believe that he was
14  shocked. And he didn't agree with the fact that I had
15  filed the complaint, which made me feel uncomfortable
16  just by itself just because of his facial expressions.
17     Q    But he didn't say anything?
18     A    No.
19     Q    What facial expressions did he give that made
20  you feel that he was uncomfortable with you filing --
21     A    He --
22     Q    Wait and let me finish, please.
23     A    Okay.
24     Q    What facial expressions did Corporal Paige make
25  that led you to the conclusion that he did not approve

Page 77

1  of your filing a complaint?
2      A    He was raising his eyebrows constantly,
3  repetitively. He kept shaking his head and looking at
4  me and just staring at me, which made me feel very
5  uncomfortable.
6      Q    To whom did you file the complaint about
7  Kelley Reynolds?
8      A    Kolby Martin.
9      Q    What was Kolby Martin's rank?
10     A    A deputy.
11     Q    Did you put the complaint in writing to
12  Kolby Martin?
13     A    No.
14     Q    You knew that the procedures for filing
15  complaints did not authorize you to make a complaint of
16  harassment to another person of the same rank as you,
17  didn't you?
18     A    Yes.
19     Q    So why did you file a complaint with
20  Kolby Martin?
21     A    I originally had told him when I had come home
22  from dinner -- or come home that night after shift, and
23  I was disgusted over what had happened. But I basically
24  told him it was a very uncomfortable position to be in
25  because of the fact that I just started there, and I

Page 78

1 didn't want to make waves when this was so important to
2 me to stay employed with the sheriff's office. I loved
3 law enforcement; that I didn't want to start out on the
4 wrong foot.
5        But this was really not the way I wanted to
6 start out my employment, was being told that females
7 didn't belong in law enforcement, which made me feel
8 like after I had turned down an offer with Commerce City
9 to stay and honor my employment with Park County, I felt
10 like this was a very disappointing way to start. And it
11 was more of a conversation between us as husband -- or
12 not at the time, boyfriend and girlfriend.
13       And when he gone into work the next day, he
14 spoke with Sergeant Brown about it because of the fact
15 that he was very disappointed how Kelley had treated me
16 has an FTO, and he was looking after me more as a
17 significant other. And he came home and told me, just
18 so you know, Sergeant Brown is going to be following up
19 with this. I hope you're not mad, but I felt he needed
20 to know.
21    Q   So were you and Kolby Martin already living
22 together by November of 2009 when the incident with
23 Kelley Reynolds occurred?
24    A   Yes.
25    Q   When did the Commerce City opportunity develop?

Page 79

1    A   I was given an offer approximately a week or
2 two within the time frame that I had started with Park
3 County.
4    Q   And you turned it down?
5    A   Yes, ma'am.
6    Q   Have you ever pursued getting rehired by
7 Commerce City?
8    A   Yes.
9    Q   When did you do that?
10   A   The summer of 2011 I had put in my application.
11   Q   What became of that application?
12   A   I was denied employment.
13   Q   Did you interview?
14   A   Yes.
15   Q   Were you told why you were denied employment?
16   A   According to HR, I failed my psych.
17   Q   Who did your psych evaluation?
18   A   Nicoletti & Flater.
19   Q   Have you had any other failed psych exams?
20   A   No, not that I know.
21   Q   Have you undergone any other psychological
22 exams for law enforcement?
23   A   Yes.
24   Q   With whom?
25   A   I believe all of them, to the best of my

Page 80

1 knowledge, was with Nicoletti & Flater.
2    Q   For what agencies?
3    A   Littleton, Lakewood, Park County, Golden, and
4 Commerce City.
5    Q   What became of your application to Littleton?
6    A   I was one of the five final candidates, and
7 they selected two others.
8    Q   What became of your application to Lakewood?
9    A   I completed my psych, and then I got my thanks
10 but no thanks letter.
11   Q   Did you ever inquire as to whether a failed
12 psych exam was the reason you were denied employment at
13 Lakewood?
14   A   They basically send a letter. If I can recall
15 the letter well enough, they will not disclose why you
16 were removed from the process.
17   Q   When did you apply with Littleton?
18   A   The summer of 2009.
19   Q   When did you apply with Lakewood?
20   A   December of 2012.
21   Q   Did you say December or summer?
22   A   December.
23   Q   Okay. Have you reapplied with Golden?
24   A   No.
25   Q   And you said that Commerce City was -- you

Page 81

1 initially applied in the summer of -- or in 2009 and
2 were offered a position?
3    A   Uh-huh.
4    Q   And then reapplied in the summer of 2011, and
5 it was at that time that you were interviewed but failed
6 your psych exam?
7    A   Yes.
8    Q   Are there any other law enforcement agencies
9 with which you have submitted an application and
10 interviewed but been turned down?
11   A   Yes.
12   Q   Which?
13   A   Are you looking for just law enforcement as a
14 police officer or as a dispatcher as well?
15   Q   Both.
16   A   I have applied with the City of Parker -- or
17 the Town of Parker, City of Westminster, Arapahoe
18 County, Jefferson County, Arvada, Lakewood, Littleton,
19 Douglas County. I think that's all I can remember for
20 now.
21   Q   What position did you apply for with Parker?
22   A   Both police officer and dispatcher.
23   Q   Were you interviewed for both?
24   A   Yes.
25   Q   What became of your application?

Exhibit 4 - Plaintiff Dep

Page 82

1    A   I was removed from the process.
2    Q   Do you know why?
3    A   No.
4    Q   Were you told anything about why you were
5  removed from the process?
6    A   No.  Just the generic thanks but no thanks
7  letters.
8    Q   What position did you apply for with
9  Westminster?
10   A   Dispatcher and police officer.
11   Q   You were interviewed for both?
12   A   Yes.
13   Q   What became of your application?
14   A   I was removed from the process.
15   Q   Were you told why?
16   A   I think, to the best of my knowledge, it was
17  because I mistakenly checked yes on something I should
18  have checked no.  And after we had talked about it
19  during the phone interview, the misunderstanding removed
20  me from the process, even though I corrected it after
21  the fact.
22   Q   What was it that you had checked yes instead of
23  no?
24   A   You know, I can't even remember.  It was back
25  in 2008 that this had all taken place.

Page 83

1    Q   When was the Parker application?
2    A   I want to say 2010 or 2011 and, also, the
3  summer of 2012.
4    Q   Were you interviewed in the summer of 2012?
5    A   Yes.  I was invited to test.
6    Q   Did you test?
7    A   Yes.
8    Q   Did you get to an interview after testing?
9    A   No.
10   Q   What about Arapahoe County, what positions?
11   A   Both dispatcher and patrol deputy.
12   Q   Were you interviewed for both?
13   A   Just dispatcher.
14   Q   Do you know why you were not interviewed for
15  the patrol deputy position?
16   A   The letter they gave me just basically said
17  that I was not one of the candidates selected.
18   Q   What became of your application for dispatch?
19   A   I tested and was removed from the process.
20   Q   Do you know why?
21   A   No.
22   Q   When did you apply in Arapahoe County?
23   A   The summer of 2012, and approximately 2010 and
24  2011.
25   Q   Were you dissatisfied with the pay in Park

Page 84

1  County?
2    A   Yes.
3    Q   Did that influence you seeking other positions?
4    A   Part of it, yes.
5    Q   Where were you living when you were employed as
6  a Park County Sheriff's deputy?
7    A   With Kolby Martin.
8    Q   The entire time?
9    A   Yes.
10   Q   Where had you lived immediately before you were
11  hired as a Park County Sheriff's deputy?
12   A   With my parents.
13   Q   Were you commuting to Park County then?
14   A   Yes.
15   Q   How long was that commute for you?
16   A   Approximately 30 to 40 minutes.  I would go to
17  the Bailey substation and meet for my shifts as a
18  reserve.
19   Q   Did you apply for both patrol and dispatch
20  positions with Jeffco?
21   A   Yes.
22   Q   What became of those?
23   A   I was removed from the process.
24   Q   Were you interviewed for either?
25   A   Yes, both.

Page 85

1    Q   Do you know why you were removed from the
2  process?
3    A   With the position for dispatcher, I struggled
4  with the CritiCall test for memory recall, and I
5  struggled with recalling seven digits or more that were
6  regurgitated back to me.  But for patrol, I was not
7  given anything.
8    Q   When did you apply with Jefferson County?
9    A   2010, 2011, 2012, so several times.
10   Q   So you continued to apply even though you never
11  knew on the patrol side why you were removed from the
12  process; is that right?
13   A   Yes.
14   Q   What about with Arvada, did you apply to be a
15  police officer?
16   A   Yes.
17   Q   What became of that?
18   A   I was removed from the process.
19   Q   Do you know why?
20   A   The first time I'm not sure.  The second time I
21  was applying as a lateral, and they said that I didn't
22  have enough experience.  But they also said I didn't
23  qualify as an entry level either.
24   Q   So when you were applying as a lateral, is that
25  while you were employed at Park County?

Exhibit 4 - Plaintiff Dep

Page 86

1   A   Correct.
2   Q   What about Douglas County, what positions?
3   A   Dispatcher.
4   Q   Not a patrol position?
5   A   I don't believe they had any at that time.
6   Q   What became of your application for dispatcher?
7   A   I was removed from the processes.
8   Q   Do you know why?
9   A   No.  And I also tested, went through these
10  tests with Aurora for dispatcher twice.
11  Q   When did you test for the Aurora positions?
12  A   I believe once in 2011 and once in 2012.
13  Q   When did you apply with Arvada?
14  A   2008, and then I think 2010 or 2011 again.
15  Q   What about Douglas County?
16  A   I believe that was during 2012.
17  Q   How would you describe your working
18  relationship with Sergeant Brown?
19  A   Up and down.
20  Q   In what way?
21  A   I felt like there were times when I could
22  really trust him, and then there were times when I felt
23  like I was scared to death of him.
24  Q   Why were you scared to death of him?
25  A   Because of his anger and the threats that he

Page 87

1   had made.  If I complained, I wouldn't make my
2   probationary period, and then I wouldn't be employed
3   with Park County.  So at that point I had basically
4   gotten the message that he didn't want to hear about
5   things that were going on within the department.
6   Q   Did Sergeant Brown come to you after Kolby
7   Martin complained to Sergeant Brown about the comment
8   from Kelley Reynolds?
9   A   Yes.
10  Q   Did you feel that Sergeant Brown handled that
11  issue appropriately?
12  A   No.
13  Q   In what way do you think he did not handle it
14  appropriately?
15  A   I felt at the meeting at the fire station after
16  the team meeting should have never taken place.  I felt
17  that my complaint should have been kept confidential.
18  It made my training very uncomfortable working with FTOs
19  after they were allowed to know that I filed a complaint
20  against Kelley, to the point where I was then moved into
21  the position to have to work with Dean Morgan right
22  after he had called me a traitor.
23      And knowing that I struggled with my training
24  with Golden, I felt that it didn't matter.  Whatever I
25  had to do, I was willing to do it to keep my employment

Page 88

1   with Park County.  And if I had to endure anything, I
2   was just going to shut my mouth and take it because I
3   wasn't going to argue with Dean after he made it clear
4   that he had thought I was a traitor.
5   Q   What were your aspects of your training that
6   you had failed at in Golden?
7   A   There wasn't anything in particular that I can
8   remember.  I think it was just the traffic stops weren't
9   running as smooth as they wanted based on their
10  expectations and getting the car positioned just the way
11  they wanted.  A lot of it was just getting comfortable
12  with the routine and getting confidence within myself
13  right away.
14      And I felt like when I had finally gotten to my
15  last FTO in Golden, I was finally catching on.  But,
16  unfortunately, so much time had lapsed with the
17  five-month training program, that the time frame had
18  gone on so long that it was a matter of at some point
19  they basically had agreed, how many more weeks of
20  training do we need to give you.  So I graciously
21  resigned even though there was no real specific problems
22  that I can remember.
23      I mean, when I had spoken with Sergeant Holmes
24  when I left, he had even told me that he had never seen
25  anyone with more heart in the job, and he said this was

Page 89

1   probably one of the hardest trainees that he has not
2   seen successfully fly through the program because of
3   just how much I wanted to learn.  I would go out on my
4   own time to even learn the addresses and drive around to
5   get comfortable with the geography.  They knew it wasn't
6   a matter of me slacking to learn the job by any means.
7   Q   What was the normal length of the FTO program
8   or the field training program in Golden?
9   A   I think it was about 16 weeks.
10  Q   As a result of the complaint that was made by
11  Kolby Martin on your behalf, Kelley Reynolds was demoted
12  from the field training officer position, right?
13  A   Yes, I think so.
14  Q   Is there any doubt in your mind?
15  A   I don't know what all transpired from my
16  complaint.
17  Q   Well, you no longer had him as your field
18  training officer, did you?
19  A   No.  I was moved to Dean.
20  Q   And this issue with Kelley Reynolds in the
21  meeting that you were referring to occurred in November
22  of 2009, right?
23  A   Correct.
24  Q   You didn't make a complaint to anyone after
25  November 2009 about the meeting that had occurred with

Page 98

1   he?
2      A   I don't know if it was because of this.
3      Q   You don't?
4      A   No one ever told me specifically he was demoted
5   because of that comment.
6      Q   You say nobody told you what the outcome of the
7   investigation was?
8      A   Not directly.
9      Q   What indirectly?
10     A   There were references made by employees in
11  general that he was demoted because of my complaint.
12     Q   Do you have any reason to believe that Kelley
13  Reynolds was not demoted because of your complaint?
14     A   No.
15     Q   You didn't have to work with him as your field
16  training officer any longer, did you?
17     A   No.
18     Q   So Captain Hancock, if he was involved in that
19  decision, carried out his responsibilities appropriately
20  as far as you were concerned, didn't he?
21     A   I don't -- no.  I would say no.
22     Q   Why not?
23     A   Because I felt that from the initial
24  investigation taken place by Hancock, I felt like it was
25  very uncomfortable in the fact that those two, he had

Page 99

1   made a reference -- he had made inferences and
2   specifically said Kelley was the son he never had.  It
3   was a conflict of interest.  It was -- when we had sat
4   down and talked, I felt like he was trying to talk me
5   out of my complaint, and the fact that he looked at me
6   and basically said, Well, is this Kolby being offended
7   or is this you being offended?
8      I said, Yes, this is me being offended because
9   I have worked my butt off all summer going to these SWAT
10  trainings, going and working as a reserve.  And the
11  first chance I get to work with somebody and train, the
12  first thing I get told is that female deputies don't
13  belong in Park County, which really made me feel like,
14  Wow, I just gave up a $50,000 a year job.  I just got
15  told because I am a female, I don't belong here.
16     Q   Well, Ms. Martin, you just testified before our
17  last break that you had one conversation with Captain
18  Hancock that was recorded, and potentially one other
19  conversation, but that was inconsequential and had
20  nothing to do with the issues in this lawsuit.  And the
21  one that you said that was recorded took place in 2010,
22  so that was a year after your complaint.
23     So are you now saying that you had a
24  conversation with Captain Hancock in which he talked to
25  you about the investigation into the allegations by --

Page 100

1   that you made or that Kolby Martin made against
2   Kelley Reynolds?
3      A   Yes.
4      Q   So when did that conversation take place?
5      A   November of 2009.
6      Q   So you had a 2009 conversation with Captain
7   Hancock and a 2010 conversation with Captain Hancock,
8   and the 2010 conversation was the one that you
9   tape-recorded?
10     A   Yes.
11     Q   So why is it that you didn't testify about the
12  2009 conversation with Captain Hancock earlier when I
13  asked you about any conversations with Captain Hancock?
14     MR. LAMAR:  Objection.
15     You can answer.
16     A   Because I'm doing the best I can with the fact
17  that this isn't just the one isolated incident.  This is
18  basically two years' worth of stuff that I'm trying to
19  recall.  I didn't deliberately cut anything out.
20     Q   (By Ms. Greer)  Okay.  Then let's start again.
21  In 2009 you start as a deputy with Park County, right?
22     A   Uh-huh, yes.
23     Q   And your field training officer is
24  Kelley Reynolds, right?
25     A   Yes.

Page 101

1      Q   And you go home one night and tell your new
2   boyfriend, Kolby Martin, who also happens to be a
3   deputy, that you dislike something that your field
4   training officer had said, correct?
5      A   Correct.
6      Q   And then the next day Kolby Martin takes that
7   to -- that information to, is it Sergeant Brown?
8      A   Correct.
9      Q   And Sergeant Brown does an investigation?
10     A   Yes.
11     Q   Kolby Martin comes back to you and tells you, I
12  hope you don't mind, but I decided to make this report?
13     A   Yes.
14     Q   And then how is it that Captain Hancock came
15  into this process?
16     A   My understanding was that Sergeant Brown wrote
17  up the complaint and sent it up to Captain Hancock to
18  investigate.
19     Q   And where did you get that understanding?
20     A   From my meeting with Sergeant Brown.  He told
21  me that he was going to report this up the chain.
22     Q   And what is your understanding as to what
23  happened?
24     A   Sergeant Brown wrote it up, sent it up to what
25  I can only presume would be Captain Hancock, as he

Exhibit 4 - Plaintiff Dep

Page 122

1   was just somehow being ostracized where I hadn't done
2   anything wrong by that point.
3       Q    And this last answer was all about
4   Sergeant Hardey?
5       A    Yes.
6       Q    So the issues you had with Sergeant Hardey, you
7   took up with Captain Hancock, right?
8       A    Correct.
9       Q    Did you feel that Captain Hancock addressed the
10  issues that you had with Sergeant Hardey?
11      A    I don't know.
12      Q    Well, you met with him for about 2-1/2 hours.
13      A    Yes.
14      Q    Did you feel that he was receptive to what you
15  were saying as it related to Sergeant Hardey?
16      A    Yes.
17      Q    Did you have any issues after meeting with
18  Captain Hancock about Sergeant Hardey?
19      A    No.
20      Q    What is your date of birth?
21      A    7/9/81.
22      Q    Did you have any issues with Jeff DeBerry?
23      A    No.
24      Q    Did you get along well with Jeff DeBerry?
25      A    Yes.

Page 123

1       Q    No complaints?
2       A    Not about him.
3       Q    Did you ever make a complaint about
4   Corporal Flint?
5       A    No.
6       Q    Other than going to Captain Hancock, did you
7   ever make a complaint about Sergeant Hardey?
8       A    Yes.
9       Q    To whom?
10      A    Sergeant Brown.
11      Q    When did you make that complaint?
12      A    Around the time that I had with meeting with
13  Hancock.
14      Q    Why did you go to Sergeant Brown rather than to
15  Captain Hancock if you had a complaint about Sergeant
16  Hardey?
17      A    I don't remember how it all transpired; what
18  led up to it.  But I know that Sergeant Brown was aware
19  of the ongoing issues, and that he basically had asked
20  me to come in on my own time and write up the memos that
21  I submitted pleading my case within the three days that
22  I had those write-ups in my file -- or that I had to
23  sign.
24       And Sergeant Brown felt strongly that they were
25  very inappropriately written such that he encouraged me

Page 124

1   to write them up, send them up the chain, and he would
2   help me write those to the point where they would be
3   sent to the proper command staff.  And I know that that
4   was the extent of him being aware of what was going on,
5   and I even had told him that I wanted to move shifts and
6   be under his watch.  At which point I felt that if I had
7   to answer to a supervisor, I felt most comfortable at
8   that time answering to Sergeant Brown because he was
9   consistently on shift.
10       He wasn't trying to orchestrate calls and
11  orchestrate a shift through text messages when he wasn't
12  on duty, and that everything was organized.  And there
13  was never any questions about when I was asked to do
14  something by Sergeant Brown, it wasn't contradicting.
15  He understood the laws about things, and he encouraged
16  more of the learning aspect of things at that time.
17      Q    So when you talk about you writing things up,
18  this is in response to Sergeant Hardey?
19      A    Correct.
20      Q    And Sergeant Brown helped you write up the
21  statements that you made that were provided to Captain
22  Hancock in November or December of 2010; is that right?
23      A    No.
24      Q    So when did Sergeant Brown do this?
25      A    Well, he didn't help me write them.  This was

Page 125

1   the memos that were submitted, but he was just present
2   when I wrote them.
3       Q    Did he encourage you to write them?
4       A    Yes.
5       Q    Okay.  I'm just trying to figure out what his
6   role was, but I also want to know what the timing of
7   this was.  So the issues that you brought up with
8   Sergeant Brown about Sergeant Hardey were the issues
9   that ultimately made their way to Captain Hancock,
10  right?
11      A    Correct.
12      Q    So after you had this conversation with
13  Sergeant Brown about wanting him to be the person who
14  would supervise you, did he supervise you?
15      A    Yes.
16      Q    Were you satisfied with him supervising you
17  then?
18      A    Yes.
19      Q    Did you have any issues with Sergeant Brown
20  from the fall of 2010 on?
21      A    Not until I needed my back surgery.
22      Q    What were your issues with Sergeant Brown with
23  respect to your back surgery?
24      A    Basically after I had returned from my back
25  surgery, I was allowed to have my husband take me to and

Page 126

1  from work when he was on duty so that I could take my
2  pain medications as prescribed.  It was arranged that we
3  would have the same hours so that I wouldn't have to
4  drive, and I could take things as prescribed.
5      But within a week that Kolby was taking me to
6  work, the complaint was made that Kolby shouldn't take
7  me to work.  And I don't know who made the complaint,
8  but I was advised by Welles Tonjes that someone felt
9  like he should not be taking me to work, and he said,
10  We're doing this as favor to you, but --
11      Q   You said he said we're doing this as a favor to
12  you.  And at this stage I've got Tonjes and Kolby both
13  in there as males, so I'm trying to figure out who said
14  what.
15      A   Welles said the department was doing this as a
16  favor to me, and that Kolby was not allowed in the
17  sheriff's office.  And I needed to take his mail out to
18  him, and he was not to be in the sheriff's office at all
19  while I was there.  And it became very difficult to do
20  his stuff because I became the middleman rather than
21  just allowing him to do his job.
22      After the second week I was there under these
23  restrictions, I was beyond offended that so many
24  stipulations were put on me under a medical requirement,
25  and yet after Kelley and Cindy were allowed to have an

Page 127

1  affair, they are going to blatantly eat lunch in front
2  of me while my husband is not even allowed to be in the
3  office with me.
4      So at the team meeting on August 17th, I had
5  complained to Welles about how I felt like it was very
6  hard to see so many stipulations put on me because of
7  the fact that he wasn't supposed to be taking me to work
8  anymore -- or he was supposed to be taking me to work.
9  So I complained to him.  He looked at Sergeant Brown and
10  told him about what I thought was unfair.  The team
11  meeting was over, so they brought me back into the
12  kitchen area over at the fire station, and I tried to
13  explain to him one more time.
14      Q   Which him?
15      A   Welles.  And so I told him that I was sorry and
16  that I just didn't feel like it was fair that I was put
17  under so many different stipulations with my husband
18  after we had just gotten married.  I had just gotten
19  back from back surgery.  He looked at me and told me to
20  shut up.  And then him and Sergeant Brown brought me
21  back into the kitchen, shut the door, and they began
22  screaming at me about how unappreciative I was.
23      Welles became irate with me to the point where
24  he was saying, This is bullshit.  He was slamming his
25  fist in front of my face.  I became so frightened that I

Page 128

1  just blacked out, started shaking.  Brown sat there
2  across the table and watched the whole thing take place.
3  I don't remember what happened after that because I
4  blacked out because I was so scared of Welles.
5      After the incident I left with Kolby, and he
6  was so mad because of the fact that he said if I
7  wouldn't be out talking to the fire guys, I would have
8  been there to protect you, and I wasn't.  I was so
9  scared after that and basically arguing whose shift I
10  was going to be on.  They said that at one point I
11  wasn't going to be on anybody's shift, and I was going
12  to be working graveyard shift so I wasn't going to see
13  anybody from the department.  They decided that I would
14  work under Brown Monday through Friday.  I called him
15  that night, and I told Brown, Well, this is going to be
16  an issue for me to go to therapy.
17      He said, Well, then I guess you are going to
18  have to use your vacation time.  That's when I didn't
19  have any vacation time left because I was banking on
20  donated time.  My donated time came strictly off of what
21  Kolby had because of the fact that the County never
22  reached out and put out any kind of email like they do
23  for anybody else.  So whatever donated time I had was
24  based on whatever I had from my husband.
25      So I went to my -- I basically had no way of

Page 129

1  getting -- because they had taken away my rides to work
2  at that point, I couldn't take any medications.  I
3  called them the next time that I needed to turn in my
4  time card and made sure that Brown was going to be
5  there, because out of the two of them I felt safer being
6  around Brown than I did being around Welles.  So I asked
7  when he would be there so I could turn in my time card.
8      He said that he would be there, and I planned
9  this so that I wouldn't have to take my medication to
10  drive.  So I got there.  He asked me if I had taken my
11  medications prior to, which in my assumption was to- the
12  fact that I felt they were going to arrest you for DUID
13  if I had taken anything.
14      So I told them no, which was the truth, and
15  that I had planned this accordingly so I could drop
16  things off before I needed to take my pain medications.
17  I was so angry because of the fact of what they had
18  orchestrated at the fire station had basically hindered
19  so much of my recovery, and I couldn't take my pain
20  medications from that point forward because of the fact
21  that I had to drive myself to and from work Monday
22  through Friday and still find time to go to therapy with
23  no time off.
24      Q   Did you tape record the August 17 conversation?
25      A   No, because I didn't know this was going to be

Page 130

1  such a hostile environment.
2      Q    Did you make any notes of the August 17th
3  conversation?
4      A    Basically I had just come home and told Kolby
5  about it.  That's it.
6      Q    Cindy Gharst offered to get you rides to and
7  from work so that you could carpool, didn't she?
8      A    Not until December, but, yes.
9      Q    Did you ever ask for any opportunity to carpool
10 before that?
11     A    Yes.
12     Q    Who did you ask?
13     A    I asked Cindy for my rides back from Kolby.
14     Q    I'm sorry.  I don't understand what that means.
15     A    I asked her to go back to the way things were,
16 and that I was hoping she would be able to help me out
17 with having Kolby take me back to work.  And I explained
18 to her the difficulties of what they orchestrated and
19 the fact that I told her I couldn't take my medications.
20 I told her that this doesn't give me to time to go to
21 therapy, and that what they had put together for a
22 schedule didn't work.
23     Q    When you say "they" put together the schedule,
24 are you referring to Brown and Tonjes?
25     A    Uh-huh.

Page 131

1      Q    Yes?
2      A    Yes.
3      Q    And this was working Monday to Friday?
4      A    Uh-huh, yes.
5      Q    What hours?
6      A    I believe it was 8:00 to 5:00.
7      Q    What shift was your husband on at that time?
8      A    I think he was working Sunday through Wednesday
9  6:00 to 4:00.
10     Q    6 p.m. to 4 a.m.?
11     A    6A to 4P.
12     Q    So if your husband was working 6:00 to 4:00,
13 how was he going to be your carpooler if you were
14 working 8:00 to 5:00?
15     A    Because at that time I was coming in when he
16 was coming in, and my hours were according to what he
17 was working.
18     Q    So you were working 6:00 to 4:00 rather than
19 8:00 to 5:00?
20     A    Correct.
21     Q    What restrictions, if any, did you have from
22 your doctor as of August 17, 2011?
23     A    No bending, lifting, and twisting.
24     Q    You weren't doing any patrol deputy work,
25 right?

Page 132

1      A    Right.
2      Q    No bending, lifting, twisting, and you were on
3  medication, right?
4      A    Correct.
5      Q    Medication that limited your ability to drive,
6  medication that limited your ability to operate certain
7  types of machinery, right?
8      A    Yes.
9      Q    Any other limitations as a result of the
10 medication?
11     A    Not that I know of.
12     Q    What type of work were you doing when you would
13 be at the office?
14     A    Scanning documents.
15     Q    What documents were you scanning?
16     A    Old police reports.
17     Q    Was scanning documents an accommodation that
18 was made for you so that you could continue to work in
19 some the capacity?
20     A    I think so.
21     Q    Well, scanning documents wouldn't be part of
22 your responsibilities as a patrol deputy, would they?
23     A    No.
24     Q    Did you report to anyone at a rank higher than
25 sergeant that you felt intimidated by Sergeant Tonjes?

Page 133

1      A    Nope.
2      Q    When did your doctor determine that you needed
3  another surgery?
4      A    September 21st.
5      Q    How much had you worked between August 17th and
6  September 21st?
7      A    I don't remember.  I know there was a week off,
8  I think, or two weeks that I wasn't permitted to come
9  back until I got a doctor's note.
10     Q    And is the only work that you did when you were
11 back before September 21st work that you did scanning
12 documents?
13     A    Yes.
14     Q    Did anyone assist you scanning documents?
15     A    Only if I had computer problems.
16     Q    Where were you doing this work?
17     A    In the squad room.
18     Q    In Fairplay?
19     A    Yes.
20     Q    What was your husband's territory?
21     A    I think they moved him to Bailey at that point.
22 I'm not sure.
23     Q    When did you have your first surgery?
24     A    July 1st.
25     Q    What was the date of your wedding?

Exhibit 4 - Plaintiff Dep

Page 134

1    A    July 23rd.
2    Q    How did you injure your back?
3    A    Originally I think I hurt it weight-lifting at
4  the fire station, and I can't pinpoint exactly the date.
5  It was spring of 2010, I want to say.
6    Q    So you were married about three weeks after
7  your first back surgery?
8    A    Correct.
9    Q    Did you take a honeymoon?
10   A    No.
11   Q    How long were you off after your first back
12 surgery?
13   A    I believe it was a month.
14   Q    So were you off on medical leave at the time
15 that you were married?
16   A    Are you asking was I on FMLA?
17   Q    Were you on any kind of leave from work at the
18 time you were married?
19   A    Taking vacation and sick time, so, yes.
20   Q    So you weren't working?
21   A    Right, yes.
22   Q    And you said you were off for a month, right?
23   A    Yes.
24   Q    Weren't you offered the opportunity to take
25 sick leave so you could go to physical therapy?

Page 135

1    A    Yes.
2    Q    Where was your physical therapy?
3    A    Lakewood.
4    Q    Where was your surgery?
5    A    Sky Ridge Medical Center here in -- what is
6  it? -- Lone Tree, I think.
7    Q    What medications were you on that prevented you
8  from being able to drive or operate equipment?
9    A    It was either Vicodin or Percocet.  I can't
10 remember which one it was.
11   Q    During what period of time were you on that?
12   A    From the end of surgery on July 1st through --
13 I know I was occasionally still taking it through
14 August.  At that point it was on an as-needed basis,
15 which -- I mean, at that point I was trying to use it
16 mainly to get to sleep and if I was having a bad day
17 with pain.
18   Q    After your doctor told you that you needed
19 another surgery September 21st, did you continue to
20 work?
21   A    For one more day, yes.
22   Q    So you worked until September 22nd?
23   A    Yes.
24   Q    What was the next surgery that you had to go
25 through on your back?

Page 136

1    A    I had to have a spinal fusion.
2    Q    Was that also done at Sky Ridge?
3    A    Yes.
4    Q    Between September 22nd and the date that you
5  resigned, how many days did you work at the Park County
6  Sheriff's Office?
7    A    None.  If I remember right, that week was my
8  last week.  I was told there was no more light duty for
9  me.
10   Q    Did you work at all after your surgery?
11   A    I think I came back for a week, maybe two.
12   Q    What did you do during the week or two that you
13 came back?
14   A    Scanned documents.
15   Q    When did your doctor release you to return to
16 full-time employment?
17   A    With no restrictions?
18   A    With no restrictions.
19   A    I was released January 17th.
20   Q    When were you released to return with
21 restrictions?
22   A    Within approximately, I want to say, it was
23 within a couple days of the detective testing, so
24 November 29th I think I came back.
25   Q    So is that the time period when you began doing

Page 137

1  the scanning?
2    A    Yes.  I scanned again.
3    Q    You didn't provide any kind of release from
4  your doctor before the detective testing, did you?
5    A    No.
6    Q    Who was your doctor?
7    A    Dr. Chad Prusmack.
8    Q    How do you spell the last name?
9    A    P-r-u-s-m-a-c-k.
10   Q    Did Dr. Prusmack know you were a sheriff's
11 deputy?
12   A    Yes.
13   Q    Did Dr. Prusmack give you any restrictions in
14 terms of what you could do as you were scanning
15 documents?
16   A    He -- yes.
17   Q    What did he say?
18   A    He basically had just told me not to be lifting
19 anything I think over -- was it 15 or 30 pounds.  I
20 can't remember what the piece of paper said.  And then
21 not to be really doing a lot of twisting, but
22 necessarily just no overt movements as far as making
23 them, you know, very distinct until that disk could
24 heal.  He said any kind of very sharp movements would
25 ultimately compensate that disk until it was finished

35 (Pages 134 to 137)

Exhibit 4 - Plaintiff Dep

Page 138

1   scarring over.
2       Q    Were you restricted in terms of how long you
3   were supposed to sit or how long you were supposed to
4   stand?
5       A    He just told me to get up and walk around maybe
6   once an hour or so, which I would follow through with.
7       Q    During the time between September 22nd and the
8   date you resigned from the Park County Sheriff's Office,
9   you did not receive any disciplinary action, did you?
10      A    No.
11      Q    You were not suspended?
12      A    No.
13      Q    You were not demoted?
14      A    No.
15      Q    You were not written up?
16      A    No.
17      Q    You didn't make any complaints to the captain,
18  undersheriff, or the sheriff between September 22nd and
19  the date you resigned, did you?
20      A    No.
21      Q    You didn't make any complaints to Cindy Gharst,
22  did you?
23      A    Yes.
24      Q    What complaint did you make to Ms. Gharst?
25      A    The stipulations that I was put under basically

Page 139

1   made it really hard on my recovery.
2       Q    You're talking about the complaint that you
3   said you made on August 17th, that you didn't like the
4   schedule you were given of 8:00 to 5:00 Monday through
5   Friday.
6       A    I had pointed out to her I couldn't take my
7   pain medications as required because of the fact that I
8   wasn't able to ride to work with Kolby anymore.  I had
9   told her that the hours were not accommodating for me to
10  be able to get down to the city to do my physical
11  therapy.  And that in order for me to go, I had to be
12  using all of my time off, which was limited based on how
13  much Kolby had left to donate to me.
14      Q    When I asked you about how many people you got
15  along with in the department, you indicated as of the
16  time you left, you got along with Yoshi Goto and your
17  husband and Brenda and one other person, right?
18      A    Correct.
19      Q    Did those people ever make any donation of any
20  time for you?
21      A    Yoshi was the only person that I know of that
22  donated any time.
23      Q    You never put a complaint to Cindy Gharst in
24  writing in the summer of 2011, did you?
25      A    Not that I can recall.

Page 140

1       Q    Did you record conversations with Ms. Gharst?
2       A    Yes.
3       Q    Did you tell her you were recording
4   conversations with her?
5       A    No.
6       Q    You testified earlier that as of August, you
7   were on an as-needed basis for the Vicodin or Percocet.
8   So you were not ordered on August 17th by your doctor to
9   take a certain amount of medication any day, were you?
10      A    Yes.
11      Q    What were you ordered to take?
12      A    I was to take -- I believe I was on an
13  antiinflammatory.  I can't remember what the name of it
14  was.  I was taking that alternating with the Vicodin
15  every four to six hours as needed for pain.  And I had
16  it down to basically a schedule that I would take it
17  before I would leave for work and then get me through
18  the day, and then I wouldn't need anymore until I got
19  home at the end of my shift, so that I could at least
20  get through my days functional while I was icing and
21  whatnot sitting there scanning.
22      Q    You had used all your own annual -- or vacation
23  leave and sick leave as of August 17th; is that right?
24      A    I think so, yes.
25      Q    As long as you were working though, you

Page 141

1   continued to accrue leave, correct?
2       A    Correct.
3       Q    Did you apply for jobs after your surgery and
4   before you resigned?
5       A    Yes.
6       Q    Was your job application with Commerce City for
7   which you had the psychological evaluation after your
8   surgery of 2011 and before you resigned?
9       A    Yes.
10      Q    And that's the one for which you were found not
11  fit for duty?
12      A    Correct.
13          MS. GREER:  Let's take a break.
14          (A recess was taken from 1:43 to 1:52 p.m.)
15      Q    (By Ms. Greer)  Did anyone assist you in
16  writing your charge of discrimination for the Equal
17  Employment Opportunity Commission?
18      A    Yes.
19      Q    Who?
20      A    Lisa Sahli and Darold Killmer.
21      Q    What did you do to prepare for this deposition
22  today?
23      A    Spoke with my attorney about what to expect.
24      Q    I don't want to know the content of any of your
25  communications with him.

36 (Pages 138 to 141)

Page 154

1  come out until after the fact was resolved, and I had to
2  have someone else come out and back me up.
3      Q   And Welles Tonjes backed you up, right?
4      A   Yes, because he didn't hear anybody else call
5  out, so he headed that way to come assist me.
6      Q   When did this incident occur?
7      A   Approximately October, I think, of 2010.
8      Q   Did you report this incident and the lack of
9  backup to the sheriff or the undersheriff?
10     A   No.
11     Q   Did you make any complaint to Mr. -- to
12 Sergeant Tonjes?
13     A   Yes.  I told -- I told Tonjes how disappointed
14 I was.
15          And he said, Well, it's clear he doesn't like
16 you.
17          I said, I know that.
18     Q   Is that all you told him?
19     A   I trusted that he would take it up because he
20 had a better relationship with the command staff at that
21 point.  And I wasn't going to make waves because I had
22 already been told at that point if I brought up anymore
23 concerns, I wouldn't make it through my job.
24     Q   Who told you that if you brought up anymore
25 concerns, you wouldn't make it through your job?

Page 155

1      A   Sergeant Brown.
2      Q   When did Sergeant Brown say that to you?
3      A   In June of 2010, I believe.
4      Q   Did you ever report Sergeant Brown's statement
5  to anyone?
6      A   No.
7      Q   Why not?
8      A   Because it was clear at that point that I was
9  going to keep my mouth shut and just do what I was told
10 to do, whether or not I felt comfortable with it,
11 because I needed my job.
12     Q   Is there anything else that anybody did that
13 you considered to have been retaliatory because of your
14 initial complaint through your husband about Kelley
15 Reynolds' conduct?
16     A   I feel that it was an ongoing issue.  There
17 were some other incidences that Kelley had failed to do
18 his job on retaliation that I can think of.
19     Q   Kelley had failed to do his job on retaliation.
20 What are you talking about?
21     A   That he failed to do his job in regards to it
22 was a continual retaliation.
23     Q   What are you talking about?
24     A   I don't know if you're just looking for one
25 incident.

Page 156

1      Q   No.  I want to know -- this is my opportunity
2  to ask you every -- ask you about every single fact upon
3  which you base your lawsuit.  You've made a retaliation
4  lawsuit claim against the sheriff's department.  I need
5  to know what is the basis for your claim that you were
6  retaliated against because of the fact that you made a
7  charge against Kelley Reynolds, or if there is any other
8  basis that you believe that you were retaliated against.
9  This is when we need to hear it.  So if you got it, tell
10 us.
11     A   I feel that Kelley didn't show up for calls
12 when I had told him the times when the kids were
13 alleging that they were going to spray other kids with
14 urine after school.  I had advised him the day before of
15 what was going on, the time that the school was going to
16 get out, and that he never showed up.  So I was going to
17 be deal with a potential fight with an entire school
18 pissed off because of the fact they were sprayed with
19 urine, and I had no backup yet again because of the fact
20 that I asked someone that I filed a complaint on two
21 years ago.  I felt like --
22     Q   Why did you make the request of Kelley?
23     A   Because he was the supervisor on duty, and I
24 was trying to at least push past the fact that I had
25 filed a complaint on him.  I knew he didn't like me.  I

Page 157

1  consistently was isolated from stuff where he come into
2  the squad room, say hi to everybody, leave me out of
3  things purposely.
4          And I was to the point where I accepted, it is
5  what it is, he didn't like me, but I was going to use my
6  supervisor and be the bigger person.  So when I leaned
7  on my supervisor, I got no backup in return.
8      Q   And when you say your supervisor, you mean who?
9      A   Kelley.
10     Q   When did Kelley become your supervisor again?
11     A   When I was still working in the SRO position
12 that spring.
13     Q   Was he your supervisor for every single shift?
14     A   No.  There were days that he was working day
15 shift, and I had to lean on him.
16     Q   Did you report to anyone the failure of Kelley
17 to provide support when he was your -- the person that
18 you called when you were the school resource officer?
19     A   Yes.
20     Q   Who did you make the complaint to?
21     A   Welles Tonjes and Sergeant Brown.
22     Q   What did they say?
23     A   They said, Well, what good does it do us to
24 hear any of this stuff?  Because they were angry because
25 I wasn't going to file suit on the commissioner for his

Page 158

1  alleged incident with the Barbie dance, and because of
2  the fact that I was still trying to salvage my job, and
3  I didn't want to file a lawsuit at that point. And I
4  told them I was uncomfortable suing the County.
5       They basically had told me, Well, we don't need
6  to do anything about this because it's not like you're
7  going to sue anybody anyways.
8     Q   What are you talking about, them wanting you to
9  sue the County?
10    A   They were -- Sergeant Brown and Welles Tonjes
11 were all in agreement that they were so appalled by what
12 the commissioner had asked of me, and the fact that he
13 had asked me to dance in front of four different classes
14 of kids and put my hand on my head and my hand on my hip
15 because it looked better in uniform, and he told me all
16 this. And the kids didn't even partake in this because
17 they were so uncomfortable with it.
18      I had told Welles Tonjes about this incident
19 after it had occurred. And at that point I had reported
20 it to him, I was in tears, I was crying. I was
21 mortified that this was what he thought of a deputy, let
22 alone a female deputy, that he is going to humiliate her
23 in front of an entire middle school.
24      And then in return, because of the fact I'm
25 trying to salvage my job and give the County the benefit

Page 159

1  of the doubt, and I'm not wanting to sue them, they
2  won't protect me from Kelley's ongoing retaliations of
3  not liking me because I filed a complaint two years ago.
4  I was so angry with the fact that I felt like they
5  didn't protect me, and no one wanted to help me.
6     Q   But you did make a complaint about the
7  commissioner's conduct, didn't you?
8     A   Correct.
9     Q   And Cindy Gharst addressed that, didn't she?
10    A   Correct.
11    Q   And you were satisfied with the response,
12 weren't you?
13    A   No.
14    Q   What did you want to have happen?
15    A   I wanted something to happen where at least
16 there was some kind of disciplinary action held standard
17 to a commissioner that is willing to -- that is held to
18 a different standard, an elected official. And like I
19 had told Cindy, I said, So it's gone to the point of
20 I've had an FTO trainer tell me that I wasn't able -- or
21 that Park County didn't need to be hiring deputies. It
22 goes to the level of sergeants harassing me and
23 basically telling me that I don't matter.
24      Now it's to the point where I've got an elected
25 official, and I've basically expressed to her, How far

Page 160

1  up the chain do I have to go before somebody is going to
2  put their foot down and say enough is enough. And I was
3  so offended when I had a state patrol officer hear about
4  the situation who tells about he basically treated you
5  like a stripper.
6       And yet because of the fact that they allowed
7  his insubordinate [sic] do the investigation, yeah,
8  she's not going to rule in favor. And I saw the
9  evidence that was submitted over the cheers that were
10 given to him, and nowhere in there was a Barbie cheer as
11 part of this.
12      So to me it was offensive. The undersheriff
13 even had told me that his wife was offended by this, so
14 how many other people does it take to be offended by
15 this guy's comments and humiliation that he put me
16 through. And then to turn around, yeah, I'm a little
17 offended because when it's all said and done, now he is
18 working in the capacity with other female deputies that
19 he turned around and basically told me I looked good in
20 uniform to go dance as a Barbie.
21      I'm sorry, but it's just -- I find that very,
22 very offensive that nothing was ever done to that.
23    Q   What do you believe that any person can do to
24 an elected official short of start a recall campaign?
25    A   I don't know what was supposed to happen, but I

Page 161

1  felt the fact that it was just brushed under the rug, I
2  felt like there was nothing else, except maybe a slap on
3  the hand, that here is -- you know, he is allowed to
4  treat a female in this --
5       (Deposition Exhibit 2 was marked.)
6       (By Ms. Greer) I'm handing you what's been
7  marked as Deposition Exhibit 2. Did you get a copy of
8  this document?
9     A   Yes.
10    Q   If you read the fourth paragraph about your
11 frustration about a prior complaint of sexual
12 harassment --
13    A   Uh-huh.
14    Q   -- do you disagree with Ms. Gharst's statement,
15 based on the information she was provided, your
16 complaint from 2009 was investigated and resolved with
17 disciplinary action against the other party?
18    A   No.
19    Q   You don't disagree?
20    A   Or, yes, I do disagree.
21    Q   So are you saying there wasn't disciplinary
22 action against Kelley Reynolds?
23    A   No, that's not what I'm saying.
24    Q   Then what do you disagree with?
25    A   The fact that it was resolved.

41 (Pages 158 to 161)

Exhibit 4 - Plaintiff Dep

Page 162

1   Q   What more did you want?

2   A   For Kelley to actually be expected to do his
3  job and face the fact that he was slapped on the hand
4  for the fact that it was inappropriate, instead of
5  continuing on for two years and holding it against me to
6  the point where I questioned whether or not my life is
7  worth anything to him.

8   Q   What contact did you have with Kelley Reynolds
9  between the 2009 complaint and when you were a school
10 resource officer?

11  A   He was my backup on occasions.

12  Q   How frequently?

13  A   I don't remember.  Probably maybe 10, 15 times
14 max.

15  Q   Do you see the last sentence of Paragraph 4,
16 "Through restructuring you have now been reporting
17 through a new chain of command of which you expressed
18 support and satisfaction."  Is that accurate?

19  A   As of June 8th, yes.

20  Q   Is there anything else that you believe
21 supports your complaint of retaliation?

22  A   I feel that a majority of the incidents that
23 occurred after I returned from having my back surgery,
24 and just prior when Welles told me if I thought I was
25 going to receive -- if I was going to have back surgery,

Page 163

1  I should plan on getting my walking papers was a very
2  significant form of retaliation.

3   Q   Did you complain to anyone about what Welles
4  told you?

5   A   No.

6   Q   What did you think -- let me rephrase that.

7      You said you think it was a significant form of
8  retaliation.  For what?

9   A   The fact that I wouldn't file lawsuits.  The
10 fact that I -- because of the fact that I never went
11 after the commissioner.  I had no support over anything
12 that was going on with Kelley Reynolds, and he knew
13 about it the entire time, because I reported to him as a
14 sergeant trusting that he would take care of it
15 accordingly.  It never happened that I was aware of.

16      And when I had come back from having surgery
17 and basically told him how unfair it was that we were
18 put under separate stipulations, that Kolby was not
19 allowed in the office with me, that he couldn't take me
20 to work after I had complained.  The incident at the
21 fire station should have never happened if he was able
22 to control his anger with me.  And the fact that I ended
23 up going through and having to have a second MRI done
24 after August 17th to make sure there was no structural
25 damage from what two sergeants had basically put me

Page 164

1  through in the firehouse, and --

2   Q   Neither of those sergeants touched you, did
3  they?

4   A   No, but they scared me to the point where I
5  looked down, and I was physically shaking from head to
6  toe.  Had I been out on the road and had I been in the
7  capacity of being in full duty, I would have been
8  authorized to probably use force to control this person.
9  But because it was my supervisor and because for the
10 fact they took away my ability to carry a firearm, I
11 felt so defenseless sitting in that firehouse because I
12 had two officers, superiors nonetheless, carrying
13 firearms that I didn't feel free to even leave the
14 office.

15      I felt trapped.  I had two individuals using
16 profanity with me.  And, meanwhile, I asked my attorney
17 for a criminal investigation done.  I reported it to
18 Yoshi because I didn't know.  And everybody kept telling
19 me that this should have been -- that this doesn't
20 warrant any kind of criminal investigation.  I didn't
21 know how to even report it to anybody.

22      But I was so angry, so hurt, and the fact that
23 I ended up to the point where I had to go in for
24 counseling over this whole thing, the fact that I
25 couldn't even sleep until they started putting me on

Page 165

1  fricking Ambien every night.  I was on Celexa.  I was on
2  a bunch of medication because of how bad they scared me.

3      But somehow because of the fact that they are a
4  superior, that they are allowed to do whatever they
5  want, say whatever they want, and act however they want,
6  and there is no criminal investigation?  Yes, I am a
7  little offended that this officer can -- all I wanted
8  was some follow-up for the fact that I told somebody
9  that Kelley Reynolds should not have said anything about
10 Park County not hiring female deputies.

11  Q   Who did you tell you wanted a criminal
12 investigation?

13  A   I had told my attorneys originally, which they
14 did nothing about.  I told Yoshi.  He said, Well, that's
15 a fine line.  Nobody is going to be able to do it.  And
16 I kept asking him, Who do I report it to?  I had tried
17 to find -- because he originally had made an
18 investigation on a prior sexual harassment case.  I was
19 trying --

20  Q   Who had made an investigation on a prior sexual
21 harassment --

22  A   I tried to find Phil Baca's phone number.  I
23 basically tried to use any resources I possibly could
24 find where I felt safe enough, because I knew I wasn't
25 going to be able to report it within the County because

Exhibit 4 - Plaintiff Dep

Page 166

1   of the fact that the history behind it was to the point
2   where I knew nobody was going to do anything.
3       Q   You didn't report to any of your superiors that
4   you felt threatened by what happened in the meeting with
5   the two sergeants, did you?
6       A   No.
7       Q   And Tonjes wasn't even with the department when
8   the Kelley Reynolds issue happened in 2009, was he?
9       A   No.
10      Q   So are you saying that you believe that Kelley
11  Reynolds -- that Sergeant Tonjes retaliated against you
12  because of your complaint against Kelley Reynolds?
13      A   He was aware of it, yes.
14      Q   That's a different question.  He may have been
15  aware of it, but what is the evidence that you have that
16  Sergeant Tonjes took any action toward you in
17  retaliation for your complaint against Kelley Reynolds?
18      A   Because I originally had told him that all of
19  this stuff was circulating around the original
20  complaint.  And he wasn't going to help me because of
21  the fact that I wouldn't sue Commissioner Tighe.
22      Q   Are you saying that Sergeant Tonjes wanted you
23  to Sue Commissioner Tighe?
24      A   Yes.
25      Q   What did he say?

Page 167

1       A   He said, Well, you can take him for everything
2   he has.  He said, I would go after him for everything he
3   has.
4       Q   And what did he say when you told him you
5   weren't going to do that?
6       A   He was angry, and he basically had said, Well,
7   any point you basically make bringing forward is just
8   going to be you crying wolf.  He said, We don't even
9   have to believe you.
10      Q   Did Sergeant Brown make any statements to you
11  about suing Commissioner Tighe?
12      A   Yes.
13      Q   What did he say?
14      A   He said, Well, shoot, you could take him for
15  his house.  You could take him for everything.  And I
16  told him I was never really -- I was never really to the
17  point of wanting to be that vindictive with people.
18      Q   But what is it that causes you to believe that
19  those two sergeants took any action that was based upon
20  the complaint against Kelley Reynolds?
21      A   Because nobody else out of married couples were
22  put under that same stipulation as Kolby and I were.
23  Nobody else had been put under the stipulations of not
24  being able to get a ride to work under the medications.
25  And even after I had basically brought it forth to Cindy

Page 168

1   that I needed a ride from Kolby, the explanation I had
2   gotten back was, Well, if he gets a call, then he's
3   going to have to dump you on the side of the road, which
4   I took very much offense to because what is the purpose
5   of having a civilian ride-along when I'm POST certified.
6       I have proper training.  I've been certified on
7   a firearm, for that matter.  If, God forbid, something
8   happened on the call to the point you're going to tell
9   me that my husband has to dump me on the side of the
10  road because he gets a call, but you're going to take a
11  civilian ride-along who doesn't have any training
12  whatsoever.  To me, I took very much offense to that
13  because, to me, says, Because you filed a complaint, and
14  if something happens, have fun walking 285 because of
15  the fact that you're not allowed the same treatment that
16  other people under light-duty status receive.
17      Q   What makes you believe that Cindy Gharst took
18  any action because of your complaint against Kelley
19  Reynolds?
20      A   Because she was aware of all of this from day
21  one.  And whether or not she was necessarily the person
22  to orchestrate all this, it was pretty clear that there
23  was retaliation that was a knee-jerk reaction out of all
24  of this.  Because when I had this meeting with her and
25  told her that I could not take my medications, that I

Page 169

1   could not get a ride into work, I needed Kolby, I needed
2   my therapy time in order to get over my surgery and
3   recover the way I needed to.  They turned around and
4   basically that day told me, Oh, there is no more light
5   duty for you, which was a lie and a half because I
6   wasn't even done scanning.
7       So to me that told me that was a clear
8   knee-jerk reaction because I had brought to her
9   attention things that had gone on since the August 17th
10  incident at the firehouse, because none of these
11  stipulations would have been put forth on me if I would
12  not have complained to them about how I did not agree
13  with the stipulations that Kolby and I were being set
14  forth that were different from everybody else.
15      Q   Are you aware of any other deputies who were on
16  the same medications that you were?
17      A   Yes.
18      Q   Who?
19      A   My understanding was that Becky Bramlett was on
20  medications and still allowed to carry her firearm.
21      Q   Do you know whether her doctor imposed any
22  restrictions on her as a result of any medications?
23      A   No.
24      Q   Are you aware of anyone else who was under
25  doctor's restrictions like you were who was allowed to

Exhibit 4 - Plaintiff Dep

Page 178

```
 1    A    Yes.
 2    Q    What are you mad at them for?
 3    A    Because while I'm trying to get my family back
 4   together, it seems like they're so involved with keeping
 5   him involved in the law enforcement capacity because of
 6   his dad that passed away, that I can't have my family
 7   back together no matter how much I want it because of
 8   the fact that they're going to make him continue to
 9   pursue his job, whether or not he can find a job down
10   here or not.
11    Q    Was his dad involved in law enforcement?
12    A    Yes.
13    Q    In what capacity?
14    A    He was, I believe, a lieutenant by the time he
15   retired from Arapahoe County.
16        MS. GREER:  Let's take a break.
17        (A recess was taken from 2:47 to 2:57 p.m.)
18    Q    (By Ms. Greer)  Ms. Martin, there were a number
19   of reasons you didn't want to return to work in January
20   of 2012, weren't there?
21    A    Yes.
22    Q    You didn't like the pay for Park County, right?
23    A    Yes.
24    Q    You wanted to complete your physical recovery,
25   correct?
```

Page 179

```
 1    A    Yes.
 2    Q    You were having trouble sleeping?
 3    A    Yes.
 4    Q    Any other reasons that you did not want to
 5   return to work for the Park County Sheriff in January of
 6   2012?
 7    A    Yes.  I didn't feel safe.
 8    Q    Anything else?
 9    A    Not that I can think of.
10        MS. GREER:  I don't have any other questions.
11        MR. LAMAR:  That was a short hour.
12        (The deposition concluded at 2:58 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 180

```
 1              A F F I D A V I T
 2
     STATE OF COLORADO        )
 3                            ) ss.
     COUNTY OF                )
 4
 5        I have read my deposition, and the same is true
 6   and accurate, save and except for changes and/or
 7   corrections, if any, as indicated by me on the amendment
 8   sheet(s) attached hereto as indicated.
 9
10   Amendment Sheet(s) attached [ ]
11   No changes; no amendment sheet attached [ ]
12
13   _____
               ABBY N. MARTIN
14
15   SUBSCRIBED AND SWORN TO before me on this
16   _____ day of _____, 2013.
17   My commission expires:
18
19   _____
               NOTARY PUBLIC
20
21   in and for the State of _____
22
23
24
25
```

Page 181

```
 1              C E R T I F I C A T E
 2
     STATE OF COLORADO      )
 3                          ) ss.
     COUNTY OF DOUGLAS      )
 4
 5
        I, Nathan Stormo, Registered Professional
 6   Reporter and Notary Public in and for the State of
     Colorado, duly appointed to take the deposition of
 7   ABBY N. MARTIN, certify that prior to the examination
     the deponent was duly sworn to testify to the truth in
 8   the matters in controversy between the parties herein;
     that the deposition was taken in shorthand by me at the
 9   time and place aforesaid and was thereafter reduced to
     typewritten form by me and processed under my
10   supervision, the same consisting of 180 pages, and that
     the same is a full, true and complete transcription of
11   my shorthand notes.  I further certify that I am not
     related to, employed by, nor counsel to any of the
12   parties herein, nor otherwise interested in the events
     of the within cause.
13
14
        A transcript review of this deposition was
15   requested and is available to the deponent as notified
     by me.
16
17
        IN WITNESS WHEREOF, I have affixed my notarial
18   seal this 9th day of December, 2013.  My commission
     expires November 20, 2017.
19
20
21   _____
                Nathan Stormo
22          Registered Professional Reporter
23
24
25
```

Exhibit 4 - Plaintiff Dep

Page 182

1              IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
2
   Civil Action No. 1:13-cv-00884-PAB-KMT
3  _____

4  VOLUME II DEPOSITION OF ABBY N. MARTIN
   EXAMINATION DATE:  February 19, 2014
5  _____

6  ABBY MARTIN,

7  Plaintiff,

8  v.

9  FRED WEGENER, IN HIS OFFICIAL CAPACITY AS SHERIFF OF
   PARK COUNTY, CO.,
10
   Defendant.
11 _____

12          PURSUANT TO NOTICE, the Volume II
   deposition of ABBY N. MARTIN was taken at 8:00 a.m.
13 on February 19, 2014, at 1700 Broadway, Suite 1020,
   Denver, Colorado, before Shauna T. Dietel, Registered
14 Professional Reporter and Notary Public in and for
   the State of Colorado, said deposition being taken
15 pursuant to the Federal Rules of Civil Procedure.

16

17

18

19

20
                   Shauna T. Dietel
21          Registered Professional Reporter

22

23

24

25

Exhibit 4 - Plaintiff Dep

Page 203

1  recycle bin with a -- with a bunch of my old case
2  reports that didn't -- or notes from the case
3  reports.
4      Q   Turn to 524.  There is an entry for Sunday
5  -- excuse me -- Sunday, August 14th.
6      A   Uh-huh.
7      Q   And it says Officer Becky -- blank.  Who is
8  that?
9      A   It's Becky Bremmlet (phonetic).  I couldn't
10 remember the spelling on her name when I was typing
11 at that time.
12     Q   What is your understanding as to what her
13 position was?
14     A   She is an animal control officer.
15     Q   In the second bullet point after
16 repercussions for reporting discrimination --
17     A   Uh-huh.
18     Q   -- it says, While this screaming, pounding,
19 and slamming was happening, the Como Fire Department
20 was in the building having a meeting and heard the
21 incident.  They were concerned, and one of them was
22 even frightened.
23         They will give a statement as to the
24 severity of the inappropriate action of the two
25 sergeants.

Page 204

1          Who are the people you're referring to who
2  will give statement -- a statement as to the severity
3  of the actions?
4      A   It was Colleen Darymple.
5      Q   Could you spell that last name.
6      A   I believe it's D-A-R-Y-M-P-L-E.  And I know
7  you guys also have a copy of the witness statement.
8      Q   Is there anyone else?
9      A   I don't know if anyone else heard.
10     Q   Where you say, "they will give a
11 statement," that implies a plural to me of more than
12 one person.
13         So did you talk to anyone else?
14     A   No.
15     Q   So they really means Ms. Darymple?
16     A   Darymple.  Correct.
17     Q   No one else?
18     A   No.
19     Q   In that very next bullet point you say,
20 There is another person on light duty who is allowed
21 to keep her patrol car and recognize all of the
22 benefits that she had before she went on light duty
23 for her pregnancy.
24         Who is that?
25     A   Becky Bremmlet.

Page 205

1      Q   Animal control officer, right?
2      A   Correct.
3      Q   What do you know about her light duty
4  restrictions?
5      A   I don't know much about her light duty
6  restrictions.  But I do know that by sheriff's
7  policy, anytime we're on light duty, that we're
8  supposed to surrender our patrol cars.  And she had a
9  take-home vehicle that was provided from the
10 sheriff's office.
11     Q   Did you ever review any documentation for
12 her leave?
13     A   No.
14     Q   Did you ever attempt to access any
15 documentation concerning the circumstances of
16 Ms. Bremmlet's light duty?
17     A   No.
18     Q   On the next page, 525, in reference to the
19 school resource officer position.  You began serving
20 as the school resource officer in the spring of 2011,
21 didn't you?
22     A   Yes.
23     Q   Was that approximately April?
24     A   Yes.
25     Q   Who asked you if you would be willing to

Page 206

1  serve in the resource officer position?
2      A   The undersheriff.
3      Q   Monte Gore?
4      A   Correct.
5      Q   And you say, I was given no training.
6          So is it your testimony that no one gave
7  you any information about what you were supposed to
8  do as a school resource officer?
9      A   Yes.
10     Q   You only served in that position until May
11 10th, 2011, right?
12     A   Correct.
13     Q   You did not fulfill any duties of school
14 resource officer after May 10th, 2011, the day of the
15 incident with Commissioner Tighe, correct?
16     A   I believe I had finished out the rest of
17 the school year.
18     Q   You believe you did?
19     A   Yes.
20     Q   Do you know how much longer that went?
21     A   It was, I believe, until sometime at the
22 end of May.
23     Q   Let me hand you what's been marked as
24 Deposition Exhibit 4.
25     A   Yes.  So May 20th was the last day that I

Page 207

1  served as the school resource officer.
2     Q    So ten more days?
3     A    Yes.
4     Q    And those would only be school days, right?
5     A    Correct.
6     Q    Was that five days a week?
7     A    Yes.
8     Q    Did anyone else from the Park County
9  Sheriff's Office attend Platte Valley School in any
10 capacity while you were serving as school resource
11 officer?
12    A    Can you repeat that one more time?
13    Q    Sure.
14        Did you interact with anyone else from Park
15 County Sheriff's Office at any time between May 10th
16 and May 20th, 2011?
17    A    Possibly.  If it was, it would have been
18 either Sergeant Tonjes, Captain Hancock.  Or at one
19 point I know I had requested backup from Kelly
20 Reynolds regarding a school incident.
21        And those are the only people I had
22 interaction with from the sheriff's office related to
23 the school.
24    Q    Please turn to Page 527.  You see the third
25 bullet point down, September 14, 2011?

Page 208

1     A    Uh-huh.
2     Q    You say, I was working in this Fairplay
3  Sheriff's Office on light duty due to my back
4  surgery.  Captain Hancock walked into the SO, say
5  (sic), Corporal Reynolds and hugged him like they
6  hadn't seen each other for ten years.
7        Captain Hancock pulled away from Kelly and
8  said, quote -- and then it's blank.
9        Isn't that what that bullet says?
10    A    Yeah.  I must have forgot to finish off
11 that portion of it.  But I do remember that they had
12 backed away from each other and said, Ewww, better
13 not do that.  But I must have missed finishing that
14 statement.
15        A lot of this stuff was trying to, I mean,
16 keep up with the typing as quick as my mind was
17 trying to come up with some of this stuff, as things
18 were transpiring.  So . . .
19    Q    When would you type these?
20    A    At home.
21    Q    After you'd get off work?
22    A    Uh-huh.  Yes, ma'am.
23    Q    Was this while you were on the pain
24 medications for your back surgery and for the pain as
25 a result of your back surgery?

Page 209

1     A    At some points, yeah, I was typing while I
2  was taking my prescribed medications at home.
3     Q    So is -- in this third bullet point on Page
4  527 of Exhibit 28 are you saying that Corporal
5  Reynolds and Captain Hancock hugged, or got close to
6  hugging but didn't hug?
7     A    No.  They hugged.
8     Q    And what do you mean "like they hadn't seen
9  each other for ten years"?
10    A    It was like this, Oh, my goodness, you
11 know, like you haven't seen an old friend in so long
12 that you run up to each other and embrace in a full
13 hug like you're excited to see each other.
14    Q    So they ran to each other and embraced each
15 other?
16    A    Yeah.
17    Q    How far did they run?
18    A    Kelly was towards the sheriff's office, and
19 Hancock came in the back area.
20    Q    Is this the squad room?
21    A    Yes.  So maybe 20, 30 feet.  I don't know
22 the distance of the squad room from the sheriff --
23 from the sergeant's office to the back door when
24 somebody came in.
25        Like I said, one of them was standing by

Page 210

1  the sergeant's door, and the other one had come in
2  the back door.  They saw each other, and quickly
3  embraced in a hug.
4     Q    And just ran toward each other?
5     A    Not full out run.
6     Q    Well, you're the one who just said they ran
7  toward each other.
8     A    Okay.  Quickly --
9     Q    How would you describe it?
10    A    Quickly walked.
11    Q    How long did they hold on to each other?
12    A    A few seconds.
13    Q    Was anyone else present when you saw this?
14    A    I don't remember.
15    Q    And you don't know why you didn't include
16 the quote that you apparently intended to start; is
17 that right?
18    A    Correct.
19    Q    In the next bullet, in the last sentence
20 you say, I was on medical leave in July 2011 --
21 excuse me -- when I was on medical leave in July
22 2011, I was informed that the affair had continued
23 between Corporal Reynolds and Officer Cindy Hardey,
24 and it was, quote, swept under the rug, end quote?
25        Who informed you that the affair had

8 (Pages 207 to 210)

Exhibit 4 - Plaintiff Dep

Page 223

1       It was an ongoing two years that every time
2 I stood up for myself, I had more incidents where
3 people would either fail to back me up or people
4 would isolate me from the team.
5       Kelly would not introduce me to the new
6 staff when he was training them as an FTO; where he
7 would go out of the his way to introduce them to
8 everybody in the room, but I was the only person that
9 I would never be included as part of the team.  It
10 made it more of a pattern of she doesn't matter.
11      And this whole incident with John Tighe
12 tied it in even further where it just reiterated to
13 him that I'm going to stand up for myself, and he
14 viewed that as a bad thing.
15   Q    Did Kelly Reynolds say anything to you
16 about the John Tighe incident?
17   A    No.
18   Q    Did you have any conversation with anyone
19 about Kelly Reynolds' knowledge of the John Tighe
20 incident?
21   A    No.
22   Q    Did Kelly Reynolds take any action that you
23 know was based on you making a complaint against John
24 Tighe?
25   A    The only action taken was the fact that I

Page 224

1 asked him for backup on May 20th, which he never
2 showed up.
3   Q    And you're saying -- I just want to make
4 sure that I understand.
5       Is it your testimony that you believe that
6 Kelly Reynolds' failure to back you up on May 20th,
7 2011 was because you had made a complaint against
8 Commissioner Tighe?
9   A    I think he -- it had added more salt to the
10 wound to the original complaint I had made against
11 him.
12   Q    No.  Please answer my question.
13      Do you believe that Kelly Reynolds failed
14 to back you up on May 20th, 2011 because you made a
15 complaint against John Tighe?
16   A    Not directly.
17   Q    Indirectly do you believe that?
18   A    Yes.
19   Q    What is your -- what are the facts upon
20 which you base that belief?
21   A    My facts are the fact that I complained
22 when I started back in 2009 about an inappropriate
23 comment made by Kelly Reynolds.
24      Throughout those two years, as these things
25 were going on, Kelly continually built a pattern

Page 225

1 where he was never actually -- I guess the only way I
2 could say it is he never got over the fact that he
3 was reprimanded.
4       It had gotten to the point where it was
5 just one extra piece that he didn't back me up on May
6 20th.
7       I filed a complaint against John Tighe, and
8 everybody in the department knew about it because of
9 the fact that everybody was disgusted with the fact
10 that the Commissioner was allowed to get away with
11 this stuff.
12      I thought that it was going to be handled
13 more appropriately than it was as far as the
14 complaint on John Tighe.
15      And by the time May 20th had come around
16 and I still had no backup from Kelly Reynolds, I felt
17 like somewhere in there there was a correlation that
18 it was either my complaint against John Tighe that
19 stirred things up, or it was just the ongoing stuff
20 that was continually going on because of my initial
21 complaint back from 2009.
22      So either way, Kelly was holding on to
23 either the John Tighe incident or my initial
24 complaint that all of this tied in yet, again,
25 together over the retaliation that I had faced.

Page 226

1   Q    You made a written complain against John
2 Tighe, didn't you?
3   A    Yes, I did.
4   Q    You did not make a written complaint
5 against Kelly Reynolds, did you?
6   A    No.
7   Q    If on May 10th, 2011 you made a written
8 complaint against John Tighe, why didn't you file a
9 written sexual harassment complaint against Kelly
10 Reynolds for the actions that you now say occurred
11 May 20th, 2011?
12   A    Because I felt that if I would have filed
13 anything more written against Kelly Reynolds that it
14 was ultimately going to come back on me, potentially
15 costing me my job.
16      I had felt that with the ongoing threats
17 that I had from my sergeants telling me that if they
18 had any more -- if I would have said anything more, I
19 would not have made it through my probationary period
20 and, ultimately, I would have not been employed with
21 the sheriff's office any further.
22      I was afraid, and my rationale behind that
23 whole process was, here's a commissioner that wasn't
24 officially tied in with the sheriff's office who
25 inappropriately asked me to dance in front of an

Exhibit 4 - Plaintiff Dep

Page 243

1   that point they were just waiting for me to take my
2   medications and arrest me.
3      Q    Did you tell Commerce City, when you
4   applied for the police department job as a patrol
5   officer in May or June of 2011, that you were going
6   to have back surgery?
7      A    Yes.  I told them during my background.
8      Q    Did you have any physical exam by Commerce
9   City?
10     A    I had to go in for a physical exam.  I
11   believe it was two weeks prior, approximately, before
12   I was released to be off of light-duty status.
13     Q    When was that?
14     A    I believe it was mid-August.  What date, I
15   -- I can't remember.
16     Q    Did you pass your physical?
17     A    I don't know.  I had asked for a delay on
18   that because I couldn't lift the requirements that
19   day that I was cleared, and so I wasn't going to put
20   my back in jeopardy to pick up a weight.
21         When I asked them, Can I do it in two
22   weeks, they said, We'll go ahead and go do your psych
23   exam the next day with Nicoletti.
24         I went to my psych exam.  At that point, I
25   talked with Renee Thomas from Commerce City.  She

Page 244

1   called me after I had completed my psych exam from
2   Nicoletti, which was, ironically, the day after -- or
3   within a few days after the incident at the firehouse
4   -- and she said, Well, don't worry about rescheduling
5   your physical because you failed your psych exam, and
6   we will not pick you up with a failed psych exam.
7      Q    Have you taken any additional psych --
8   psychological tests with Nicoletti or anyone else?
9      A    At all or since then?
10     Q    Since then.
11     A    Yes.
12     Q    With whom?
13     A    City of Lakewood.
14     Q    What was the result of that psychological
15   exam?
16     A    I was removed from the testing process
17   after completing my psych exam.
18     Q    So you failed that psych exam as well?
19     A    Yes, ma'am.
20     Q    Did you take a psych exam with the City of
21   Golden?
22     A    Yes.
23     Q    Do you know what the results of that were?
24     A    I believe I passed, since I was hired.
25     Q    Did you ever see the results?

Page 245

1      A    No.
2      Q    Was that also with Nicoletti?
3      A    Yes.
4      Q    What was the second surgery that you had?
5      A    Spinal fusion.
6      Q    Are there any physical restrictions on you
7   at the present time?
8      A    No.
9      Q    None whatsoever?
10     A    No.
11     Q    No weight lifting restrictions or anything
12   related to the number of pounds that you can lift?
13     A    No.
14     Q    When did you last have any weight
15   restrictions on you?
16     A    I was released from any restrictions
17   January 17th of 2012, I believe.
18     Q    And by that time, you'd already tendered
19   your resignation to Park County, correct?
20     A    Correct.
21         MS. GREER:  I don't have any other
22   questions.
23         MR. LAMAR:  Great.
24         (The deposition concluded at 9:27 a.m.)
25

Page 246

1         A F F I D A V I T
2
   STATE OF        )
3                  ) ss.
   COUNTY OF       )
4
5
6      I have read my Volume II deposition, and the
7   same is true and accurate, save and except for
8   changes and/or corrections, if any, as indicated by
9   me on the amendment sheet(s) attached hereto as
10   indicated.
11
12   Amendments Sheet(s) attached [ ]
13   No changes:  No amendment sheet attached [ ]
14
15   _____
         ABBY N. MARTIN
16
     SUBSCRIBED AND SWORN TO before me on this
17   _____ day of _____, 2014.
18     My commission expires:
19   _____
         NOTARY PUBLIC
20
21   in and for the State of_____
22
23
24
25

Exhibit 4 - Plaintiff Dep

Page 247

```
1            C E R T I F I C A T E
2
    STATE OF COLORADO  )
3                      ) ss.
    COUNTY OF ADAMS    )
4
5
        I, Shauna T. Dietel, Registered Professional
6   Reporter and Notary Public in and for the State of
    Colorado, duly appointed to take the Volume II
7   deposition of ABBY N. MARTIN, certify that prior to
    the deposition the witness was duly sworn to testify
8   to the truth in the matters in controversy between
    the parties herein; that the deposition was taken in
9   shorthand by me at the time and place aforesaid and
    was thereafter reduced to typewritten form by me and
10  processed under my supervision; the same consists of
    65 pages; and that the same is a full, true, and
11  complete transcription of my shorthand notes.  I
    further certify that I am not related to, employed
12  by, nor counsel to any of the parties herein, nor
    otherwise interested in the events of the within
13  cause.
14
15      A transcript review of this deposition was
    requested and is available to the deponent as
16  notified me.
17
18
        IN WITNESS WHEREOF, I have affixed my
19  notarial seal this 24th of February, 2014.  My
    commission expires October 6, 2017.
20
21
22      _____
            Shauna T. Dietel
23          Registered Professional Reporter
24
25
```

Stormo Reporting, Inc.  (303) 200-4792