# Transcript of the Testimony of:
# Welles Tonjes

**Date:** January 8, 2014

Abby Martin v. Fred Wegener, in his official capacity as Sheriff of Park County, CO



Mile High Court Reporting and Video, Inc.
Phone: 303-202-0210
Fax: 303-205-0034
Email: contact@milehighreporting.com
milehighreporting.com

Exhibit 7 - Tonjes Dep

Deposition of: Welles Tonjes - January 8, 2014
Abby Martin v. Fred Wegener, in his official capacity as Sheriff of Park County, CO

Page 6

1  I'm asking for information you received from anyone
2  other than an attorney.
3      A   Sure.
4      Q   What's your full name?
5      A   Welles, W-E-L-L-E-S, middle initial E., and
6  the last name Tonjes, T-O-N-J-E-S.
7      Q   What is your current title with Park County?
8      A   I'm a sergeant for the patrol and
9  investigations, both.
10     Q   Who do you currently report to?
11     A   I have two. For patrol it's Captain Hancock,
12 and then for the investigation it's Captain Bonnelycke.
13 And if you want, I can spell "Bonnelycke" for you.
14     Q   Sure.
15     A   It's B, as in baker, O-N-N-E -- wait --
16 E-L-Y-C-K-E. Did you get it?
17     Q   Yes.
18     A   It's a long one.
19     Q   Did you review any documents before attending
20 or in preparation for the deposition?
21     A   I reviewed a -- I think it was Ms. Martin's
22 complaint; and then I reviewed -- I think it was some
23 recordings that you had provided.
24     Q   Do you know whether that was a transcript or
25 whether it was a document that Ms. Martin produced that

Page 7

1  was a summary of the recordings?
2      A   I thought it was her discrimination
3  complaint, the document that I saw.
4      Q   Understood. But you said you also
5  reviewed --
6      A   Oh, the recordings.
7      Q   -- a recording. And whether you actually
8  listened to it or whether you just read what was
9  assigned --
10     A   No. No. I listened to when supposed
11 recordings were made that involved me when she was
12 wearing a body mic or whatever.
13     Q   Understood. I just didn't know if you
14 listened to it or if you read it.
15     A   No. I listened to it.
16     Q   And when you say, "the complaint," do you
17 mean that was filed in federal court or the one with
18 the EE- --
19     A   I don't know which one it was. It was the
20 one that I was provided.
21     Q   Don't worry about --
22     A   I don't know which one it was.
23     Q   Do you know whether you ever saw the EEOC
24 charge that she filed?
25     A   I believe I did. Was that like about a year

Page 8

1  ago?
2      Q   Give or take, yes.
3      A   Yeah, I believe I did.
4      Q   What was your date of hire?
5      A   For here?
6      Q   I'm sorry. Yes. And I'll refer it to as
7  "PCSO." Is that fair enough?
8      A   No, that's cool. I was hired in November
9  2009.
10     Q   And what was your position at hire?
11     A   Detention deputy.
12     Q   So you were working over for the jail?
13     A   I worked in the jail.
14     Q   When did you move over to patrol?
15     A   September 2010.
16     Q   Did you move over as a deputy, or did you
17 move over as a promoted --
18     A   No. I moved over as a deputy.
19     Q   And tell me what promotions you received and
20 the rough dates that you received them.
21     A   Okay. So in April 2011 I tested for corporal
22 with -- I think there were six or seven other deputies
23 that tested at the same time, and I scored No. 1 on
24 that written and oral board, and I was promoted then.
25         And then I guess you'd call it a field

Page 9

1  promotion. I don't know. I was promoted in July of
2  that year to sergeant.
3      Q   Earlier when we were talking about your
4  deposition history, you said you've been in law
5  enforcement a long time.
6      A   Uh-huh.
7      Q   What year did you enter law enforcement?
8      A   June of 1972.
9      Q   And what agency?
10     A   Denver Police Department.
11     Q   How many years did you work for the Denver
12 PD?
13     A   I retired January 2008 with 35 years 7
14 months.
15     Q   What was your title or rank at that time?
16     A   At that time I was a technician for the
17 juvenile bureau.
18     Q   What did you do between your date of
19 retirement and when you started with PCSO, if anything,
20 other than having fun?
21     A   Well, there was no fun. I thought -- I was
22 retired. I thought that I would be able to do
23 something other than law enforcement. So I actually
24 bought 50 percent of a feed store. I wasn't so good at
25 the feed-store business.

Exhibit 7 - Tonjes Dep
Deposition of: Welles Tonjes - January 8, 2014
Abby Martin v. Fred Wegener, in his official capacity as Sheriff of Park County, CO

Page 10

1     And then I did a part-time security job for a
2  couple months.  Other than that I was retired until I
3  came back to work.
4     Q   So there was a break in your law enforcement
5  career between when you left Denver PD --
6     A   Yes.
7     Q   -- and when you started with PCSO?
8     A   Yes.
9     Q   Did you have any connection with Sheriff
10 Wegener prior to your hire with the department?
11    A   No.  It was kind of funny how I got hired,
12 but I didn't know any of those folks.
13    Q   What was the story behind how you got hired?
14    A   I have a young son, and I brought him to
15 school.  And when they're like in kindergarten, first
16 grade, second grade you take them into the cafetorium,
17 and I just happened to sit by the undersheriff.
18        And as cops are cops, I started talking to
19 him, and he found out I was a retired Denver officer,
20 and he offered me a part-time job.  And it was supposed
21 to be transport, but it never gelled to part time.  I
22 went right into full time.
23    Q   So did you live in Park County at the time
24 you were taking your child to --
25    A   Yeah.  I've lived here since '06.  I commuted

Page 11

1  for a year and a half.
2     Q   Down to Denver?
3     A   Uh-huh.
4     Q   Who did you report to when you initially
5  became a deputy in patrol?
6     A   Oh, wow.  Let's see.  There was Sergeant
7  Theobald, and then there was -- there were three
8  sergeants in the jail:  Sergeant Theobald, Sergeant
9  Reynolds, and Sergeant Bramlett.
10    Q   So Sergeant Reynolds, was this Kelley
11 Reynolds over in the jail or a different Reynolds?
12    A   No.  No.  It was his wife.
13    Q   And what's her name, first name?
14    A   Kristin.
15    Q   And you said Bramlett?
16    A   Yeah.  His first name is Raymond, and then
17 Theobald was Scott Theobald.
18    Q   Who did you report to when you became a
19 deputy in patrol in 2010?
20    A   Let's see.  At that time I think Sergeant
21 Hardey and Sergeant Brown.
22    Q   Would that have been Mike Brown?
23    A   Yes.
24    Q   You said then you tested for and became a
25 corporal in the spring of 2011.  Who was your -- the

Page 12

1  sergeant that you reported to, if any, at that point?
2     A   Sergeant Brown.
3     Q   It stayed the same?
4     A   Yeah.  Well, we're a small agency, so -- I
5  can't remember if Hardey was a sergeant then or not.
6     Q   And you currently report to Captain Hancock
7  and Captain Bonnelycke?
8     A   Bonnelycke.
9     Q   Did you go from reporting to Sergeant Brown
10 to reporting to the two captains or was there somebody
11 in between?
12    A   No.  No.  No.  Because Sergeant Brown was
13 demoted; and once he was demoted, then I was the direct
14 line to the captain, because Sergeant Brown at the time
15 was a master sergeant.  I was just a sergeant.
16    Q   Do you know when approximately Sergeant Brown
17 was demoted from the master sergeant to a sergeant?
18    A   I believe it was, I'm guessing, December --
19 first part of December 2011, I believe it was.
20    Q   So did you start -- well, let me ask you:
21 When do you remember the beginning time when you
22 started supervising Abby Adam or Abby -- as she's known
23 today, Abby Martin?
24    A   Right.  So when I was promoted to corporal,
25 because of the training I've had as a school resource

Page 13

1  officer and stuff, so when -- I believe it was when she
2  became the school resource officer, because I had to
3  take care of the school resource officer issues.
4        But at the same time, Captain Hancock was
5  doing the same thing.  So it was kind of -- you know,
6  because he had training as a school resource officer.
7     Q   And that was going to be my next question.
8  Who did you understand to have sort of supervised or
9  overseen the school resource officers prior to you
10 assuming that role?
11    A   I don't know.  It was probably Captain
12 Hancock, but I don't know.
13    Q   With regard to when you assumed those
14 roles -- and for purposes of the deposition, is
15 "SRO" -- are we on the same page for school resource
16 officer?
17    A   Yes.
18    Q   Was there any specific training, to your
19 knowledge, given to the SROs prior to when you started
20 handling those responsibilities?
21    A   I couldn't state for sure.  I know that
22 Captain Hancock would come into the schools and train
23 them, but -- and I'm only guessing on this one.  It
24 seemed to me that they did go to an SRO school, but I'm
25 not sure, because, like I said, I wasn't in the mix of

Exhibit 7 - Tonjes Dep

Deposition of: Welles Tonjes - January 8, 2014
Abby Martin v. Fred Wegener, in his official capacity as Sheriff of Park County, CO

Page 30

1 would let Master Sergeant Brown know something like
2 that and then that would pass up the chain.
3     In the case like what happened with Abby Adam
4 on the John Tighe thing, that was a totally different
5 thing. I still let the command staff know, but then
6 that had to be passed on to human resources.
7   Q   Okay. So you understood that as a corporal
8 you had a duty to pass on information, either up the
9 chain of command or to human resources, if it involved
10 a personnel issue where somebody was complaining about
11 being mistreated?
12   A   Yeah, I believe. Yeah.
13   Q   Did you ever receive any training when you
14 were an employee of PCSO on its antidiscrimination
15 policies and procedures?
16   A   No. I think it was just the yearly training
17 or every two years where everybody receives that
18 training.
19   Q   Let me ask you: Did you ever have any
20 understanding that you were expected to conduct an
21 investigation into possible issues of retaliation or
22 discrimination at PCSO?
23       MS. GREER: Objection to form. Go ahead.
24   A   I -- it depended like -- okay. So I wouldn't
25 do the investigation unless I was instructed to do so.

Page 31

1 Okay.
2   Q   (By Mr. Lamar) Okay. Do you remember how you
3 learned about the incident with Commissioner Tighe or
4 Tighe?
5   A   Abby Adam called me and we met.
6   Q   Where did you meet?
7   A   We parked in our vehicles outside the
8 Jefferson market in Jefferson, Colorado.
9   Q   And what did she tell you had happened?
10   A   She had told me that they were doing career
11 fair or career day, and -- and I don't know if John
12 Tighe, at that time, was -- because he was a
13 commissioner at that time, but he was also a reserve
14 deputy, and I don't remember if he was in uniform or
15 not. But she told me what had occurred, how -- I think
16 they were in a middle school class grade.
17   Q   Okay.
18   A   And he had -- I don't know how it came about,
19 but he'd asked her to come up front and do what he
20 called a Barbie Dance that he supposedly learned from
21 the D.A.R.E. program. And then she described to me
22 what the D.A.R.E. -- what the Barbie Dance was, what he
23 had her do.
24   Q   Did she tell you she wanted to file a formal
25 complaint against him for that?

Page 32

1   A   I don't remember if she said she wanted to
2 file a formal complaint. I advised her if she wanted
3 to file a complaint, that she needed to write it up and
4 then I would take care of it and send it up the chain,
5 but I needed a detailed statement of what had occurred.
6   Q   Do you remember what you did with -- I take
7 it she did end up filing a formal complaint?
8   A   I believe -- yeah, I believe she did a
9 written one on probably the following day. I'm not
10 real sure when I got it.
11   Q   What did you do with it when you received it?
12   A   I passed it to Master Sergeant Brown.
13       (Deposition Exhibit 3 was marked for
14 identification.)
15   Q   Sergeant Tonjes, I'm showing you what's been
16 marked as Exhibit 3. This is a memo that's addressed
17 to Monte Gore, the undersheriff, from Deputy Abby Adam
18 with a carbon copy to yourself, Master Sergeant Mike
19 Brown, and Captain Hancock.
20       Is this the complaint that you remember
21 filing on her behalf?
22   A   I don't remember, but I believe it is.
23   Q   Now, there's a statement from Melissa
24 Carrigan that's attached at the back. Do you know how
25 that statement was obtained? Whether it was obtained

Page 33

1 by Ms. Adam, by yourself, Master Sergeant Brown?
2   A   Okay. Now, I remember Ms. Carrigan being one
3 of her witnesses, and I know that I advised her that we
4 needed to know who was present and we had to get
5 statements.
6       Now, I don't know if she had gotten the
7 statement or if I had asked for it. I don't remember
8 that one exactly, but I told her we needed to document
9 with any witnesses we had.
10   Q   Is it -- well, let me ask you this: Do you
11 believe that Abby Adam actually composed this memo
12 herself or was it done with your assistance?
13   A   No, I wouldn't have.
14   Q   Well, I didn't know if you --
15   A   No. No. She was quite capable of writing it
16 herself, and I wasn't there, so she would have had to
17 write it.
18   Q   Did she tell you when she met with you on the
19 10th that she no longer wanted to be an SRO?
20   A   I don't remember that.
21   Q   You said you believed this might have been on
22 a career day. Is career day -- does it take place
23 before the school year ends, or is it right at the very
24 end?
25   A   No. This obviously, with this being dated,

Exhibit 7 - Tonjes Dep
Deposition of: Welles Tonjes - January 8, 2014
Abby Martin v. Fred Wegener, in his official capacity as Sheriff of Park County, CO

Page 70

1 not be any congregating also apply to a deputy who was
2 married to somebody who might be in detention or animal
3 control so that they weren't wasting time in the
4 office?
5   A   I'm sorry. So go to the first part of that
6 question. I caught the last part.
7   Q   Sure. I'm going to summarize your testimony,
8 which is that you were talking about, you didn't want
9 people congregating and just sort of sitting around
10 wasting time and not being productive.
11   A   Right.
12   Q   For the deputies -- Deputy Martin and Deputy
13 Martin were married. They were the only couple that
14 were both patrol deputies.
15   A   Right.
16   Q   But you indicated that there were married
17 couples in which both of them weren't deputies but one
18 of them was; is that correct?
19   A   Yes.
20   Q   I'm asking whether your expectation or your
21 directive or your order, your requirement applied to a
22 couple where not -- where both of them weren't patrol
23 deputies, but one of them was so that the patrol deputy
24 wasn't sitting around wasting time?
25        MS. GREER: Objection to form and foundation.

Page 71

1 Go ahead.
2   A   Okay. So we wouldn't expect them to hang out
3 in the area with each other.
4   Q   (By Mr. Lamar) Right.
5   A   But thinking on all the couples that I
6 remember, they were all on opposite shifts.
7   Q   So you don't have a recollection of the
8 Reynolds -- I take -- both of the Reynolds were
9 employed by the Park County Sheriff's Office?
10   A   Yes, sir.
11   Q   And the Hardeys were both employed by the
12 Park County Sheriff's Office, correct?
13   A   Yes.
14   Q   And Ms. Hardey was the animal control
15 officer; is that correct?
16   A   Yes.
17   Q   But Mr. Hardey was in the patrol division?
18   A   Yes.
19   Q   And your recollection is that Ms. Hardey and
20 Mr. Hardey never hung out in the office at the same
21 time?
22   A   I wouldn't say never. Animal control works
23 day shift. Glen Hardey worked nights. So their shifts
24 were opposite. When it come to the Reynolds, it was
25 the same case, only Kelley Reynolds worked day shift

Page 72

1 and his wife worked swing shift, I believe, over in the
2 jail.
3   Q   Did either Abby Adam, well, or Martin, when
4 she became married, or her husband, Kolby, ever
5 complain to you that they thought they were being
6 subjected to a different standard than some of the
7 other deputies with regard to this expectation about
8 presence in the office at the same time?
9   A   I believe so.
10   Q   Was it Ms. Martin or Mr. Martin who
11 complained or both of them who complained?
12   A   No. I believe it was her.
13   Q   And what was your response when she
14 complained to you about that?
15   A   Well, I tried to explain to her that, first
16 of all, I have no control over animal control or
17 detention; only what happens with patrol.
18        And if I remember correctly, even when they
19 were dating, before they were married, they were on
20 opposite shifts so that we -- it's dangerous for
21 individuals to have them on the same shift, spouses.
22   Q   Were they on the same shift when she started
23 doing the light-duty work?
24   A   They would have been then, I believe. I
25 don't remember if he was on nights or not. I believe

Page 73

1 he was on days.
2   Q   And, in fact, he was giving her lifts into
3 the office; is that correct?
4   A   For a short time.
5   Q   And that was approved because other people on
6 light duty had been given lifts in by other deputies in
7 the past?
8        MS. GREER: Objection to form and foundation.
9 Go ahead.
10   A   I don't know about that.
11   Q   (By Mr. Lamar) Well, you said it was for a
12 short time. How long, to your knowledge, did it go on
13 that he gave her a lift in?
14   A   Maybe a couple of weeks until we
15 re-evaluated.
16   Q   When you say, "we re-evaluated," did you mean
17 you, or were there other persons who considered that
18 arrangement?
19   A   No. I believe we -- myself and Sergeant
20 Brown talked about it.
21   Q   And when you say you re-evaluated it, what
22 did you consider before deciding whether to let that
23 practice continue?
24   A   First of all, liability. Okay. When she was
25 on light duty, she was still POST certified. She was

Exhibit 7 - Tonjes Dep
Deposition of: Welles Tonjes - January 8, 2014
Abby Martin v. Fred Wegener, in his official capacity as Sheriff of Park County, CO

Page 74

1 riding in a patrol car that was subject -- because the
2 way our shifts work, if you work 6:00 a.m. to
3 4:00 p.m., you call on duty at your house at 6:00 a.m.
4 and you're obligated to handle calls until 4:00 p.m.
5     Okay. So when she would be in the vehicle,
6 she's on light duty. Well, light duty is a danger to
7 her, as far as an injury, and also it's a danger to the
8 deputy that's responding because -- I mean, that's
9 transporting, like in her case, Kolby, because he is
10 responsible for calls at that time.
11     So knowing where they live, because I live
12 close to them, and knowing the travel time and the
13 distance and stuff like that, and knowing where Deputy
14 Martin would have had to work, he could have been -- he
15 would have been out of service and unavailable for
16 calls anywhere -- now, this is total per way --
17 anywhere from an hour to three hours a day.
18     That would have been No. 1; it would have
19 been the liability. Okay. When it came to that
20 situation, we had -- to my knowledge -- and I had
21 called and asked Cindy Gharst this -- we had never been
22 given any paperwork, medical paperwork, from a
23 physician of hers or a therapist saying that she
24 couldn't drive. I personally was well aware of the
25 fact that she was driving her own personal vehicle.

Page 75

1     My understanding on the limitations were that
2 she had to be able to get up and move around, where she
3 was able to do that while scanning. If she'd have been
4 in control -- running a control booth, she wouldn't
5 have been able to do that. You sit at a console. So
6 that's where that situation there was.
7   Q   Why did you originally approve of this
8 practice for a couple of weeks if you knew all that
9 information before they suggested this as a way for her
10 to get to work?
11      MS. GREER: Objection to form and foundation.
12 Go ahead.
13   A   All I can say is that, first of all, we were
14 trying to help out. I mean, gas is expensive. But I
15 don't think we ever realized the possibilities here at
16 first.
17   Q   (By Mr. Lamar) So you didn't think it through
18 before you approved it?
19   A   No. It was -- you know, it was a judgment
20 call that was made trying to assist, I guess, more than
21 realizing what we were doing.
22   Q   There wasn't any documentation of this
23 process of deciding that the liability issues and the
24 time issues were going to cause you to say that he
25 shouldn't drive her into work?

Page 76

1      MS. GREER: Objection to form and foundation.
2   A   No. I am sorry. No.
3   Q   (By Mr. Lamar) So you didn't know that she
4 was taking medications and that she didn't feel
5 comfortable driving -- the pain medications, driving a
6 Park County vehicle to and from work; that that wasn't
7 the reason why she was asking her husband to drive her
8 in?
9      MS. GREER: Objection to form and foundation.
10   A   Okay. You lost me on that question
11 completely.
12   Q   (By Mr. Lamar) Sure. I'm trying to find out,
13 you did understand that Ms. Adam, Ms. Martin, had
14 requested that her husband be able to drive her to and
15 from work.
16      And I'm asking, so you didn't understand that
17 the whole reason for her doing that was because she was
18 taking painkillers and didn't feel that she could
19 safely drive a Park County sheriff's vehicle of her own
20 to and from the office?
21   A   Well, when you're on light duty, you're not
22 allowed to operate vehicles for the county.
23   Q   Okay.
24   A   Okay. I had no idea what medication she was
25 on. That wasn't in my part of the ballpark.

Page 77

1   Q   Ride-alongs, those are something that are
2 done occasionally, correct?
3   A   Like civilian ride-alongs?
4   Q   Correct.
5   A   Sure.
6   Q   And those civilian ride-alongs are not -- the
7 civilians are not POST certified; is that correct?
8   A   Yes, currently.
9   Q   And when a ride-along is done, the sheriff's
10 deputy responds to the call with the civilian in the
11 vehicle; is that correct?
12   A   Correct.
13   Q   And aren't there liability issues with that?
14   A   Yes.
15   Q   But the ride-alongs have not been
16 eliminated --
17   A   No.
18   Q   -- since -- okay.
19      So how would your concern about Deputy Abby
20 Adam being on light duty change the liability
21 considerations if the county was already letting
22 nonPOST-certified individuals do ride-alongs?
23   A   Okay. So let me explain as a whole on --
24 just not Park County. All right. So on ride-alongs,
25 if you chose to come out and do a ride-along with us,

Exhibit 7 - Tonjes Dep

Deposition of: Welles Tonjes - January 8, 2014
Abby Martin v. Fred Wegener, in his official capacity as Sheriff of Park County, CO

Page 78

1  you would sign a waiver of liability, okay, on your
2  ride-along request.
3       Second of all, when -- most agencies, if you
4  have a significant other, spouse, whatever, you don't
5  want them even working the same shift, let alone in the
6  same vehicle, because that's a danger for parties
7  involved. You tend to worry about your spouse, which
8  causes a danger to you because you don't worry about
9  what's going on. It becomes very emotional and very
10 traumatic.
11      If I can give you an example of a situation
12 which involved Kolby?
13 Q   I'm listening.
14 A   Okay. Unfortunately for Kolby, he had
15 requested that his father be allowed to ride along with
16 him. His dad signed the waiver and everything. His
17 dad was a retired lieutenant, I believe Arapahoe or
18 Douglas County.
19      And they were working the night shift, and
20 the reason I know this is because they called me while
21 this was going on. And I don't know if they were
22 searching a school or what, but Kolby's father was
23 riding along with him and I think he had a massive
24 coronary or something.
25      While this is all going on, the corporal

Page 79

1  called me. And I could hear the radio, and then I was
2  on the radio to listen to how the reaction of the
3  deputy was, because now he is out on a -- I don't know
4  if they were checking a building or what and his father
5  goes down, to listen to the stress level, the concerns,
6  and stuff like that. You could tell his whole
7  attention was drawn to what was happening to his
8  father.
9       This is an example of what would occur when
10 you have a spouse working even the same shift, let
11 alone in the same vehicle. Okay.
12 Q   And that happened before Abby and Kolby got
13 married, correct?
14 A   I don't believe so. I think it happened
15 after the wedding because I think his father was at the
16 wedding, but I might be wrong. I don't remember.
17 Q   Do you remember if it happened before Kolby
18 was driving Abby into work?
19 A   I believe it happened after.
20 Q   Let me backtrack just a tiny bit.
21 A   Sure.
22 Q   You said that in responding to Abby's concern
23 that she and Kolby were being treated differently than
24 other married couples, you said that you didn't
25 supervise or have any authority over animal control or

Page 80

1  over anybody other than the patrol division.
2       But you did have authority to issue rules for
3  the spouses who were in patrol, did you not?
4  A   Yes.
5  Q   So you could have told -- for instance, with
6  the Reynolds couple, you could have told Corporal
7  Kelley Reynolds, You're not to be in the office; and
8  even though his wife was in detention and came in the
9  office, you could still say to Corporal Kelley
10 Reynolds, Out of here?
11 A   I could, except for one thing.
12 Q   What is that?
13 A   They didn't work the same shift.
14 Q   I understand that. I understand that. But
15 you brought up two things. You brought up the fact
16 that they typically tended to work off shifts, so they
17 weren't on the same shifts, but you also mentioned the
18 fact that you didn't supervise at least one of the
19 other spouses?
20 A   Right.
21 Q   But because you did at least supervise one of
22 the spouses, you had the authority to say to whoever
23 was a patrol deputy, Out of here, you need to be going,
24 doing something else, did you not?
25 A   Exactly, except for one thing.

Page 81

1  Q   What's that?
2  A   I never saw them together.
3  Q   Understood.
4  A   So I wouldn't have had to address that with
5  them.
6  Q   Did Abby Adam make a complaint to you in the
7  summer of 2011 about her treatment by Deputy Strehl?
8  A   Give me a specific incident. I think I know
9  where you're going with this.
10 Q   Did she tell you that he had knocked some
11 papers off of her desk and that he said he's not a
12 fucking Cheeto when she asked him to pick it up?
13 A   Yes.
14 Q   What was your response to her?
15 A   Okay. I was present in the sergeants' office
16 when this was going on. Abby Adam and Brandon Strehl
17 were sitting out in the squad room, both working on the
18 computers.
19      They -- as my mom used to say, they were
20 bickering back and forth. They were taking shots at
21 each other verbally. I could hear that. And so they
22 were having -- I don't know what you'd call it -- a
23 verbal exchange back and forth. She would say
24 something to get him upset or, you know, to respond.
25 He would say something. It was bantering, I guess

21 (Pages 78 to 81)

Exhibit 7 - Tonjes Dep

Deposition of: Welles Tonjes - January 8, 2014
Abby Martin v. Fred Wegener, in his official capacity as Sheriff of Park County, CO

Page 82
1  you'd call it. So that's what was going on then.
2   Q   What did you say in response to her complaint
3  about what Strehl said and did to her?
4   A   Well, she complained that he knocked the
5  papers off her desk, and I went out there because she
6  was out there in the squad room. I didn't see no
7  papers knocked off the desk. I didn't hear no papers
8  knocked off the desk.
9       I basically told them both, Knock it off,
10 because -- I told them that. Later, after that was all
11 done, she -- in fact, I told them both that they
12 sounded like a brother and sister out there fighting
13 or, you know, having a war of words.
14  Q   And I'm going to do -- hopefully not too much
15 during the rest of the deposition, but back to the
16 light duty. And you said that in terms of organizing
17 or setting up the light duty, that's not normally
18 something that you would handle; that's something that
19 somebody else would be responsible for; is that
20 correct?
21  A   Right. So if I had a deputy that was going
22 on light duty and you were the civilian in charge, you
23 would say, I need them to do this, and that would be
24 set up that way.
25  Q   And you mentioned that your understanding was

Page 83
1  that Abby was doing scanning of documents. Was this at
2  the sheriff's office, or was this for the county,
3  separate operations of the county?
4   A   The part I knew about was at the sheriff's
5  office.
6   Q   Did you have any understanding as to how long
7  that light-duty work would last when it originally
8  started?
9   A   I had no idea.
10  Q   At any point in time did you learn from the
11 person who had given her this task that the work was
12 going to come to a conclusion?
13  A   Yes.
14  Q   Who told you that?
15  A   Cindy Gharst.
16  Q   So it was your understanding that Cindy
17 Gharst set up the actual light-duty assignment for
18 Ms. Adam?
19      MS. GREER: Objection to form and foundation.
20 Go ahead.
21  A   I was just contacted by Cindy Gharst and said
22 that there was -- I needed to give -- to write up a
23 letter stating that as of such-and-such a date there
24 would be no more light-duty work for her.
25  Q   (By Mr. Lamar) Did you understand that to

Page 84
1  mean that Cindy Gharst had simply decided that
2  light-duty work would not be offered to her or that the
3  light-duty tasks -- that the job was finished and so
4  there was no option for her?
5       MS. GREER: Objection to form and foundation.
6   A   The latter part.
7   Q   (By Mr. Lamar) So you understood that there
8  was not going to be any need for any more scanning?
9   A   That was my understanding.
10      (Deposition Exhibit 5 was marked for
11 identification.)
12  Q   Sergeant Tonjes, I'm showing you what's been
13 marked as Exhibit 5 to your deposition. This is a memo
14 from Cindy Gharst to you dated September 14, 2011. Do
15 you remember seeing this memo before?
16  A   No, but I'm sure I did.
17  Q   Do you remember whether your conversation
18 with Cindy Gharst was before this memo or basically
19 concurrent with the memo or at some point after the
20 memo?
21  A   I don't remember because -- I remember that
22 one thing I made a mistake on, when I typed up the
23 letter informing her that there was no more off -- I
24 mean, no more light-duty work, was I forgot to put the
25 date on it, and I remember that.

Page 85
1       So I don't remember. Maybe I did put the
2  date on it. I don't know. I thought I didn't.
3       (Deposition Exhibit 6 was marked for
4  identification.)
5   Q   Sergeant Tonjes, I'm showing you what's been
6  marked as Exhibit 6, and this is a memo from you to
7  Deputy Abby Martin dated September 22, 2011. Is this
8  the memo you were referring to?
9   A   Yes. And I guess I did put the date on it.
10 I thought I hadn't. So that would have been after this
11 letter or email or whatever that Cindy Gharst had sent.
12  Q   Is there anywhere in Ms. Gharst's memo to you
13 on the 14th, that's marked as Exhibit 5, that says that
14 the work tasks that Ms. Martin has been doing are
15 basically about to run out?
16  A   Can I have time to read it?
17  Q   Sure.
18  A   Okay.
19      (The deponent perused the document.)
20  A   The only place I see in your reference to
21 that is, I think, the third paragraph.
22  Q   And that paragraph begins with what sentence?
23  A   "There has been concern."
24  Q   Does it say anywhere in that paragraph that
25 the specific duties that Ms. Adam has been performing

Exhibit 7 - Tonjes Dep

Deposition of: Welles Tonjes - January 8, 2014
Abby Martin v. Fred Wegener, in his official capacity as Sheriff of Park County, CO

Page 102

1 to limit her use of the cell phone during work hours?
2   A   No.
3   Q   Did you argue with Sergeant Brown about who
4 Abby would report to during this meeting?
5   A   I don't think we had an argument. I think it
6 was discussed, but I don't remember. Because we were
7 both on day shift, so I think it was discussed
8 because -- if we were going to put her on a later shift
9 or a night shift.
10   Q   Did either you or Master Sergeant Brown tell
11 her how unappreciative she was about what you had done
12 for her?
13   A   I don't think so. I don't remember that.
14   Q   Did either you or Master Sergeant Brown tell
15 her that you were going to change her days off from the
16 same ones that her husband had?
17   A   No, I don't --
18   Q   Were you aware at that time that she had the
19 same days off as Kolby Martin did?
20   A   I think that probably she did. I mean, even
21 when she -- even when she and Kolby were working
22 patrol, we tried to make sure that they had the same
23 days off, even when she was doing the school resource
24 officer thing.
25   Q   As a result of your discussions at that

Page 103

1 meeting or shortly thereafter, was a decision made so
2 that her days off would change?
3   A   I don't -- see, I'm trying to think if --
4 when she was doing that scanning, if she went to five
5 eights or five days a week or she was doing four,
6 because --
7   Q   Four 10s?
8   A   Right. Because the scanning would have had
9 to have been done Monday through Friday, those days,
10 where Kolby Martin's shift would have been either
11 Sunday through Wednesday or Wednesday through Saturday.
12 So there would have been a couple days where she would
13 have been scanning and he wouldn't have been on duty.
14   Q   Okay.
15   A   And there would have been at least a day
16 where he would have been on duty and she wouldn't have
17 been scanning.
18   Q   You had mentioned the possibility of changing
19 her hours so that she could get the work done. But in
20 terms of the scanning, was she expected to -- the
21 sheriff's office was open until, what was it,
22 2:00 a.m.?
23   A   Well, the actual office is -- has employees
24 until 6:00 p.m. That's the civilian employees.
25   Q   Was the idea that she would have different

Page 104

1 hours -- was the idea there that she would work into
2 the evening so that it wasn't during the normal
3 business day so she wouldn't be distracted?
4       MS. GREER: Objection. Form. Go ahead.
5   A   The idea was that she would be able to get
6 more work done because she wouldn't have the
7 distractions from the other employees and deputies.
8   Q   (By Mr. Lamar) And would those hours have
9 gone over into the evening at a time in which there
10 were no staff personnel?
11   A   Yes.
12   Q   So she would have just been doing this
13 scanning at night when nobody else was around, other
14 than deputies coming in?
15   A   Right. And that was just a brief discussion.
16 I don't think we -- in fact, I know it never happened.
17 I don't believe it ever happened.
18   Q   So her hours weren't changed to work in the
19 evening; they stayed during the daytime?
20   A   Yeah, I believe so.
21   Q   Prior to Ms. Adam having her husband drive
22 her to work, had any other deputies who were on light
23 duty been allowed to be driven to work by other
24 deputies?
25   A   I don't know. Not that I'm aware of.

Page 105

1   Q   Did either Abby Adam or Abby Martin at that
2 time or Kolby mention to you that other employees in
3 the past had been driven to work by other deputies when
4 they were on light duty?
5   A   No.
6       MS. GREER: Can we take a break whenever --
7       MR. LAMAR: Yes, this is fine.
8       (A recess was taken from 11:28 a.m. to
9 11:32 a.m.)
10       (Deposition Exhibit 7 was marked for
11 identification.)
12   Q   (By Mr. Lamar) Just tying up a loose end,
13 Sergeant Tonjes. If you'll take a look at Exhibit 6,
14 which is your memo to Deputy Martin dated September 22.
15 I just want to know whether Exhibit 7 is the doctor's
16 note that you were referring to in Exhibit 6.
17   A   Doctor's note?
18   Q   In the first sentence you say, "We have
19 received your most recent doctor's note from
20 September 22, 2011," and --
21   A   I wouldn't know because that's what I was
22 told from Cindy Gharst.
23   Q   So you don't remember seeing Exhibit 7?
24   A   No. And on the doctor's notes and stuff like
25 that that come in, unless it says that they're allowed

Exhibit 7 - Tonjes Dep

Deposition of:  Welles Tonjes - January 8, 2014
Abby Martin v. Fred Wegener, in his official capacity as Sheriff of Park County, CO

Page 110
1  decided that -- you know, it was decided to eliminate
2  any -- any inference even, that it would be better if
3  she was in the squad room.
4      Q    I think I know what the mark on the
5  prescription pad is.  That's an anti-forgery mark that
6  only shows up when something's been -- it's like the
7  anti-forging with checks, at least I believe that to be
8  the case.
9      A    Probably.  When you photocopy it or
10 something?
11     Q    Yes.  A watermark.
12     A    Yeah.
13     Q    Did you learn in November that Ms. Martin was
14 going to be returned to light-duty work?
15     A    I don't believe so.
16     Q    Do you know whether she did, in fact, return
17 to light-duty work in November of 2011?
18     A    I don't remember because -- I mean, I don't
19 remember if she did or if she didn't.
20     Q    When she was told in September that there
21 would be no more light-duty work, do you have any
22 recollection whatsoever of her ever coming back to work
23 in any capacity before her employment ended?
24         MS. GREER:  Objection.  Form.  Go ahead.
25     A    I don't.  I don't remember, because if there

Page 111
1  was a break in her light-duty work, I don't remember
2  when it was, if it was.
3      Q    (By Mr. Lamar) Okay.  And we talked about the
4  sequence of events that led up to your memo of
5  September 22, and I just didn't know if you had any
6  memory of her ever coming back to work in any capacity
7  after September 22.
8      A    Well, if she did, I'm sure it would have been
9  light duty, but I'm not sure.
10     Q    You don't have a recollection of her working
11 at all?
12     A    She might have.  I don't know.  Like I said,
13 if she did, there might have been -- between
14 September 26 and whenever, it would have been probably
15 a brief break, but I don't...
16     Q    But if she came back to light-duty work,
17 would the county, either Cindy Gharst or someone in the
18 command chain, have notified you that she would be
19 coming back to light-duty work?
20     A    Well, we would have known, yes.  But I --
21 that whole time during there, I don't remember because
22 I know she was off for the surgery and then I believe
23 she came back and did light duty.  But like I said, I
24 don't know.
25     Q    At some point Kolby Martin started working in

Page 112
1  Bailey; is that correct?
2      A    Yes.
3      Q    In the Bailey section of the county?
4      A    Right, 5 and 6.  Districts 5 and 6.
5      Q    How many different districts are there in
6  Park County?
7      A    Nine.
8      Q    And was that in August of 2011, shortly after
9  the --
10     A    I believe it was before August.
11     Q    Well, if it was before the firehouse meeting,
12 was Ms. Martin's light-duty work being done in the
13 Bailey substation?
14     A    No.  It was being done at the sheriff's
15 office.
16     Q    And the sheriff's office is in Jefferson or
17 Fairplay?
18     A    It's right here in Fairplay, so it would be
19 in District 4.
20     Q    So if Kolby Martin was driving her to work,
21 is it your understanding that he would drive her here
22 into Fairplay and then he would go back out to Bailey?
23     A    That would have been what he would have had
24 to do, yes.
25     Q    But that's your understanding of what was

Page 113
1  going on before that meeting in the firehouse?
2      A    I believe so.
3      Q    Had he worked in Fairplay prior to working in
4  Bailey?
5      A    The only time I remember him working in
6  Fairplay was when I first started working patrol.
7      Q    Is it your understanding that he started
8  working in Bailey then before you became a corporal?
9      A    I don't remember when he started working over
10 on the Bailey side.
11     Q    So you had nothing to do with ordering him to
12 go work in the Bailey -- in Districts 5 and 6?
13     A    The only thing I've had to do with him
14 working in Districts 5 and 6 was that -- and I don't
15 remember when this was.  One time he had -- he had the
16 dogs at home, and he lived -- his house is in
17 District 6, and he would have to come home in the
18 middle of the shift to let the dogs out.
19         So I remember making it that so that he would
20 be able to do that, which means he'd have to work 5 and
21 6.  But I don't remember when that was.
22     Q    So your understanding is that he lives in
23 Bailey or the Bailey area?
24     A    No.  No.  No.  He lives in the Bailey, if you
25 would, precinct area.  Bailey is 5 and 6.  5 is

Deposition of: Welles Tonjes - January 8, 2014
Abby Martin v. Fred Wegener, in his official capacity as Sheriff of Park County, CO

Page 122

```
 1              AFFIDAVIT
 2      I, WELLES TONJES, have read my deposition and
 3  it is true and accurate, except for any changes or
 4  corrections now indicated by me on the Amendment sheet.
 5          Amendment sheet attached   ( )
 6          No changes to testimony   ( )
 7
           _____
 8              WELLES TONJES
 9
10      SUBSCRIBED AND SWORN to before me this
11  date _____.
12
           My commission expires _____.
13
           _____
14
                NOTARY PUBLIC
15
           _____
16
                STREET ADDRESS
17
           _____
18
                CITY, STATE, ZIP
19
20  Return to: MILE HIGH COURT REPORTING & VIDEO, INC.
           14143 Denver West Parkway, Suite 100A
21         Golden, Colorado  80401
22
23
24
25
```

January 22, 2014

CATHY HAVENER GREER, ESQ.
Wells, Anderson & Race, LLC
1700 Broadway, Suite 1020
Denver, CO 80290

Re: Abby Martin v. Fred Wegener
    Deposition of WELLES TONJES
    January 8, 2014

Dear Ms. Greer,
Enclosed with your copy of the above-referenced deposition is the signature page from the Court's original transcript.
In accordance with the Rule, please have the witness read and sign his or her testimony, then return the executed signature page and any amendment sheets used to us within 35 days of the date of this letter.

Sincerely,

MILE HIGH COURT REPORTING & VIDEO, INC.
Encl.
cc: Original transcript
    Ralph E. Lamar, IV, Esq.

Page 123

```
 1              CERTIFICATE
 2      I, Melissa Emily Huston, a Registered
 3  Professional Reporter, Notary Public of the State of
 4  Colorado, certify that before the deposition the
 5  witness was sworn by me to testify to the truth, and
 6  that the foregoing is a true transcript of the
 7  questions asked, testimony given, and proceedings had.
 8
 9      I further certify that I am not related to
10  any party herein, nor their counsel, and have no
11  interest in the result of this litigation.
12
13      IN WITNESS WHEREOF, I have hereunto set my
14  hand and seal this _____ day of _____, 2014.
15
16
17         _____
           Melissa Emily Huston, RPR
18         My Commission expires 4/14/2015
           Notary ID:  19994009481
19
20
21
22
23
24
25
```

RALPH E. LAMAR, IV, ESQ.
Law Office of Ralph Lamar
8515 Braun Loop
Arvada, Colorado 80005

Re: Abby Martin v. Fred Wegener
Civil Action No.:  1:13-cv-00884-PAB-KMT
Deposition of WELLES TONJES
Taken January 8, 2014

Dear Mr. Lamar:
The above-referenced original deposition is being filed with you this date: _____.

Pursuant to the governing Rules of Civil Procedure, the above-mentioned deposition is being filed:
_____ signed, with no changes
_____ signed, with changes, a copy of which is attached
_____ unsigned, no changes
_____ unsigned, with changes, a copy of which is attached

_____ unsigned, pursuant to agreement of counsel that the deposition may be reviewed and signed at or before the time of trial

_____ unsigned, our office having received notice that the case has settled
_____ signature waived at the time of deposition
_____ signature not required

MILE HIGH COURT REPORTING & VIDEO, INC.

cc: Original transcript
    Cathy Havener Greer, Esq.

32 (Pages 122 to 125)

```
Deposition of: Welles Tonjes - January 8, 2014
Abby Martin v. Fred Wegener, in his official capacity as Sheriff of Park County, CO
```

                                                                    122

 1                          AFFIDAVIT

 2       I, WELLES TONJES, have read my deposition and

 3  it is true and accurate, except for any changes or

 4  corrections now indicated by me on the Amendment sheet.

 5                  Amendment sheet attached    ( ✓ )

 6                  No changes to testimony    ( )

 7                  _____

 8                  WELLES TONJES

 9

10       SUBSCRIBED AND SWORN to before me this

11  date  18th February 2014  .

12

13       My commission expires  10-14-17  .

14  _____
    NOTARY PUBLIC
15

16  1180 Co Rd 16
    _____
    STREET ADDRESS
17

18  Fairplay, CO 80440
    _____
    CITY, STATE, ZIP
19

20  Return to:  MILE HIGH COURT REPORTING & VIDEO, INC.
                14143 Denver West Parkway, Suite 100A
21              Golden, Colorado  80401

22

23

24                                          ORIGINAL

25

[Stamp: BRENDA GREEN / NOTARY PUBLIC / STATE OF COLORADO / NOTARY ID 20054035599 / MY COMMISSION EXPIRES OCTOBER 14, 2017]

# AMENDMENT TO DEPOSITION

I, Welles E. Tonjes, wish to make the following changes to my testimony as originally given:

| PAGE | LINE | SHOULD READ | REASON |
|---|---|---|---|
| 86 | 24 | Deputy Goodman. | misunderstood |
| 87 | 1 | Goodman. | misunderstood |
| 87 | 2 | Goodman? | misunderstood |
| 87 | 3 | Goodman. | misunderstood |

Subscribed and sworn to before me this date: 2-17-14

Signature of Notary: Brenda Green

Deponent Signature: Welles E. Tonjes

My Commission expires: 10-14-17

BRENDA GREEN
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20054035599
MY COMMISSION EXPIRES OCTOBER 14, 2017

Mile High
Court Reporting & Video, Inc.

14143 Denver West Parkway, Suite 100
Golden, Colorado 80401
303-202-0210   contact@milehighreporting.com