Exhibit 9 - Gharst Dep

# Transcript of the Testimony of:
## Cindy Gharst

**Date:** January 17, 2014

Abby Martin v. Fred Wegener, in his official capacity as Sheriff of Park County, CO



Mile High Court Reporting and Video, Inc.
Phone: 303-202-0210
Fax: 303-205-0034
Email: contact@milehighreporting.com
milehighreporting.com

Exhibit 9 - Gharst Dep
Deposition of:  Cindy Gharst - January 17, 2014
Abby Martin v. Fred Wegener, in his official capacity as Sheriff of Park County, CO

Page 22

1  raised against?
2      A   Can you clarify that a little further?
3      Q   Sure.  You said that there were some
4  situations --
5      A   Right.
6      Q   -- that you found were valid complaints.  Did
7  you document in the individual's personnel file, who
8  was the subject of the complaint, that a complaint had
9  been made and that it was a valid complaint and that
10 they were being disciplined in some form or another?
11     A   Yes.
12     Q   With regard to your investigations, is it
13 your understanding that an investigation is to be --
14 designed to be as confidential as possible?
15     A   An investigation should be kept as
16 confidential as possible while also practical in that
17 you must find -- you need to talk to people who may
18 have knowledge of that particular complaint or
19 situation.
20         So you keep it as confidential as you
21 possibly can, but it may not be able to be only held
22 confidential between the accuser and the accused
23 because you do have to...
24     Q   Have you, in the course of any of your
25 investigations, ever brought the accused and the

Page 23

1  accuser into the same room along with other individuals
2  and asked the accused in front of the accuser and the
3  other individuals whether they were guilty of the
4  conduct that was alleged?
5      A   No.
6      Q   When you received the Letter of Complaint, it
7  indicates that -- and we're talking about Exhibit 8 --
8  that Sergeant Brown had met on November 18 with
9  Corporal Morgan, Corporal Paige, Corporal Reynolds, who
10 was the subject of the complaint, and Abby Adam; and
11 that he discussed, in front of these other three
12 corporals, her complaint about Corporal Reynolds.  Do
13 you see that --
14         MS. GREER:  Objection --
15     Q   (By Mr. Lamar) -- on the first page?
16         MS. GREER:  Objection to form.
17     A   Yes, I do.
18     Q   (By Mr. Lamar) Did you form an opinion when
19 you saw that as to whether that was proper procedure by
20 Master Sergeant Brown in doing that?
21         MS. GREER:  Objection to form.  Go ahead.
22     A   No, I did not consider that.
23     Q   (By Mr. Lamar) You're saying that you never
24 formed an opinion as to whether that was proper or not?
25     A   That is correct.

Page 24

1      Q   If you will take a look at Exhibit 3 in the
2  book.  This is a complaint that Abby Adam wrote to the
3  undersheriff, Monte Gore.  Do you see that?
4      A   Yes.
5      Q   But ultimately you ended up doing the
6  investigation for this complaint; is that correct?
7      A   My understanding is that this complaint was
8  presented to the undersheriff, and I believe the
9  undersheriff did have a conversation with John Tighe.
10 I'm not aware if they did their own investigation or
11 not, but then I did do an investigation when I was
12 called upon.
13     Q   And that's what I was going to ask you, was:
14 Did you ever receive a separate Letter of Complaint
15 from Abby Adam regarding the John Tighe incident?
16     A   I was presented this Letter of Complaint.
17     Q   Exhibit 3?
18     A   Yes.
19     Q   Do you remember whether Abby provided you
20 with Exhibit 3 or whether the undersheriff provided you
21 with Exhibit 3?
22     A   I believe Abby provided it to me.
23     Q   Did she tell you that the reason she was
24 coming to you was because she didn't think the sheriff
25 was going to investigate?

Page 25

1      A   No, that's not...
2      Q   Did she explain to you why she was coming to
3  you?
4      A   It was actually Sergeant Brown who called me
5  concerned about this complaint that had been submitted
6  and asked me if I would -- or advised me that maybe
7  Abby wanted to talk to me or could I get in touch with
8  Abby because I don't think -- what I recall is that
9  Abby was not satisfied with whatever was taking place
10 within the sheriff's office.
11     Q   Do you know whether the undersheriff ever
12 provided any response to Abby Martin, Abby Adam at the
13 time, with regard to her complaint about John Tighe?
14     A   No, I don't.
15     Q   And you'd never contacted him to find out
16 what, if any, action he had taken; is that correct?
17     A   I had a conversation -- I think I spoke with
18 the undersheriff.  I did not specifically ask him what
19 had been -- what he had done or not done.
20     Q   When Abby came to you -- and she did come to
21 you, didn't she, after the phone call from Sergeant
22 Brown?
23     A   Yes.  We arranged and met the next day at the
24 sheriff's office with Sergeant Brown present and
25 Welles.

7 (Pages 22 to 25)

Deposition of: Cindy Gharst - January 17, 2014
Abby Martin v. Fred Wegener, in his official capacity as Sheriff of Park County, CO

Page 26

1  Q    Did you mention to her that you had a concern
2  that Commissioner Tighe was in your reporting chain;
3  that a complaint about his behavior would cause you to
4  have problems, given that he was above you in the chain
5  of command at the county?
6  A    No, I did not.
7  Q    Did that actually cause you any concern
8  without mentioning it to Ms. Adam at the time?
9  A    Can you clarify your question again?
10 Q    Sure.  Did it cause you any concern that
11 Ms. Adam was coming to you and asking you to do
12 something about the actions of somebody who was above
13 you in the chain of command?
14 A    Although the commissioner was above me in the
15 chain of command, there are three commissioners, and he
16 is only one of the three.  It certainly is not
17 comfortable, but I felt there was a duty to respond to
18 her complaint.
19 Q    Did you believe that you had the authority to
20 make a recommendation that Commissioner Tighe be
21 disciplined if the charge were founded?
22 A    That's a difficult question because he is an
23 elected official, so I'm not sure what disciplinary
24 action -- I was not uncomfortable if I needed to report
25 to the county attorney or the other two commissioners

Page 27

1  if something had been found.
2  Q    Did you explain to Ms. Adam at the time that
3  you might not have the ability to take any corrective
4  action with regard to Commissioner Tighe?
5  A    I did not make a statement at that time
6  because I didn't know where we were going to be at the
7  end of the investigation.  The intent was to look into
8  the complaint.
9  Q    Did you know at the time that Commissioner
10 Tighe was a reserve deputy?
11 A    Yes.
12 Q    Did you feel that if any corrective action
13 were to be taken with regard to his actions, vis-a-vis
14 his role as a reserve deputy, that that would have been
15 done by the sheriff's department?
16 A    Yes.  I would have had no authority to...
17 Q    Take a look at Exhibit 4.  Did Ms. Adam share
18 with you what's been marked as Exhibit 4 when she met
19 with you on the 11th?
20 A    Yes.
21 Q    So you knew that she had asked to go back to
22 patrol?
23 A    Yes.
24 Q    Do you have an understanding as to whether
25 the SRO position had a difference in pay between that

Page 28

1  of a patrol deputy or was it the same pay?
2  A    The same pay.
3  Q    If you would take a look at Exhibit 11 for
4  me.  This report is dated June 6, 2010, and this report
5  was produced by you in response to Abby Adam's
6  complaint that was marked as Exhibit 3; is that
7  correct?
8  A    Yes.
9  Q    Who was this report distributed to?
10 A    The county attorney.
11 Q    And when you say, "the county attorney" --
12 A    I'm sorry.  Lee Phillips.
13 Q    Okay.  That's where I was going with that.
14 Anybody else besides the county attorney?
15 A    No.
16 Q    Did you have a follow-up conversation with
17 either Master Sergeant Brown or Captain Hancock or the
18 undersheriff regarding the results of your
19 investigation?
20 A    No.  The results of the investigation were
21 provided to John Tighe and Abby Martin.
22 Q    If you'll take a look at Exhibit 13.  This is
23 a two-page exhibit.  The first page is the memo
24 specifically to Ms. Adam, and then the second page is
25 the Summary of Findings.  Do you see that?

Page 29

1  A    Yes.
2  Q    Did you actually have a conversation with
3  Abby regarding your findings, or did you hear nothing
4  after you had this sent to her, or did you meet in
5  person with her on the 8th to discuss it?
6  A    I did not meet in person with her.  I had the
7  letter and the findings delivered -- well, or I
8  delivered them to her or sent them to her.  And I don't
9  recall that we ever had a conversation about them
10 after.
11 Q    Now, your first finding on this summary page
12 says that "It is conclusive that requesting the
13 complainant to perform the cheer was not sexual
14 harassment because there was no condition of employment
15 or any employment decision made regarding it."
16 Did you believe that when Abby was asked to
17 do the Barbie Cheer, that she was not actually working
18 at the time?
19 A    No, she was working.
20 Q    And you didn't understand that somebody in a
21 position of power over a female employee who asked them
22 to do something that was demeaning and sexualized would
23 not involve a condition of her employment?
24 MS. GREER:  Objection to form.  You can go
25 ahead and answer.

8 (Pages 26 to 29)

Exhibit 9 - Gharst Dep
Deposition of: Cindy Gharst - January 17, 2014
Abby Martin v. Fred Wegener, in his official capacity as Sheriff of Park County, CO

Page 30

1  A   The commissioner -- I'm sorry.  Let me
2  rephrase that.  The sheriff is the elected official who
3  Abby reports to as opposed to the commissioner;
4  therefore, there was no employment decisions that the
5  commissioner would have made or could have made of her
6  employment.
7  Q   (By Mr. Lamar) Do you understand that
8  employers can be liable for sexual harassment by
9  individuals who don't work for the employer?
10 A   Yes.
11     MS. GREER:  Objection.  Form and foundation.
12 Q   (By Mr. Lamar) So when there are situations
13 where a third party, whether it's a vendor, a customer,
14 or somebody from just the general public, sexually
15 harasses somebody, it's your understanding that it's
16 not a condition of employment because they don't have
17 the ability to make a decision about the individual's
18 job status?
19     MS. GREER:  Objection.  Form and foundation.
20 You can go ahead.
21 A   In the context of Finding 1, that statement
22 was made because the commissioner -- there was no
23 condition of her employment; when asked to do that
24 cheer, there was no decision or repercussion if she
25 said no or yes to doing it.  I think -- is that

Page 31

1  answering your question?
2  Q   (By Mr. Lamar) So if the sheriff had ordered
3  her to do the Barbie Cheer, it would have constituted
4  sexual harassment because he was her boss; but because
5  Commissioner Tighe had no ability to take any action
6  against her, that's why you made that finding?
7      MS. GREER:  Objection.  Form.
8  A   No.
9  Q   (By Mr. Lamar) Well, I'm trying to find out
10 the distinction.  Did you find Commissioner Tighe's
11 behavior to be acceptable?
12 A   The findings state that it was not -- that it
13 was found to be not appropriate for the workplace and
14 not condoned.
15 Q   If Sheriff Wegener had said to Abby Adam
16 while she was an SRO that day, I want you to do the
17 Barbie Dance, the Barbie Cheer in front of these
18 students, that would not have been acceptable, correct?
19 A   The same would have held true.
20 Q   Okay.  Not acceptable?
21 A   Correct.
22 Q   We're in agreement on that?
23 A   Yes.
24 Q   But your distinction is because Commissioner
25 Tighe didn't have the ability to make a specific

Page 32

1  employment decision with regard to Abby Adam and did
2  not have the authority to order her under threat of
3  discipline, that that was not a condition of her
4  employment?
5      MS. GREER:  Objection to form.  You can go
6  ahead and answer.
7  A   I'd like you to repeat the question again.
8  Q   (By Mr. Lamar) Sure.  I'm trying to find out
9  if the reason you held that it was not a condition of
10 employment was because of Commissioner Tighe's status
11 as a commissioner for the county and because he was not
12 actually employed in the chain of command by the
13 sheriff's department.
14 A   If Abby had refused to do -- state, Forget
15 it, no way, the commissioner would not have had the
16 ability to impose any discipline or other adverse
17 action with her employment status at the sheriff's
18 office.
19 Q   Do you understand that sexual harassment also
20 applies to coworker harassment?
21     MS. GREER:  Objection.  Form.  Go ahead.
22 A   Yes.
23 Q   (By Mr. Lamar) And in coworker harassment,
24 the coworkers don't have the ability to affect the
25 complaining party's employment either, do they?

Page 33

1  A   Correct.
2  Q   John Tighe, as a reserve deputy, was
3  basically a coworker of Deputy Adam's at the time?
4      MS. GREER:  Objection.  Form.  Foundation.
5  Q   (By Mr. Lamar) Correct?
6      MS. GREER:  Objection.  Form.  Foundation.
7  You can go ahead.
8  A   Okay.  As a reserve officer he would be a
9  coworker of the deputies.
10 Q   (By Mr. Lamar) And Title 7 does not allow
11 coworkers to harass their fellow coworkers, does it?
12     MS. GREER:  Objection.  Form and foundation.
13 Go ahead.
14 A   Correct.
15 Q   (By Mr. Lamar) So in his role as a reserve
16 deputy, you would have expected that the sheriff would
17 have conducted some form of investigation and made some
18 sort of finding with regard to Commissioner Tighe's
19 behavior on that day, correct?
20 A   I would think that they would, yes.
21 Q   Did you take any action or make any
22 recommendations with regard to the commissioner in his
23 duties as a commissioner with regard to his behavior as
24 complained to you?
25     MS. GREER:  Objection.  Form.  Go ahead.

Exhibit 9 - Gharst Dep
Deposition of: Cindy Gharst - January 17, 2014
Abby Martin v. Fred Wegener, in his official capacity as Sheriff of Park County, CO

Page 34
1  A   Would you repeat the question again?
2  Q   (By Mr. Lamar) Sure.  Did you make any
3  recommendations with regard to the commissioner as --
4  in his status as a commissioner in light of your
5  investigative findings?
6       MS. GREER:  Same objection.  Go ahead.
7  A   The commissioner was warned that the behavior
8  was -- or the conduct was not appropriate and to --
9  that it was not appropriate for the work environment.
10 Q   (By Mr. Lamar) Because it sexualized Abby
11 Adam?
12 A   No.  It was not appropriate for the
13 workplace, not condoned, but we didn't -- it was not
14 found to be...
15 Q   You didn't find it to be sexually demeaning?
16      MS. GREER:  You just interrupted her.
17      MR. LAMAR:  No, I didn't, Counsel.
18      MS. GREER:  I don't believe she was finished.
19 A   What I was going to say is that he was warned
20 that although he -- that particular cheer that he
21 gave -- or was performed in this school event had been
22 done in the past and he had learned it in the D.A.R.E.
23 training, he needs to re-evaluate those things.  It was
24 not appropriate in this day and age, and he was warned.
25 Q   (By Mr. Lamar) Did you discuss with any

Page 35
1  members of the sheriff's department whether the Barbie
2  Cheer had ever been trained -- had ever been part of
3  the training for the D.A.R.E. program?
4  A   No, I didn't.
5  Q   And just so that I -- we're on the same page,
6  it was Ms. Adam's complaint that what the commissioner
7  had asked her to do was to put her hands on her hips
8  and shake her hips and do the Barbie Cheer and say,
9  "Hubba hubba"?
10 A   That's correct.
11 Q   Okay.  And you don't find asking a woman in
12 the workplace to engage in such conduct is a sexually
13 offensive request?
14 A   I think the context of that particular event
15 and the training materials that have since been
16 produced and validate the training that John Tighe
17 received, I agree it was not appropriate, but it may
18 not have risen to the level of sexual harassment.
19 Q   Do you find that asking a woman to put her
20 hands on her hips and shake her hips in front of a room
21 full of students and say, "Hubba hubba," isn't sexually
22 offensive to a woman?
23 A   It may be, and it certainly wasn't
24 appropriate.  But in the context of this particular
25 investigation, the totality of the circumstances, it

Page 36
1  may not -- it did not rise to that level.
2  Q   In any of the training materials that you did
3  review for D.A.R.E. training, is there anything in
4  there that talks about a Barbie Cheer?
5  A   Did not find a Barbie Cheer.
6  Q   And you didn't find anything that suggests
7  that a female deputy should put her hands on her hips
8  and shake her hips and say, "Hubba hubba," correct?
9  A   No.  But I found many other samples of these
10 techniques, which you could construe to not be
11 appropriate either in this day and age.
12 Q   And those materials were produced to us in
13 discovery, correct?
14 A   Uh-huh.  Yes.
15 Q   So you believe that the Barbie Cheer that
16 Commissioner Tighe asked Abby Adam to perform was no
17 worse than any of the other cheers that were part of
18 the D.A.R.E. training?
19 A   No, that's not what I'm saying.
20      THE DEPONENT:  Can we take a break?
21      MS. GREER:  Sure.
22      (A recess was taken from 9:47 a.m. to
23 9:54 a.m.)
24 Q   (By Mr. Lamar) Ms. Gharst, did you ever have
25 any conversations with either of the other two

Page 37
1  commissioners about the complaint that Abby Adam filed
2  and that you investigated?
3  A   I believe that -- I believe that we had
4  informed the other two of the complaint.
5  Q   And who were the other two commissioners at
6  the time?
7  A   Richard Hodges and Mark Dowaliby.
8  Q   Did you ever see anything in writing
9  explaining that because he was an elected official,
10 John Tighe was immune to any discipline by the county
11 for his behavior on May 10 at the school?
12 A   Would you repeat that?
13 Q   Sure.  Did you ever have a discussion or see
14 anything in writing from the other two commissioners
15 that suggested that because John Tighe was a
16 commissioner, there was nothing that the county could
17 do with regard to --
18 A   I did not see anything in writing or discuss
19 with the commissioners that he couldn't be disciplined.
20 Q   Take a look at Exhibit 12 for me.  This is
21 dated from -- it's from you to a File dated
22 May 16, 2011, regarding a phone call from Abby Adam.
23      Did you maintain a separate personnel file
24 for Ms. Adam?
25      MS. GREER:  Objection to form.  Go ahead.

Exhibit 9 - Gharst Dep
Deposition of: Cindy Gharst - January 17, 2014
Abby Martin v. Fred Wegener, in his official capacity as Sheriff of Park County, CO

Page 42
1  And then it says on the next sentence, "Knowing that
2  she had a problem with Kelly during her FTO period, I
3  asked her if she had any problems working with Jen."
4      So you were aware that she felt that Kelley
5  Reynolds might retaliate against her?
6      MS. GREER: Objection to form. Go ahead.
7   A   I was aware, based on her statement, that she
8  might have a concern. And I had just learned about the
9  Kelley Reynolds complaint. I hadn't seen her other
10 issues in the documents she had provided later.
11     And then you'll see that I also advised her
12 to go to Mike Brown to see if she could work out an
13 issue if she had concerns about that.
14  Q  (By Mr. Lamar) Based upon your level of
15 responsibility and what her complaints were, at least
16 as expressed in this file memo, you would have expected
17 her to go back to the sheriff's department and go to
18 somebody in the chain of command and talk about it,
19 correct? Is that what I'm understanding?
20  A  Would you repeat the question?
21  Q  Sure. Did you have the authority to
22 investigate any claims she was making of retaliation by
23 the sheriff's department?
24     MS. GREER: Objection to form. Go ahead.
25  A  At the time I had the conversation on the

Page 43
1  16th, I hadn't been fully advised by Abby of her
2  concerns and issues in the sheriff's office. All I
3  knew is she had the complaint against John Tighe and
4  there had been some complaint against Kelley in 2009.
5      So when I spoke to her in the context of this
6  conversation, all I tried to do was advise her to go to
7  Mike Brown if she had a concern about her schedule or
8  reporting to her supervisor.
9      Mike Brown and Welles Tonjes were very
10 supportive of Abby, and that is why I made the
11 statement I made in that phone call.
12  Q  (By Mr. Lamar) I understand. Did you tell
13 her during that meeting that you did not have the
14 authority to investigate or address any issues of
15 retaliation in the sheriff's department?
16     MS. GREER: Objection to form. Go ahead.
17  A   I did not make a statement that I had no
18 authority.
19     (Deposition Exhibit 14 was marked for
20 identification.)
21  Q  (By Mr. Lamar) This is a new exhibit,
22 Ms. Gharst, and this is what appears to be a carbon
23 copy or at least a duplicate of your letter that you
24 sent to Abby Adam but this one is addressed to
25 Commissioner Tighe in connection with the complaint

Page 44
1  that was raised against him. It says it's addressed to
2  Commissioner Tighe.
3      My question is: Were there any former files
4  that were maintained for the commissioners that this
5  could be maintained in?
6      MS. GREER: Did you say "formal" or "former"?
7      MR. LAMAR: "Former." Sorry. I meant to say
8  "formal."
9   A   I would have put this letter --
10  Q  (By Mr. Lamar) Exhibit 14?
11  A   -- Exhibit 14 in the file, the personnel
12 file of John Tighe, as I did the file for Abby Martin.
13  Q  So he was treated as an employee of Park
14 County in some respect?
15     MS. GREER: Objection to form. Go ahead.
16  A   I'm not sure I understand your question.
17  Q  (By Mr. Lamar) Well, my belief is that
18 Commissioner Tighe was not an actual employee of the
19 county; that he was an elected official.
20  A  That is correct.
21  Q  Was he considered an employee of the county?
22     MS. GREER: Objection. Form. Go ahead.
23  A   He's not -- he is not considered an employee
24 in the same way as an at-will employee. He's an
25 elected official.

Page 45
1   Q  (By Mr. Lamar) But nonetheless, he is
2  considered an employee of the county; just not the same
3  as an at-will employee?
4   A  Correct. He falls under the Park County --
5  I'm not sure how to answer that.
6   Q  He's subject to the same policies and
7  procedures as all the full-time employees who are
8  at-will employees?
9      MS. GREER: Objection to form and
10 foundation -- objection to form. Not foundation. Go
11 ahead.
12  A  There would be limitations on how he would
13 be -- he -- he's not subject to all the same policies
14 and procedures as an elected official.
15  Q  (By Mr. Lamar) You mean as an at-will
16 employee he's not subject to the same policies and
17 procedures?
18  A  There are certain policies and procedures
19 that do not apply to an elected official.
20  Q  Are any of those policies and procedures, do
21 any of those that he's not subject to, do they deal
22 with sexual harassment or Title 7 issues?
23  A  Would you repeat that?
24  Q  Sure. You said that he's not subject to the
25 same policies and procedures as an at-will employee,

Exhibit 9 - Gharst Dep
Deposition of: Cindy Gharst - January 17, 2014
Abby Martin v. Fred Wegener, in his official capacity as Sheriff of Park County, CO

Page 46
1  and I'm asking: Are any of those policies and
2  procedures that he's not subject to, do any of those
3  policies and procedures deal with Title 7?
4      MS. GREER: Objection. Form. Go ahead.
5      A   He is subject to the same policies and
6  procedures related to Title 7.
7      Q   (By Mr. Lamar) You state in the third
8  paragraph in Exhibit 14, "It is apparent that the
9  situation could have been avoided if the materials and
10 techniques from your prior trainings had been given
11 more thought by you periodically to make sure that they
12 are still current and appropriate for use."
13     Did Commissioner Tighe provide you with the
14 materials and information -- printed materials that he
15 had from his prior trainings?
16     A   He did not provide me with any materials for
17 the Barbie Cheer, although he did provide them -- I
18 think they have been provided since that time.
19     Q   So in referencing that, you were talking
20 about what he had specifically simply told you as
21 opposed to any documented information you had from any
22 D.A.R.E. program training?
23     A   That was not -- the statement was that -- not
24 only the Barbie Cheer, but any other training that he
25 may have had he should consider that may not be

Page 47
1  appropriate for use in the future.
2      Q   Okay. Here's what I'm trying to get with
3  that paragraph: You don't -- in your investigation, I
4  don't believe -- and you're welcome to go back to it,
5  the exhibit -- where you -- that says, I asked
6  Commissioner Tighe for all printed materials from his
7  prior trainings.
8      A   I did ask him for that.
9      Q   Okay. And did he provide that to you before
10 June 8, 2011?
11     A   No.
12     Q   With regard to this paragraph then, you
13 reference, the situation could have been avoided if the
14 materials and techniques from his prior trainings had
15 been given more thought by him.
16     So in making that statement, were you simply
17 relying on what he had told you? Because you said that
18 he hadn't provided you with the actual documents from
19 his trainings, correct?
20     A   That is correct.
21     Q   So in making that statement to him, you were
22 relying on what he had told you about his prior
23 training?
24     A   And research I had done on D.A.R.E. training
25 in general and the techniques used, yes.

Page 48
1      Q   And the research that you did did not provide
2  any information suggesting that anyone had been trained
3  in a Barbie Cheer, correct?
4      A   I had not seen a Barbie Cheer specifically.
5      Q   When did you learn that Ms. Martin had a back
6  condition that was going to require that she miss some
7  time?
8      A   I want to say it was in the last two weeks of
9  June.
10     Q   Of 2011?
11     A   I'm sorry. June 2011.
12     Q   And how did you learn that?
13     A   Abby came to see me regarding FMLA.
14     Q   Did she discuss with you at that point in
15 time possibly doing light-duty work for the PCSO?
16     A   I don't remember specifically if that was
17 discussed or not.
18     Q   Any coordination she would have or any setup
19 of light-duty work would have been through the
20 sheriff's --
21     A   Correct.
22     Q   -- department?
23     Do you remember -- take a look at Exhibit 5,
24 and this is a memo you wrote to Welles Tonjes on
25 September 14, 2011.

Page 49
1      A   Yes.
2      Q   Do you remember why you sent him this memo?
3      A   Yes. I was contacted to ask about light duty
4  and what the requirements were and how long, does it
5  have to be indefinite, and that was my response.
6      Q   But the light-duty program and light-duty
7  policies are all implemented by the sheriff's
8  department, correct?
9      MS. GREER: Objection. Form. Go ahead.
10     A   The sheriff's office has a light-duty policy,
11 and they would be the ones to determine whether or not
12 they have appropriate duty that would meet somebody's
13 restrictions.
14     Q   (By Mr. Lamar) Okay. I'm just curious why
15 Sergeant Tonjes contacted you if the sheriff's
16 department has their own light-duty policy.
17     A   I believe the reason was, more than likely,
18 because she was on FMLA, wondering if there was any
19 special rule under FMLA, is my speculation.
20     Q   But you don't have a particular recollection
21 today, as we sit here, why he contacted you?
22     A   I believe it was, more than likely, because
23 she was on FMLA, wondering if there was some
24 restriction or rule related to her leave under the
25 FMLA.

13 (Pages 46 to 49)

Exhibit 9 - Gharst Dep
Deposition of: Cindy Gharst - January 17, 2014
Abby Martin v. Fred Wegener, in his official capacity as Sheriff of Park County, CO

Page 50

1  Q   And is it your understanding that when light
2  duty is provided, that if a person is doing their 40
3  hours of work, that they're actually using up their
4  FMLA leave?
5  A   No.  If they're on light duty and they're
6  working, that doesn't go against their FMLA.
7  Q   FMLA only applies when it's being used when
8  they're not at work, for unpaid leave, correct?
9  A   Well, it can still be paid leave if
10 they're -- yes.
11 Q   Understood.  They're not performing any
12 services for the county?
13 A   Correct.
14 Q   And your memo indicates that she had gone on
15 medical leave in July and had returned on August 1 with
16 a release allowing her to do light-duty work and that
17 she would be re-evaluated in three months?
18 A   Uh-huh.  Yes.
19 Q   And then you summarized what had happened
20 subsequent to her coming back on light duty with regard
21 to her medical.  And you indicated that -- in the third
22 paragraph that "There has been concern about
23 accommodating light duty indefinitely and questions
24 about how long the Sheriff's Office has to provide
25 light duty."  Do you see that?

Page 51

1  A   Uh-huh.  Yes.
2  Q   Did Abby Martin, to your knowledge, ever ask
3  for an indefinite light-duty assignment?
4  A   Not to my knowledge.
5  Q   So the concern about accommodating light duty
6  indefinitely was raised on its own by somebody in the
7  sheriff's department.  Is that your understanding?
8  A   Yes.
9  Q   Was that Sergeant Tonjes or somebody else in
10 the sheriff's department who was concerned about that?
11 A   I don't know of anybody else.  It was
12 Sergeant Tonjes with whom I spoke.
13 Q   Okay.  Is it your understanding that the
14 Americans with Disabilities Act does allow for some
15 time off beyond the 12 weeks permitted under the FMLA?
16     MS. GREER:  Objection.  Form.
17 Q   (By Mr. Lamar) Assuming that they're a
18 qualified individual with a disability.
19     MS. GREER:  Objection.  Form.  Foundation.
20 Go ahead.
21 A   Yes.
22 Q   (By Mr. Lamar) Did you indicate to Sergeant
23 Tonjes either on the 14th or shortly thereafter that
24 the sheriff's office may have a duty to accommodate her
25 by giving her light duty -- I'm sorry, that she might

Page 52

1  be entitled to more time off than the 12 weeks under
2  the FMLA?
3      MS. GREER:  Objection.  Form.  Go ahead.
4  A   I don't recall having a specific conversation
5  about that.
6  Q   (By Mr. Lamar) Is it your understanding that
7  light duty is provided so that sheriff's deputies
8  continue to receive pay instead of going out on unpaid
9  FMLA leave?
10 A   Would you repeat that question?
11 Q   Sure.  Is it your understanding that the
12 sheriff's department provides the light-duty assignment
13 so that deputies can actually receive a paycheck when
14 they're on a light-duty status instead of being out on
15 FMLA, which is unpaid leave?
16 A   Well, actually FMLA, the way we run it, you
17 can still be on FMLA not reporting to work on paid time
18 as opposed to unpaid time.  But in general -- I'd like
19 you to repeat the question so I can answer it more
20 directly.
21 Q   Sure.  Is it your understanding that one of
22 the reasons the sheriff's department offers light-duty
23 work is so that individuals can receive a paycheck
24 instead of being out on an unpaid FMLA leave?
25 A   I think in general if an employer, whether

Page 53

1  it's the sheriff's office or other departments, can
2  provide light duty that meets restrictions, it's
3  always -- it could be beneficial to the employee, but I
4  don't know specifically if that's why the sheriff's
5  office provides light duty or not.
6  Q   Do you have an understanding that the
7  sheriff's office also allows other employees to donate
8  medical time, paid time off?
9  A   Yes.
10 Q   So earlier you referenced they can be on FMLA
11 but being paid, and that's through the donated time,
12 correct?
13 A   Our FMLA people need to use their own
14 vacation, sick, or comp time first on -- for the paid
15 leave.  When it's exhausted, we do allow people to
16 receive donated time to help cover that period while
17 they're out.
18 Q   Is there any limit on how much donated time
19 can be given to an individual, to your knowledge?
20 A   We have some restrictions.  If you -- a
21 person can't donate time if they fall below a certain
22 amount in their own sick bank.  Okay.  So that is a
23 limiting factor.
24     But in terms of how much time is donated,
25 there's -- it's case-by-case.  There's no specific

Exhibit 9 - Gharst Dep
Deposition of: Cindy Gharst - January 17, 2014
Abby Martin v. Fred Wegener, in his official capacity as Sheriff of Park County, CO

Page 54

1 limit, at that time, that was given.
2   Q  You write in that third paragraph down, "If
3 work restrictions and light duty requirements are
4 requested after the upcoming re-evaluation, the
5 Sheriff's Office does not have to provide it." Do you
6 see that?
7   A  Yes.
8   Q  You didn't mention anything in this letter
9 about the Americans with Disabilities Act, did you?
10   A  No.
11   Q  And you are aware that the sheriff's
12 department, just like the county, has an obligation to
13 engage in an interactive process to try and see if a
14 reasonable accommodation can be made if somebody has
15 some work restrictions?
16       MS. GREER: Objection. Form and foundation.
17 Go ahead.
18   A  Yes.
19   Q  (By Mr. Lamar) And then you say, "Another
20 concern brought to my attention is precedent of how
21 light duty has been provided to other employees in the
22 past." Who brought that concern to your attention?
23   A  I'm recollecting it was more than likely
24 Sergeant Tonjes. That's why I replied to him.
25   Q  It just seemed an odd use of phrase as

Page 55

1 opposed to saying the concern you expressed, and so I
2 wasn't sure whether it was someone else.
3       And what was the concern about the precedent
4 of light duty that he brought to your attention?
5   A  I think -- I think it was in the context of
6 equal duty for everybody. I'm not sure. I think it
7 probably had to do with, does it have to be the same
8 for everybody.
9   Q  And by "the same," do you mean the amount of
10 time, or do you mean the type of duties? What do you
11 mean by "the same"?
12   A  The type of duties. The length of the duty.
13 How it's applied. That's what I'm thinking the context
14 of that comment was.
15   Q  The next sentence says, "Of course, each
16 situation is different and the needs of the business
17 operations may or may allow for the exact same light
18 duty each time." Is that a typo? It meant to say may
19 or may not?
20   A  Correct.
21   Q  But it's underlined. Do you see that?
22   A  Uh-huh.
23   Q  Was that underlining done by you or somebody
24 else?
25   A  It was not done by me.

Page 56

1   Q  And then you indicate in the next paragraph
2 that if Abby was not released to full duty at her
3 upcoming appointment and -- you meant by that a
4 doctor's appointment, correct?
5   A  Correct.
6   Q  -- and that no light duty is provided to her,
7 she will then continue to use the rest of her available
8 FMLA leave?
9   A  Correct.
10   Q  Did you believe, in sending this memo to
11 Sergeant Tonjes, that he was going to stop her
12 light-duty assignment?
13   A  I didn't know if he was or wasn't going to.
14   Q  Did he get back in touch with you to tell you
15 whether he was going to stop her light-duty assignment?
16   A  I really don't remember if he -- if he did or
17 when he did. I don't really remember.
18   Q  Did you ever receive something in writing
19 from Welles Tonjes after September 14, 2011, saying
20 that the specific duties that Ms. Adam had been
21 performing were completed and that there was no
22 light-duty tasks available for her anymore?
23   A  I never received anything.
24   Q  Do you know what she was doing on her
25 light-duty assignment?

Page 57

1   A  As far as I know, she was in the office doing
2 some administrative work, like scanning, some kind of
3 scanning project.
4   Q  If you'll take a look at Exhibit 6 in the
5 book and Exhibit 7. Exhibit 7 is a medical release,
6 and Exhibit 6 should be a memo from Sergeant Tonjes to
7 Abby Martin.
8       Did you ever see a copy of this memo to her
9 either on the 22nd or shortly thereafter?
10   A  I believe I received a copy of it sometime
11 thereafter.
12   Q  Did you receive a copy of the doctor's
13 release that's marked as Exhibit 7?
14   A  I probably did. It looks familiar.
15   Q  Did Welles Tonjes ever explain to you why
16 there was no longer going to be any light-duty work for
17 her as of September 26, 2011?
18   A  I don't remember that we had any conversation
19 that -- where he explained to me why they did not have
20 any more light duty.
21   Q  Did Ms. Adam, she was Ms. Martin then, come
22 in and see you on the 22nd to talk to you about
23 Sergeant Tonjes' memo?
24   A  Yes.
25   Q  And did she ask you why there had been a

Deposition of:  Cindy Gharst - January 17, 2014
Abby Martin v. Fred Wegener, in his official capacity as Sheriff of Park County, CO

Page 58
1  decision about no more light-duty work for her as of
2  the 26th?
3      A   Probably.  I think we talked about -- well,
4  she'd obviously been advised and was wondering then
5  what the next steps would be for her, and I think she
6  had some insurance issues.
7      Q   But you don't have any recollection as to any
8  explanation you may have given her about why the light
9  duty was going to stop as of the 26th?
10     A   I don't remember specifically, but more than
11 likely it's because obviously the sheriff's office, for
12 business reasons, didn't feel that there was any more
13 light duty.  I don't remember any specifics of the
14 conversation.
15         (Deposition Exhibit 15 was marked for
16 identification.)
17     Q   Ms. Gharst, I'm showing you Exhibit 15.  This
18 is a letter from Darold Killmer dated October 13, 2011,
19 and it was addressed to the sheriff, to Captain
20 Hancock, and to you.  Do you see that?
21     A   Yes.
22     Q   Do you remember receiving this letter from
23 Ms. Martin's attorney?
24     A   Yes, I do.
25     Q   Mr. Killmer in here, in the first paragraph,

Page 59
1  states that -- at the very end of the first paragraph,
2  Although Deputy Martin was capable of continuing
3  light-duty employment, Park County denied her further
4  light-duty employment and required her to take a
5  medical leave of absence when she notified Sergeant
6  Welles Tonjes on or about September 22 that she would
7  require a second surgery.
8          As a result of reading that sentence, did you
9  contact Sergeant Tonjes to ask him whether that was,
10 indeed, true?
11     A   I don't believe I contacted Sergeant Tonjes.
12     Q   Did you speak with either the sheriff or
13 Captain Hancock or anyone in the sheriff's office to
14 find out if the facts as alleged by Mr. Killmer were
15 correct?
16         MS. GREER:  Objection to form.  Go ahead.
17     A   Would you repeat the question?
18     Q   (By Mr. Lamar) Sure.  Did you talk to anyone
19 at the sheriff's office to determine whether the
20 allegation that Mr. Killmer has made in that paragraph
21 that we're talking about was accurate?
22         MS. GREER:  Objection to form.  Go ahead.
23     A   I believe I may have spoken with the sheriff.
24     Q   (By Mr. Lamar) Do you remember what the
25 sheriff said?

Page 60
1      A   No.  I can't be certain.
2      Q   Do you remember being notified that Abby
3  Adam, well, she was Abby Martin then, had applied for a
4  detective position?
5      A   Yes.
6      Q   And how did you learn of that?
7      A   I think it was Mike Brown who may have -- I'm
8  trying to remember.  I think it was Mike Brown who had
9  let me know.  I think it was from Mike Brown.  I don't
10 remember exactly.
11     Q   Did he call you asking for advice, or did
12 he -- was it just a heads-up type of communication?
13     A   I think it was more -- I think we were
14 expecting that -- I'm trying to remember how it came
15 about, because I think it may have just been in
16 anticipation of Abby -- knowing Abby would hopefully be
17 returning at the end of November, we were having a
18 conversation or trying to plan the schedule or -- I
19 don't remember exactly.
20         It was just an advisement that she would
21 be -- had been interested in testing or was going to be
22 interested in testing.  I don't remember exactly.
23     Q   Did you understand Exhibit 7, which is the
24 release from her doctor, to mean that she could not
25 perform any more work at that time?

Page 61
1      A   Exhibit 7?
2      Q   Right.
3      A   Dated September 22?
4      Q   Correct.
5      A   I can't really read the last two lines.
6      Q   Read for me as much as you can.
7      A   Patient non-responding to conservative
8  management or -- I think that's the neuro- --
9      Q   Diskectomy?
10     A   Yes.  Then I can't read.  Then something
11 light duty and pursuing fusion.
12     Q   Okay.  Did anybody ever tell you that Abby
13 Adam had been taken completely out of work on a medical
14 basis as of September 26 --
15         MS. GREER:  Objection.  Form.
16     Q   (By Mr. Lamar) -- 2011?
17         MS. GREER:  Objection.  Form.  Go ahead.
18     A   Repeat that question, please.
19     Q   (By Mr. Lamar) Sure.  Did either Welles
20 Tonjes or the sheriff or anybody say to you, Abby
21 Adam's medical status right now is that she is
22 medically unable to perform any work at all?
23     A   No.
24     Q   Okay.  And you said that she was doing
25 administrative work for the sheriff's department, to

16 (Pages 58 to 61)

Deposition of: Cindy Gharst - January 17, 2014
Abby Martin v. Fred Wegener, in his official capacity as Sheriff of Park County, CO

Page 74

1 regular basis in this time period?
2    A   They would be there regularly on a Wednesday
3 and Thursday for their meetings and occasionally any
4 other day of the week possibly.
5    Q   These were public meetings, or these were
6 meetings just between the three of them?
7    A   No. They were work sessions, informal,
8 public meetings.
9    Q   So I'm just trying to find out whether you
10 remember ever discussing with them the results of your
11 investigation into Commissioner Tighe's action on
12 May 10.
13    A   It wouldn't have been done in a formal
14 meeting, so I don't -- I really don't remember.
15    Q   What grade were the students that were
16 present when Deputy Martin was asked to do the Barbie
17 Cheer?
18    A   It was career day, and I'm not sure. I think
19 it was middle school and possibly high school or high
20 school and possibly middle school.
21    Q   How many employees did the county have
22 in 2011?
23    A   I would say approximately 230.
24    Q   Has it changed much over the last three or
25 four years?

Page 75

1    A   I would say it's fairly consistent with 230.
2    Q   And that includes part-timers?
3    A   Yeah, part time, exactly.
4    Q   Did you understand that Sergeant Tonjes had
5 made the decision not to let Kolby Martin drive his
6 wife, Abby Martin, to work in August of 2011?
7    MS. GREER: Objection. Form and foundation.
8 Go ahead.
9    A   I think it was in the latter part of August
10 when there had been discussion about the vehicle and
11 dress codes.
12    Q   (By Mr. Lamar) Did you ever see anything in
13 writing in which he said, You're not -- Kolby is not
14 going to be able to drive you anymore?
15    A   No.
16    Q   Did you understand that she drove to work
17 while she was on light duty for about a month before
18 the light-duty assignment was ended?
19    A   I believe so, yes.
20    Q   And did you understand that she was taking
21 pain medications during that month?
22    A   I understood she was taking some medications.
23 I don't know specifically what she had been taking at
24 the time.
25    Q   Did you ever feel it was inappropriate for

Page 76

1 her to take pain medications while she was doing
2 light-duty work for the sheriff's department?
3    A   Repeat the question.
4    Q   Sure. Did you feel it was inappropriate for
5 her to take pain medications while she was doing
6 light-duty work for the sheriff's department?
7    A   I think it would have to depend on what the
8 pain medication was to determine whether or not it was
9 safe for somebody to be working.
10    Q   Did you ever see anything in writing from any
11 of the sheriff's command structure that indicated there
12 was a concern about her taking pain medications while
13 she was doing light-duty work?
14    A   No.
15    Q   Can you explain to me why -- knowing that she
16 had had pain medications on her light-duty assignment
17 in late August and September, what your understanding
18 was as to why it was now a problem for her in late
19 November/early December?
20 Because earlier you said her doctor changed
21 her restrictions because she had -- she was taking pain
22 medications.
23    MS. GREER: Objection. Form and foundation.
24    A   My understanding is that Abby was taking pain
25 medications after her initial procedure. When she was

Page 77

1 driving her own vehicle, she did not take certain
2 medications since she was driving.
3 As I recall, she had stated to me, because we
4 did have a conversation -- this was at the end of
5 September when she met me that day and she had
6 mentioned something about the pain medications, and she
7 said on an as-needed basis she would take them.
8 She drove her own vehicle. The doctor did
9 not restrict her from driving or being at work with the
10 pain medications. So then in November she returned to
11 work, as I recall, on the 29th and the 30th. And then
12 she had a doctor's appointment or physical therapy, and
13 for those two days she had driven herself in.
14 And my recollection of the conversation was,
15 not being able to take her pain medications because she
16 had to drive herself was the reason she had contacted
17 the doctor and that's why the doctor restricted -- and
18 her note says something -- the December 1 note says
19 something about, due to the medication she takes, she
20 couldn't be on the light duty.
21 So there was no restriction from the doctor
22 in September, August, but specifically I believe the
23 note in December said something about the light-duty
24 change.
25    Q   (By Mr. Lamar) Was it in December when you

20 (Pages 74 to 77)

Deposition of: Cindy Gharst - January 17, 2014
Abby Martin v. Fred Wegener, in his official capacity as Sheriff of Park County, CO

Page 78
1  made the offer to either drive her yourself or have
2  someone else drive her, who worked at the county as
3  opposed to the sheriff's department, to work?
4      A   Correct.  Because when she contacted me to
5  tell me that her -- she had spoken to her doctor and
6  here's her new note and they were not going to allow
7  her the modified duty because of the pain medication,
8  that's when I said, Well, gosh, if that's the only
9  thing holding you up from coming, we can arrange a
10 carpool, and that's why the offer was made.
11     Q   And you had not made that offer in August
12 when she was told that her husband, Kolby, would not be
13 allowed to drive her to and from work, correct?
14     A   I was unaware of some of -- of her issue with
15 regard to driving herself and the medication.  She only
16 stated to me her concern about not being able to take
17 her medication, I think it was at the end of September,
18 and her doctor hadn't said it was an issue.
19     Q   When Abby told you that she took pain
20 medication as needed in the August/September area, did
21 you ask her whether she had ever needed to take
22 medication while she was driving to and from work?
23     A   Would you repeat that?
24     Q   Sure.  Based upon your earlier testimony, I
25 understand you to have had a conversation with her

Page 79
1  before her first light-duty assignment ended in which
2  she discussed with you the fact that she would take
3  pain medication on an as-needed basis.
4      Am I correct that that was before her
5  light-duty assignment ended?
6      A   What I remember is, when she came to my
7  office -- I believe it's when she came to my office on
8  September 22, and I remember a conversation in which --
9  and I don't remember why it -- how it started, but the
10 conversation about -- she mentioned about her pain
11 medications.  And that's -- and she -- I asked her,
12 well, does she need it on an as-needed or is it
13 regimented; trying to understand the need that she had.
14     And it was at that point she said she -- I
15 think there's a window of time, but she doesn't take a
16 narcotic to drive, and she had -- was taking Advil or
17 some other type of pain reliever while she was at work.
18     But it was at that point the light duty was
19 ending, and it appeared that there was no -- that was
20 my understanding of her pain use at that time -- or
21 medication use.
22     And I asked her if her doctor was aware of
23 the concerns she had with her not taking her pain
24 medication.  I think I asked her about her doctor being
25 aware.

Page 80
1      Q   Do you remember when Corporal Reynolds did
2  leave the sheriff's department?
3      A   Yes.
4      Q   When was that?
5      A   I think he left in 2012, is my recollection.
6      Q   Do you remember what time of year?
7      A   April, maybe.  April or May, I think.
8      Q   When we were talking about when you posted
9  the position for a deputy, was there any documentation
10 created that described the fact that the sheriff's
11 department knew that Corporal Reynolds was going to be
12 leaving and you were creating a new pool?
13     A   I don't have any documentation.
14     MR. LAMAR:  I think I'm done, but I just need
15 to confer with counsel for a second.
16     (A recess was taken from 11:05 a.m. to
17 11:07 a.m.)
18     Q   (By Mr. Lamar) Ms. Gharst, did Sergeant
19 Tonjes or anyone from the sheriff's office ever put in
20 writing their justification for their concerns about
21 Kolby Martin driving his wife into work?
22     A   No.
23     MR. LAMAR:  I'm done.
24     MS. GREER:  I don't have any questions.
25     (The deposition concluded at 11:07 a.m.)

Page 81
1          AFFIDAVIT
2      I, CINDY GHARST, have read my deposition and
3  it is true and accurate, except for any changes or
4  corrections now indicated by me on the Amendment sheet.
5      Amendment sheet attached   ( )
6      No changes to testimony    ( )

8  _____
   CINDY GHARST

10     SUBSCRIBED AND SWORN to before me this
11 date _____.

   My commission expires _____.

14 _____
   NOTARY PUBLIC

16 _____
   STREET ADDRESS

18 _____
   CITY, STATE, ZIP

20 Return to:  MILE HIGH COURT REPORTING & VIDEO, INC.
21         14143 Denver West Parkway, Suite 100A
            Golden, Colorado  80401

Deposition of: Cindy Gharst - January 17, 2014
Abby Martin v. Fred Wegener, in his official capacity as Sheriff of Park County, CO

81

1                          AFFIDAVIT

2         I, CINDY GHARST, have read my deposition and

3    it is true and accurate, except for any changes or

4    corrections now indicated by me on the Amendment sheet.

5              Amendment sheet attached    ( )

6              No changes to testimony     (✓)

7              _____
                          *[signature]*
8                        CINDY GHARST

9

10             SUBSCRIBED AND SWORN to before me this

11   date  *February 7, 2014*  .

12

13             My commission expires  *1/13/14*  .

14   _____
            *[signature: Pat Stoinski]*
     NOTARY PUBLIC

15

16   *1150 Castello Ave*
     _____
     STREET ADDRESS

17

18   *Fairplay, Co 80440*
     _____
     CITY, STATE, ZIP

19

20   Return to:  MILE HIGH COURT REPORTING & VIDEO, INC.
                 14143 Denver West Parkway, Suite 100A
21               Golden, Colorado   80401

22

23      PATRICIA STOINSKI
        NOTARY PUBLIC                 ORIGINAL
        STATE OF COLORADO
24      NOTARY ID 20014036889
        MY COMMISSION EXPIRES JANUARY 13, 2018

25

Mile High Court Reporting and Video, Inc.  303-202-0210
contact@milehighreporting.com

Deposition of: Cindy Gharst - January 17, 2014
Abby Martin v. Fred Wegener, in his official capacity as Sheriff of Park County, CO

Page 82

```
 1              CERTIFICATE
 2        I, Melissa Emily Huston, a Registered
 3   Professional Reporter, Notary Public of the State of
 4   Colorado, certify that before the deposition the
 5   witness was sworn by me to testify to the truth, and
 6   that the foregoing is a true transcript of the
 7   questions asked, testimony given, and proceedings had.
 8
 9        I further certify that I am not related to
10   any party herein, nor their counsel, and have no
11   interest in the result of this litigation.
12
13        IN WITNESS WHEREOF, I have hereunto set my
14   hand and seal this _____ day of _____, 2014.
15
16
17        _____
          Melissa Emily Huston, RPR
18        My Commission expires 4/14/2015
          Notary ID: 19994009481
19
20
21
22
23
24
25
```

RALPH E. LAMAR, IV, ESQ.
Law Office of Ralph Lamar
8515 Braun Loop
Arvada, Colorado 80005

Re: Abby Martin v. Fred Wegener
Civil Action No.: 1:13-cv-00884-PAB-KMT
Deposition of CINDY GHARST
Taken January 17, 2014

Dear Mr. Lamar:
The above-referenced original deposition is being filed with you this date: _____.

Pursuant to the governing Rules of Civil Procedure, the above-mentioned deposition is being filed:
_____ signed, with no changes
_____ signed, with changes, a copy of which is attached
_____ unsigned, no changes
_____ unsigned, with changes, a copy of which is attached

_____ unsigned, pursuant to agreement of counsel that the deposition may be reviewed and signed at or before the time of trial

_____ unsigned, our office having received notice that the case has settled
_____ signature waived at the time of deposition
_____ signature not required

MILE HIGH COURT REPORTING & VIDEO, INC.

cc: Original transcript
    Cathy Havener Greer, Esq.

January 27, 2014

CATHY HAVENER GREER, ESQ.
Wells, Anderson & Race, LLC
1700 Broadway, Suite 1020
Denver, CO 80290

Re: Abby Martin v. Fred Wegener
    Deposition of CINDY GHARST
    January 17, 2014

Dear Ms. Greer,
Enclosed with your copy of the above-referenced deposition is the signature page from the Court's original transcript.
In accordance with the Rule, please have the witness read and sign his or her testimony, then return the executed signature page and any amendment sheets used to us within 35 days of the date of this letter.

Sincerely,

MILE HIGH COURT REPORTING & VIDEO, INC.
Encl.
cc: Original transcript
    Ralph E. Lamar, IV, Esq.

22 (Pages 82 to 84)