Exhibit 10 - Investigation Report



# INVESTIGATION REPORT
## Confidential Information
## Not for Distribution

**Subject:** Complaint of sexual harassment toward a female deputy by John Tighe in the form of a "Barbie cheer" during a presentation to students at a career day event at Fitzsimmons Middle School; the deputy cited in her written complaint this as a another incident of sexual harassment toward her during her employment.

**Conducted by:** Cindy Gharst, HR Administrator

**Date of Report:** June 6, 2010

**Notification of Complaint:**

The actual written complaint was addressed and submitted to Undersheriff Monte Gore with copies to Captain Mark Hancock, Senior Sergeant Mike Brown and Corporal Welles Tonjes. It is unknown to me the exact date and time the written complaint was submitted.

On Wednesday, May 11th, Sr. Sgt. Brown called to notify me that Deputy Abby Adam had made a complaint against Commissioner John Tighe, who also serves as a Reserve Officer with the Park County Sheriff's Office.

Sr. Sgt. Brown briefly explained to me that the nature of complaint was related to a "Barbie Dance" Commissioner Tighe requested Deputy Adam to perform in the classroom during his presentations. Sr. Sgt. Brown informed me that Undersheriff Gore was going to address the issue with Commissioner Tighe but that Deputy Adam might still have issues about this. He also referred to a prior complaint from Deputy Adam against Corporal Reynolds during her FTO period. I advised Sr. Sgt. Brown that I was unaware of any complaint by Deputy Adam against Corporal Reynolds. Sr. Sgt. Brown then advised that Deputy Adam would be calling to arrange a time to meet with me.

**Procedure:**

1. The written complaint was submitted directly to Undersheriff Gore. The details of any conversations between the Undersheriff and Deputy Adam are unknown to me.
2. Notification of the complaint was made to me by Sr. Sgt. Brown on May 11th, at which time I was advised that Deputy Adam was going to contact me about it. I received a phone call from Deputy Adam that afternoon and we arranged to meet the following day. She stated to me that she was surprised that I was unaware of her complaint against Kelly Reynolds.



EXHIBIT: 11
Deponent: Brown
Date: 1/8/14  RPR: MH
Mile High Court Reporting

3. Undersheriff Gore contacted Commissioner Tighe directly on Thursday, May 12th to address this complaint since Commissioner Tighe also serves as a Reserve Officer. The details of this conversation are unknown to me.

4. Commissioner Tighe contacted me the morning of May 12th to discuss the complaint, which he had seen and read. Although I had not seen the written complaint at that time, I was aware of it generally to ask preliminary questions and listen to Commissioner Tighe's explanation.

5. I met with Deputy Adam at 3:30pm on May 12th at which time she gave me a copy of the complaint and her letter requesting to be transferred as the SRO to patrol. She advised me of the issue at hand as well as other issues which occurred during her employment. I asked her preliminary questions. She offered to provide me with copies of other documents related to a conflict with her former supervisor. We agreed that she would have the copies for me on Monday. I advised her that I would have more questions for her and would be in touch.

6. Early on Monday, May 16th, Deputy Adam called me concerned about pursuing anything further with regard to her complaint specifically due to fear of retaliation. During this phone call I stated to her that retaliation is prohibited. (See notes regarding details of phone conversation)

7. Mid-afternoon on Monday, May 16th, Corporal Welles Tonjes called me to request that I meet with Deputy Adam at the Sheriff's Office regarding her complaint. This meeting took place in Sr. Sgt. Brown's office with him, Corporal Tonjes, Deputy Adam and me present. During this meeting I received the documents supporting additional concerns of Deputy Adam regarding her former supervisor. I was also provided the documentation regarding the complaint against Kelly Reynolds. I asked additional questions and reconfirmed information provided on the prior Thursday. The fear of retaliation was again brought up by Sr. Sgt. Brown and Corporal Tonjes. At this point, I explained that the County does not tolerate retaliation and that it is prohibited. I advised that regardless of the outcome of the investigation, Deputy Adam brought forward a valid complaint. I further explained that Deputy Adam is an employee of the elected official, Sheriff Wegener. The power regarding any employment decisions rested within the Sheriff's Office. Commissioner Tighe does not have authority over her evaluations, individual pay raise, promotions, etc. At the meeting's conclusion, I told Deputy Adam that her complaint was a priority and that I had several other employment issues pending at the same time so it might take some extra time to complete my report and that I may have additional questions.

8. Follow-up questions with Commissioner Tighe on May 18th.

9. Research DARE program and classroom management techniques

**Attachments:**
- Park County's EEO Statement and Policy Against Harassment
- Sexual Harassment Complaint- Memo to Undersheriff Monte Gore dated 5/10/11
- Statement dated 05/11/11 from Melissa Carrigan
- Memo dated 05/10/11 requesting transfer as SRO to Patrol
- Memo dated 05/16/11 regarding phone conversation with Deputy Adam
- DARE training manual
- Classroom Management Techniques-examples of cheers, brain breaks
- Memo dated November 25, 2009 regarding complaint against Corporal Kelly Reynolds
- Memo dated October 29, 2010 regarding Incident at Sheriff's Office on October 29, 2010
- Memo dated November 12, 2010 as a written Level II Complaint by then-Sgt Glenn Hardey
- Memo dated December 11, 2010 as a written Level II Complaint by then-Sgt. Genn Hardey
- Memo dated December 11, 2010 from Deputy Adam to Captain Hancock refuting/rebutting performance complaints

Exhibit 10 - Investigation Report

## Summary of Issues

In the written complaint, Deputy Adam described the chain of events during four classroom presentations in which Commissioner Tighe led cheers with students before and after his presentations. The initial cheer to regain students' attention was that of the "I'll be back" tag line from The Terminator movie. Another cheer he led was called the "Barbie cheer". Deputy Adam stated that Commissioner Tighe told the class that this cheer "would be one that Deputy Adam would be better to join." The movements described by Deputy Adam were to put your right hand on your head and your left hand on your hip; then to say hubba hubba hubba as you sway your hips. Deputy Adam complained that she felt uncomfortable and put on the spot during the first three classes and that by the fourth class, Commissioner Tighe must have realized her discomfort because he stated that "Deputy Adam doesn't have to come up here and do it if she doesn't want to."

## Investigator Findings

**Allegation 1:   There is a claim of sexual harassment against Commissioner John Tighe because he asked Deputy Adam to participate in the "Barbie cheer" in front of a classroom of students which made her uncomfortable and which she felt affected her ability to build respect and credibility in the school.**

Supporting Information:
1.   Commissioner Tighe acknowledged that he led the Barbie cheer and did ask Deputy Adam to perform it during the three classroom presentations.
2.   The statement from Melissa Carrigan who observed the cheer supported Deputy Adam's claim that the Barbie cheer was demeaning.

Refuting Information:
1.    Commissioner Tighe stated that the cheers he used in the presentations were classroom management techniques he learned in DARE training by Colorado DARE Association in Colorado Springs, 2002. "Brain breaks" are a common classroom management technique referred to in the DARE Training Manual. There are various types of brain breaks including songs, dances, and physical movements used for different age groups. (See attached DARE Training Manual and sample brain break techniques and cheers/songs from other sources.)
2.   Commissioner Tighe stated that he learned the Barbie cheer from a female officer/instructor during his DARE training.
3.   Commissioner Tighe who was the School Resource Officer at Fitzsimmons Middle School and Platte Canyon High School previously stated that he has used this cheer and others with students and parents in the past.
4.   Commissioner Tighe stated that it was not until the last class that he recognized that Deputy Adam was not comfortable with the cheer; upon this realization he did not ask her to participate again.
5.   Commissioner Tighe stated that Deputy Adam did not tell him after any of the first three classes that she was uncomfortable.
6.   Melissa Carrigan's statement was that Commissioner Tighe asked Deputy Adam to come up in front of the class to do the Barbie cheer "because it looks better done in uniform," as opposed to being for the reason that she was female.

Exhibit 10 - Investigation Report

Comments:

• When asked if Deputy Adam could have advised Commissioner Tighe after the first class that she did not want to participate or that she felt the Barbie cheer was inappropriate, Deputy Adam responded that she probably could have but that she felt he should have seen/known because it was obvious that she was not comfortable.

• The fact that John Tighe is a Commissioner and also serves as Reserve Officer (volunteering his time at the school) might have been confusing in the context of the expected behavior. For example, if he was giving his presentation as a police officer, DARE officer or SRO, the cheers and classroom management style would not have seemed out of the ordinary.  Since he was at career day as the Commissioner, an elected official, there might have been a different expectation of his behavior to be a more professional style.  In fact, Melissa Carrigan thought the cheers did not pertain to a Commissioner's duties.

• I heard Commissioner Tighe describe this cheer in the past.  Approximately one year ago, another staff member who was a former DARE officer and Commissioner Tighe compared different cheers they used in DARE classes to keep kids' attention.  This prior experience supported Commissioner Tighe's explanation that he learned and used the cheer as part of DARE.

• There were other contributing factors affecting Deputy Adam's work environment and concern about building respect and credibility in the school:

> 1. Deputy Adam stated that she was asked to transfer from patrol to the school to replace Deputy Mithuen as the SRO for the remainder of the year.  (Deputy Mithuen was removed from his position as SRO in a disciplinary action).  She stated that she was not given any training or the opportunity to shadow someone before actively working at the school.
>
> 2. Deputy Adam stated that the kids liked her but she did not feel she had the support of the administration.  She referred to the fact that Mrs. Mithuen, who is the mother of former SRO Mark Mithuen, works at the school which creates an uneasy atmosphere due to the circumstances of her son's removal as the SRO.  She further described an incident involving Ms. Carol Wilburn when she was assisting with a special needs student and felt unfairly scrutinized.  She also commented that she felt the school was not cooperating with her, in her viewpoint of what her role was regarding drugs in the school (i.e. Safe-To-Tell program).

• Prior to this incident and in the context of a general conversation about changes in the Sheriff's Office, Commissioner Tighe told me that he thought Deputy Adam was doing well in the school; that she related well to the students.

## Other Issues

Although the written complaint of May 10th was specific to the conduct of Commissioner Tighe, it also referred to a prior complaint of sexual harassment she made regarding a derogatory comment by her FTO Corporal Kelly Reynolds about hiring female deputies in November 2009. Deputy Adam voiced her frustration about the cumulative incidents within the Sheriff's office since her employment, many of which from her perception were swept under the rug.  Thus, the incident at the school appeared to her as an on-going pattern of inappropriate behavior that has risen to the level of an elected official.

1. Prior Complaint of Sexual Harassment
The complaint filed in November 2009 was based on a statement about not hiring any more female deputies by Corporal Kelly Reynolds.  This complaint was investigated by Sr. Sgt. Mike Brown.  His report and recommendations were provided to Captain Mark Hancock for action. (See attached Memo dated November 25, 2009)

COUNTY 000108

*(To my knowledge, as a result of this complaint and other performance/conduct issues, Kelly Reynolds was demoted from a corporal to a deputy sheriff; he was also removed as Deputy Adam's FTO.)*

Although action was taken regarding the complaint, Deputy Adam advised me of the following, which suggests to me that the original complaint might not be resolved completely for her:

> a. Captain Hancock made the statement to her, "well, you're not really mad about this;" the context being that the issue was really about Deputy Kolby Martin/Sgt Mike Brown.
> b. At a team meeting after the complaint, Deputy Adam stated that Kelly Reynolds yelled at her in front of others for filing the complaint (present: Dean Morgan, Rick Paige)
> c. Deputy Adam stated that her FTO Rick Paige always reminded her that his training evaluations were not reflective of her complaint on Kelly.

2. Conflict With Supervisor, Glenn Hardey, 2010

Deputy Adam described problems with her supervisor, Glenn Hardey in November/December 2010 in which she felt singled out. "These consequences are seeming more like a personal attack and not due to me recklessly doing my job." According to the memo dated December 11, 2010 from Deputy Adam to Captain Hancock, the following were a few examples of her issues:

> a. Corporal Glenn Hardey (a sergeant and her supervisor at the time) used text messaging to communicate with her instead of direct conversations using a phone or in person for several weeks after the incident on October 29, 2010 nor was she informed about who was working where. Per her memo, other deputies were kept informed and were in contact with the same supervisor.
> b. Corporal Hardey told Detective Goto that he was frustrated that Deputy Adam was no longer on probation and was trying to find a way to get her back on probation or fired. This conversation took place when Hardey gave Goto a ride home while Goto's duty vehicle was unavailable after an accident (approximately November 2010)
> c. Corporal Hardey responded to her in a disrespectful manner using vulgar language which Deputy Adam questions as a violation of the same policy for which he wrote a complaint about her.

Since that time, the patrol division was restructured with Deputy Adam reporting through the chain of command to Sr. Sgt. Brown. Corporal Hardey was demoted for other disciplinary reasons and has no supervisory authority. Although this particular complaint seems to be resolved, the complaint was another example of Deputy Adam's to illustrate the continued issues during her employment.

3. On-going Pattern of Inappropriate Conduct

Deputy Adam also made a comment that she and others have had to sacrifice or make adjustments because of the misbehavior of others and that she would not have even been working in the school when the incident occurred had it not been for the recent misconduct by deputies involving a minor at a party.

She mentioned the following situations in which it did not seem like there were consequences for misconduct:

> • K. Reynolds-child shot by sibling with his gun accidentally
> • K. Reynolds-affair with coworker
> • Hardey's party where minor was present

Exhibit 10 - Investigation Report

## Conclusion

It was conclusive that performing the cheer was not made a condition of Deputy Adam's employment nor was any refusal to do so the basis of any employment decision.

Whether the conduct unreasonably interfered with Deputy Adam's job performance or created an intimidating, hostile or offensive working environment was questionable because there were other factors within the school organization, itself, which were problematic for Deputy Adam based on her statements. Also, Deputy Adam could have communicated to Commissioner Tighe after the first class that she was not comfortable with the cheer. Likewise, Commissioner Tighe could have communicated to Deputy Adam prior to the class his plans for the different cheers so that she would have been prepared or had the opportunity to refuse or change the plan ahead of time.

Commissioner Tighe should have clearly maintained his role as Commissioner if that is how he was representing himself on career day. Using his style as a former DARE/SRO and current Reserve Officer was contradictory to the expectation of his presence as an Elected Official.

The cheers/techniques which he learned in DARE training were used by Commissioner Tighe based on past practices. In the future, however, any past training materials should be carefully reviewed periodically to determine if they are still appropriate for current situations.

## Summary of Findings

1. It is conclusive that requesting the complainant to perform the cheer was not sexual harassment because there was no condition of employment or any employment decision made regarding it.
2. It is conclusive that there was no sexual harassment in the context of unreasonably interfering with an individual's performance or creating a hostile or offensive work environment  Although the cheer might have been appropriate in a different setting or at a different time, it is conclusive that it was not appropriate for the work place and is not condoned. Whether that specific conduct, however, rises to the level of unlawful sexual harassment depends on the totality of circumstances and involves an evaluation of the overall pervasiveness and severity of the conduct. The information obtained through investigation of the complaint does not support the conduct to be sexual harassment.

Exhibit 10 - Investigation Report

# I. NONDISCRIMINATION

## I.A.        Equal Employment Opportunity Statement

It is the policy of the County to staff positions with the best available, qualified people regardless of race, color, creed, religion, national origin, age, gender, pregnancy, disability, veteran status, political affiliation, or sexual orientation. The County prohibits discrimination in employment based on these factors. In addition, policies that affect employees will be carried out without regard to these factors.

The County prohibits retaliation against any employee for filing a complaint under this policy or for assisting in a complaint investigation. If you believe there has been a violation of our EEO or retaliation standard, please follow the complaint procedure contained in the following Policy Against Harassment.

## I.B.        Policy Against Harassment

Prohibited Conduct

It is the policy of the County to provide an environment free from all forms of harassment including sexual harassment, offensive language, and behavior based on an individual's race, color, creed, religion, national origin, age, gender, pregnancy, medical condition, disability, veteran status, political affiliation, or sexual orientation.

Unlawful harassment includes verbal, physical and visual conduct, which has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile or offensive work environment. Such conduct is unacceptable and will not be tolerated, whether it occurs in the workplace or at outside workplace-sponsored or work-related activities.

Verbal Harassment – Epithets, derogatory comments, slurs, propositioning, or otherwise offensive words or comments on the basis of race, color, creed, religion, national origin, age, gender, pregnancy, medical condition, disability, veteran status or political affiliation, whether made in general, directed to an individual or a group of people regardless of whether the behavior was intended to harass. This includes but is not limited to inappropriate, sexually oriented comments on appearance, sexual rumors, code words, and race oriented stories.

Physical Harassment – Assault, impeding or blocking movement, leering, or the physical interference with normal work privacy, or movement when directed at an individual on the basis of race, color, creed, religion, national origin, age, gender, pregnancy, medical condition, disability, veteran status or political affiliation. This includes but is not limited to patting, pinching, grabbing, gestures, inappropriate behavior in or near bathrooms, sleeping facilities and eating areas, or making explicit or implied threats or promises in return for submission to physical acts.

COUNTY 000111

Exhibit 10 - Investigation Report

<u>Visual Harassment</u> – Derogatory, prejudicial, stereotypical or otherwise offensive posters, photographs, cartoon, e-mails, notes, bulletins, drawings or pictures on the basis of race, color, creed, religion, national origin, age, gender, pregnancy, medical condition, disability, veteran status, political affiliation or sexual orientation.  This applies to materials posted or maintained in or on County equipment or personal property in the work place.

<u>Sexual Harassment</u> – It is defined by the Equal Employment Opportunity Commission as any **unwelcome** sexual advance, request for sexual favors, or other verbal or physical conduct of a sexual nature when:

1) Submission to the conduct is made, either explicitly or implicitly, a term or condition of an individual's employment;
2) Submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting the individual; or
3) The conduct has the purpose or effect of unreasonably interfering with the individual's performance or of creating an intimidating, hostile, or offensive working environment.

Sexual harassment does not refer to polite or inoffensive behavior or occasional compliments of a socially acceptable nature.  The types of behaviors that may constitute sexual harassment may include but are not limited to:
- unwelcome sexual flirtations, advances or propositions
- derogatory, vulgar or graphic written or oral statements regarding one's sexuality, gender or sexual experience
- unnecessary touching, patting, pinching or attention to an individual's body
- physical assault
- unwanted sexual compliments, innuendos, suggestions or jokes
- any display of sexually explicit pictures, greeting cards, articles, books, magazines, photos or cartoons

Some behavior, which is more appropriate in a social setting, may not be appropriate in the workplace; but, in any case, if it is insulting and demeaning to the recipient, it cannot be tolerated in the workplace.  Whether specific conduct rises to the level of unlawful sexual harassment depends on the totality of the circumstances, and involves an evaluation of the overall pervasiveness and severity of the conduct, determined on a case-by-case basis.  All employees, supervisors, department directors, and elected officials will be expected to comply with this policy and to take appropriate actions to ensure that such conduct does not occur.

<u>Harassment Complaint Procedure</u>
1)   Any employee who believes that he or she has been the subject of sexual or other unlawful harassment by anyone including a supervisor, co-worker, or other person in the workplace must report the alleged conduct immediately to his or her supervisor,

department director, elected official, County administrator or other designated party or the Human Resources Administrator. Any other person receiving a report of unlawful harassment or observing conduct that he or she believes to be unlawful harassment should also report such conduct to their supervisor, department director, elected official, County administrator or other designated party or Human Resources. Failure to notify the County promptly hinders the County from taking effective action.

2)      If the complaint involves a department director, County administrator or other designated party, or elected official who is the employee's immediate supervisor, or if the employee is uncomfortable for some reason making the complaint to those particular people, the complaint shall be filed directly with the Human Resources Administrator.

3)      All complaints will be handled in a prompt manner and actions taken internally to investigate and resolve sexual or other unlawful harassment complaints. The complaint shall be conducted confidentially to the extent practicable and appropriate in order to protect the privacy of the persons involved. Investigation may include interviews with the parties involved in the incident, and if necessary, with the individuals who may have observed the incident or conduct or who may have other relevant knowledge.

4)      All employees shall be protected from coercion, intimidation, retaliation, interference or discrimination for filing a complaint or assisting in an investigation.

5)      If the investigation substantiates the complaint, appropriate corrective or preventative action and/or disciplinary action will be taken without delay. Even if the investigation produces insufficient evidence to support the complaint, and even if the charges cannot be proven, there will be no discrimination or retaliation against any individual who files a good-faith sexual or other unlawful harassment complaint.

Every employee is encouraged to raise any questions or concerns regarding this policy with Human Resources or the County administrator or other designated party. It is the County's policy to encourage the reporting of all perceived incidents of sexual harassment, regardless of the position of the alleged offender. The County will take all steps that are necessary to enforce its policy prohibiting sexual or other unlawful harassment.

COUNTY 000113