# Transcript of the Testimony of:
## Mark Hancock

**Date:** January 14, 2014

Abby Martin v. Fred Wegener, in his official capacity as Sheriff of Park County, CO



Mile High
Court Reporting & Video, Inc.

Mile High Court Reporting and Video, Inc.
Phone: 303-202-0210
Fax: 303-205-0034
Email: contact@milehighreporting.com
milehighreporting.com

Exhibit 2

Deposition of: Mark Hancock - January 14, 2014
Abby Martin v. Fred Wegener, in his official capacity as Sheriff of Park County, CO

Page 50

1   A   Would it have been important for them to
2   mention that to me?
3   Q   (By Mr. Lamar) Sure. Right.
4   A   Yeah, I would have wanted to know.
5   Q   Did either Deputy -- sorry. Did either
6   Tonjes or Brown tell you that they had allowed Kolby
7   Martin to drive Abby Martin into work for about two
8   weeks before they'd made this decision?
9   A   No.
10  Q   Job openings. When the department either
11  loses a deputy or due to an increase in budget and now
12  there's money for another deputy, does the process
13  start with you in terms of notifying Cindy Gharst or
14  someone that they need to start sending out hiring
15  notices, or how does that work, to your knowledge?
16  A   Me. I go to Sarah, who contacts Cindy
17  Gharst, and they post the position. And I have her
18  write down the requirements and what I'm looking for.
19  Q   Sarah who?
20  A   Kimsey.
21  Q   How do you spell that? Do you know? Okay.
22  The court reporter is giving me the sign that she does
23  already know how to spell the last name.
24  A   Okay.
25  Q   And you said you're the one who goes to Sarah

Page 51

1   and then there's some communication with Cindy Gharst.
2   But do you make that decision independently, or have
3   you in the past been told by Monte Gore, We need to
4   hire for a new deputy?
5       MS. GREER: Objection. Form and foundation.
6   A   It's a mutual thing. I mean, if I'm needing
7   deputies, I go and say, I need deputies. And they say,
8   Well, you know, go hire them. And then I go to Sarah
9   and say, You need to call Cindy Gharst and get it
10  posted.
11  Q   (By Mr. Lamar) Did you ever make a decision
12  with the undersheriff or the sheriff that you were
13  going to hire for Abby Martin's position before her
14  employment actually ended?
15      MS. GREER: Objection. Form.
16  A   Did I make a decision to do that?
17  Q   (By Mr. Lamar) Right.
18  A   No.
19  Q   Okay. Did you learn that somebody else had
20  made that decision?
21      MS. GREER: Objection. Form. Go ahead.
22  A   No. I would have wanted to replace the
23  position as soon as possible, knowing that it was going
24  to be open.
25  Q   (By Mr. Lamar) Do you have a recollection

Page 52

1   that at the end of 2011 the Park County Sheriff's
2   Office was going to be able to expand due to additional
3   money in the budget?
4   A   2011?
5   Q   Right. At the end of 2011, that they were
6   going to be able to hire on an additional deputy.
7   A   For patrol?
8   Q   Yes.
9   A   No.
10  Q   As we sit here, do you have any
11  recollection -- and I want you to assume for the
12  purpose of my question it's true -- that Abby Adam's
13  position was posted before she resigned?
14      MS. GREER: Objection. Form and foundation.
15  A   I wouldn't have known that because I don't
16  know when she resigned as opposed to that.
17  Q   (By Mr. Lamar) Does Cindy Gharst have the
18  authority to post for a deputy sheriff position without
19  having any input whatsoever from the command structure
20  of the sheriff's office?
21  A   I don't know. The -- for jail deputy
22  sheriffs, I believe, it's posted all the time, because
23  they're constantly looking for officers.
24  Q   But that's a communication from the sheriff's
25  office that they need somebody.

Page 53

1   A   Right.
2   Q   And I'm asking simply: Do you have any
3   knowledge that Cindy Gharst has ever posted for a
4   deputy, whether in corrections or as a patrol, without
5   any information from the sheriff's office that they
6   actually need somebody?
7   A   I wouldn't think she would do that, no.
8   Q   At any point in time have you told anyone at
9   the Park County Sheriff's Office that Ms. Martin's case
10  had already settled for a particular amount of money?
11  A   This case?
12  Q   Yes.
13  A   I may have because I heard something that
14  wasn't -- but I would think it would be about the other
15  case, as far as the -- John Tighe.
16  Q   What was -- and that's the other case that
17  you just were referring to as --
18  A   Right. And then in an ADA complaint as well,
19  but I would have had no factual knowledge to that.
20  Q   Did you ever make any comments to anyone in
21  the Park County sheriff's department that Abby Adam's
22  baby or Abby Martin's baby is not Kolby Martin's?
23  A   I did.
24  Q   Who did you make that to?
25  A   I believe it was Yoshi Goto, and I didn't

14 (Pages 50 to 53)

Deposition of: Mark Hancock - January 14, 2014
Abby Martin v. Fred Wegener, in his official capacity as Sheriff of Park County, CO

Page 54

1  mean it.
2     Q  Did you believe --
3     A  It was in poor taste.
4     Q  -- you were making it obvious to Mr. Goto
5  that it was a joke?
6     A  Yeah. Yes.
7     Q  Did you hold any animosity toward Ms. Martin
8  at the time she left the sheriff's department?
9     A  At the time she left the sheriff's office?
10    Q  Right.
11    A  Animosity. No. Angry that, you know, the
12 position -- and I put work into recruiting her and
13 training her and trying to get it to work out; that it
14 didn't work out. Maybe disappointment, not anger.
15    Q  Did it occur to you at that time that maybe
16 it didn't work out because there hadn't been enough
17 support from the lower command staff with regard to her
18 potential success?
19    A  I didn't feel that way, no.
20    Q  Was there anything subsequent to the ending
21 of her employment and before the joke that you said was
22 in poor taste to Mr. Goto that changed your opinion
23 from the way you held it at the time she left the Park
24 County Sheriff's Office?
25    A  The joke about the child?

Page 55

1     Q  Right.
2     A  That was a long time after that she had left,
3  and it was in poor taste. I don't feel that way.
4     Q  Understood. And I just didn't know whether
5  there was anything that happened between when she
6  resigned and when you told the joke that caused you to
7  tell the joke.
8     A  No. With Kolby and SWAT guys and police
9  officers, those jokes unfortunately are commonplace.
10 But I'm certainly not proud of saying that.
11    Q  Was Kolby in the room when you said that, to
12 your knowledge?
13    A  I don't believe so.
14    Q  Do you believe you would have said it if he
15 were present?
16    A  Probably. Yes.
17    Q  Did Master Sergeant Brown ever tell you that
18 he was trying to schedule Deputy Adam or Deputy Martin
19 so that she didn't have to report on a shift to
20 Corporal Reynolds?
21    A  No.
22    Q  If it were Master Sergeant Brown's contention
23 that he was doing this because he had heard a complaint
24 from Deputy Martin about her treatment by Corporal
25 Reynolds, is that the kind of thing that you would have

Page 56

1  expected him to pass on to you; that he was actually
2  trying to schedule her so that she wasn't supervised by
3  Corporal Reynolds?
4        MS. GREER: Objection. Form and foundation.
5     A  I would want them to work together and work
6  through their differences, and I know I've made that
7  clear to Sergeant Brown when officers have differences.
8  So I don't believe so.
9     Q  (By Mr. Lamar) In your experience at the
10 PCSO, is it a fairly common occurrence for people who
11 are cover for another deputy not to show up as backup
12 for serious incidents?
13       MS. GREER: Objection. Form and foundation.
14    A  For serious incidents?
15    Q  (By Mr. Lamar) Sure.
16    A  Not to show up?
17    Q  Not to provide the backup.
18    A  Right. It could occur because we're spread
19 out over 2,400 square miles and hundreds of roads -- of
20 miles of roads. We don't want that to happen
21 certainly.
22    Q  If Abby Adam complained to Tonjes or Brown
23 that Reynolds had failed to provide her cover on two
24 circumstances that could have been serious and that he
25 had no excuse for failing to cover and they did nothing

Page 57

1  in the way of discipline, would you be concerned about
2  that?
3        MS. GREER: Objection. Form and foundation.
4     A  I would.
5        MR. LAMAR: I don't have any further
6  questions.
7              EXAMINATION
8  BY MS. GREER:
9     Q  Captain Hancock, in reference to the question
10 that you were just asked about the complaint that
11 Ms. Martin allegedly made about lack of cover by Kelley
12 Reynolds, did she ever make a complaint to you that she
13 didn't get cover by Kelley Reynolds?
14    A  No.
15    Q  Did Abby Martin ever complain to you about
16 Kelley Reynolds' behavior after you first learned about
17 the complaint that Kolby Martin made about statements
18 that Kelley Reynolds made to Ms. Martin?
19    A  No.
20    Q  Did Abby Martin ever ask you if she could
21 wear a less formal uniform as a school resource
22 officer?
23    A  No.
24    Q  Did you meet with Abby Martin at times at the
25 school where she served as an SRO?

15 (Pages 54 to 57)

Deposition of: Mark Hancock - January 14, 2014
Abby Martin v. Fred Wegener, in his official capacity as Sheriff of Park County, CO

70

1                           AFFIDAVIT

2         I, MARK HANCOCK, have read my deposition and

3    it is true and accurate, except for any changes or

4    corrections now indicated by me on the Amendment sheet.

5              Amendment sheet attached    ( )

6              No changes to testimony     (X)

7                    _____

8                    MARK HANCOCK

9

10             SUBSCRIBED AND SWORN to before me this

11   date  4th February 2014.

12

             My commission expires  10-14-2017.

13

14   _____
     NOTARY PUBLIC

15

16   _____1180 Co Rd 16_____
     STREET ADDRESS

17

18   _____Fairplay, CO 80440_____
     CITY, STATE, ZIP

19

20   Return to:  MILE HIGH COURT REPORTING & VIDEO, INC.
                 14143 Denver West Parkway, Suite 100A
21               Golden, Colorado   80401

22

23                                      ORIGINAL

24

25

BRENDA GREEN
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20054035599
MY COMMISSION EXPIRES OCTOBER 14, 2017