IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-00884-PAB-KMT

ABBY MARTIN,

    Plaintiff,

v.

FRED WEGENER, IN HIS OFFICIAL CAPACITY AS SHERIFF OF PARK COUNTY, CO

    Defendant.

## DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR LEAVE TO IDENTIFY AN ECONOMIC EXPERT FOLLOWING TRIAL

Defendant Fred Wegener, by and through undersigned counsel, LLC hereby submits his Response to Plaintiff's Motion for Leave to Identify an Economic Expert Following Trial as follows:

### I.    BACKGROUND

Plaintiff Abby Martin has brought a claim of retaliation arising out of her employment with the Park County Sheriff's Office ("PCSO"). Expert disclosures were due on November 20, 2013, and discovery was completed on February 20, 2014. Defendant has filed a motion for summary judgment, and the briefing on that motion was completed in April 2014. Trial is set to begin on November 10, 2014.

On October 15, 2014, Plaintiff filed her Motion to Identify an Economic Expert Following Trial. Plaintiff asserts that she was recently laid off from comparable employment and is now eligible for more back pay than previously sought, as well as front pay. Plaintiff requests

1

that she be permitted to identify an economic expert to address these facts after trial, assuming a favorable verdict.

**II.     ARGUMENT**

Defendant opposes the relief sought on the grounds that the Court has already decided this issue; granting this relief would be futile because Plaintiff is not entitled to back pay beyond July 1, 2013, or any front pay; and Defendant will be prejudiced.

A.  The Court has already Rejected Plaintiff's Proposal.

The July 22, 2013, Scheduling Order set a deadline for expert disclosures of November 20, 2013. In the Scheduling Order, Plaintiff noted her proposal that expert disclosures not be made until and if the jury entered a verdict for Plaintiff. *See* Scheduling Order, Document 27. In ordering that expert disclosures be submitted by November 20, 2013, Magistrate Judge Tafoya implicitly rejected Plaintiff's proposal. The issue has been decided and should not be raised again three weeks before trial.

Further, in the Pre-Trial Order filed with the Court on May 27, 2014, Plaintiff did not assert that she was seeking front pay. See Pre-Trial Order, Document 61 Section, 3 a, Page 3. There is always a possibility that a plaintiff's job status may change in the course of litigation. Plaintiff could have anticipated and planned for such an event by timely designating an economic expert. She elected not to, and therefore has waived any right to front pay and to untimely designate an economic expert.

B. <u>Plaintiff's Request is Futile because she is not Entitled to Back Pay Beyond July 1, 2013, or any Front Pay.</u>

Allowing Plaintiff to untimely disclose an expert would be futile because her claimed back pay does not require an expert economist, and she is not entitled to any front pay. While the decision of whether to award back or front pay is generally not made until after trial, Plaintiff has put these issues before the court in her pre-trial motion. Therefore, the factors used in determining back and front pay, including the details of Plaintiff's employment history, should be considered here because they demonstrate the futility of Plaintiff's request.

*i. Plaintiff 's employment history*

Plaintiff's employment history is relevant to both her claims for back and front pay. Plaintiff graduated from college in 2003. For about one year from 2004-2005, Plaintiff worked for the Third Way Center, a residential treatment center for children, as a mental health counselor. She was terminated because she "wasn't fit for the team." Plaintiff Dep., Ex. 1, P. 21 L. 22- P. 23 L. 20; P. 25 L. 23 – P. 26 L. 6. Plaintiff then worked as a lifeguard and assistant pool manager for the City of Lakewood until July 2007. *Id*. at P. 26 L. 10- 19. In July 2007, Plaintiff moved to Houston for a boyfriend. She did not work in Houston, and returned to Colorado in September 2007. Thereafter, Plaintiff worked for Coleman Natural Foods for nine months prior to being laid off. *Id*. at P. 27 L. 1 – P. 30 L. 20.

After leaving Coleman, Plaintiff began her first attempt at law enforcement. She worked as a police officer for the City of Golden from January through May of 2008. However, she

3

never completed the training process and resigned following a mutual agreement with her supervisor that she "wasn't catching on fast enough." Plaintiff Dep. P. 28 L. 23 – P. 29 L. 22.

Plaintiff next worked as a deputy for the PCSO for just over two years, from November 2, 2009 through January 5, 2012. Plaintiff's Second Amended Complaint; ¶¶9, 62. During this time, Plaintiff took two leaves of absence. On July 1, 2011, Plaintiff underwent back surgery and was off work until August 1, 2011, when she returned to light duty. Amended Complaint, ¶43. Plaintiff left work again on September 22, 2011, for another surgery on October 18, 2011, and never returned to work. Plaintiff Dep., P. 135 L. 18 – P. 136 L. 9; Amended Complaint, ¶58. Thus, her last day of work on unrestricted duty was June 30, 2011, approximately nineteen months after she became a deputy.

Throughout her brief tenure with the PCSO, Plaintiff applied for law enforcement positions with Arapahoe County in 2010 and 2011, with Jefferson County in 2010, 2011, and 2012, with the city of Aurora in 2011 and 2012, with the city of Arvada in 2010 and 2011, and with Commerce City in summer 2011. Plaintiff Dep., P. 79 L. 6 – P. 86 L. 14. Plaintiff was looking to leave the PCSO, in part, because she was dissatisfied with the pay. *Id*. at P. 83 L. 25 – P. 84 L. 4.

After resigning from the PCSO, Plaintiff worked as a dispatcher for Denver Public Schools for about three months. Plaintiff left that position because she was working graveyard shifts and was not getting enough sleep during her pregnancy. *Id*. at P. 15 L. 3 – P. 16 L. 19. Over a month later, Plaintiff began working for a temp agency called Adecco, which placed her at Blue Linx, where she worked with billing and sales orders. *Id*. at P. 14 L. 22 – P.15 L. 2; P. 7

L. 21 – P. 8 L. 3; Plaintiff's Resume, **Ex. 2.**  Plaintiff became a full time employee with Blue Linx on July 1, 2013, earning $18 per hour, more than she was earning at the PCSO.

On November 11, 2013, in a supplemental response to discovery requests, Plaintiff's counsel conceded that she had no claim for front pay and that her back pay was cut off as of July 1, 2013.  He explained that Plaintiff was seeking eighteen months of back pay, calculated at $48,708, reduced to $28,900 for interim earnings. Plaintiff's counsel explained that "the reason that there are only 18 months of back pay is that plaintiff obtained a job on July 1, 2013, with Blue Linx in which she makes $18.00 per hour for a 40 hours week. **At that rate of pay she has fully mitigated her losses**." *See* November 11, 2013, Letter, attached as **Ex. 3** (emphasis added.)

In December 2013, Defendant prepared a subpoena to Blue Linx, but Plaintiff's counsel objected, claiming that the information was not relevant and may interfere with her employment. Since Plaintiff had represented that her damages were fully mitigated as of July 1, 2013, and in the spirit of compromise, Defendant agreed not to subpoena her employment records from Blue Linx.  *See* December 2014 emails, attached as **Ex. 4**.

When her deposition was taken in November 2013, Plaintiff was employed with Blue Linx. She testified that she had no applications pending for law enforcement and did not intend to continue in law enforcement. Plaintiff Dep. P. 20 L. 2 – 14.

Now, on the eve of trial, Plaintiff asserts that she lost her job at Blue Linx effective October 1, 2014, "as a result of corporate restructuring." Plaintiff seeks to withdraw her concession of November 2013 that her losses were fully mitigated and seeks to reinstate claims for back pay and front pay. Her affidavit states, "on September 25, 2014, I was notified that my employment with Blue Linx was terminated, effective October 1, 2014. I was notified by my

supervisor Ron Lais that the termination was due to a re-organization and had nothing to do with my job performance. I was provided with a severance package." *See* Plaintiff's Affidavit, ¶ 6, attached to her motion.

On October 20, 2014, Plaintiff's counsel produced a copy of Plaintiff's severance agreement, which indicates that she received four weeks of severance beginning October 1, 2014. In exchange for the severance package, Plaintiff signed a release of any claims she may have against Blue Linx resulting from her employment. *See* Severance Agreement, attached as **Ex. 5.**

Plaintiff also produced copies of cover letters she has submitted to potential employers. The cover letters are virtually identical, including the following language, "Due to the passing of one of my coworkers **I was advised that my work hours will be changing from 7:30 a.m. to 4:30 p.m. to 1:00 p.m. to 10:00 p.m. As I am a single parent these hours do not work for me to be able to care for my daughter, and I would lose my daycare**." *See* October 20, 2014, Letter to City and County of Denver, attached as **Ex. 6** (emphasis added). The reference to a schedule change is consistent with the release Plaintiff signed, which states, in pertinent part, that Plaintiff has no recall or reemployment rights "as a result of the **modification** of your job." Ex. 5, Page 4. Although Plaintiff claims that she was "laid off," it appears from her own admission that she resigned after her shift was changed.

> ii.  *Plaintiff is not entitled to back pay after July 1, 2013, and no expert is required.*

Plaintiff argues that she should receive back pay from October 1, 2014, the date her employment with Blue Linx ended, through trial, in addition to the $28,900 previously asserted

6

in her counsel's November 11, 2013, letter. [1]   Plaintiff is not entitled to any back pay beyond July 1, 2013, and even if she is, she does not need an expert to quantify these damages.

Courts generally hold that a plaintiff's back pay is cut off from the date she obtained comparable employment. *See Ford Motor Co. v. EEOC*, 458 US 219, 232 (1982).  Since Plaintiff obtained not only comparable but better paying employment as of July 1, 2013, any entitlement to back pay should be terminated as of that date.

Plaintiff argues that where a plaintiff is laid off from comparable employment through no fault of her own, she may continue to recover back pay.  Defendant acknowledges this general statement of cases in other jurisdictions. However, even if the court chooses to consider this authority, it does not apply here. Contrary to Plaintiff's own affidavit, her cover letters indicate that she was not terminated.  Plaintiff's hours were changed and she chose to resign for personal reasons rather than switch her schedule.  When a plaintiff voluntarily resigns due to personal reasons, the back pay period is tolled between time of resignation and next full time job[2].

For example, in *McDaniel v. Essex Int'l,* 509 F. Supp. 1055 (W.D. Mich. 1981), the plaintiff had been working a six hour shift for the defendant. Shortly after her termination, she took a job working eight hour shifts for a new employer. She quit that job after six months because she felt that "the additional hours of working and commuting were causing her to neglect her children's needs and because her girls were out of school for the summer." *Id*. at 1065. The court held that the amounts earnable by plaintiff had she continued her subsequent job should have the same effect in reducing a back pay award as the amounts actually earned there.

---

[1] For the reasons set forth herein, Defendant reserves the right contest the $28, 900 amount Plaintiff previously claimed.  Specifically, Plaintiff is not entitled to any back pay from the time she left Denver Public Schools because of pregnancy-related fatigue and the date she began working for Blue Linx through Adecco.

[2] Defendant anticipates that Plaintiff may argue that she was "terminated" after refusing to work her new schedule. This is semantics. Whether she was terminated or she resigned, her decision caused her employment to end.

*Id*. The court rejected plaintiff's argument that her back pay should not be reduced because the new job was not "like" employment to her job with defendant. As the court explained, "there is no requirement that a plaintiff's next job be 'like' employment; this is simply an income replacing reward." *Id*.

As in *McDaniel*, Plaintiff elected to leave her job because the new schedule interfered with her parenting duties, i.e. a <u>personal reason</u>. Here, the shift Plaintiff rejected at Blue Linx is in fact "like" her employment with the PCSO in terms of the schedule, the very reason she claims the job is unsuitable. Even before Plaintiff had childcare concerns, one of her complaints about the PCSO (and one of her examples of a "hostile work environment") was that she sometimes had to work nights. *See* Plaintiff's Response to Summary Judgment, ¶14, P. 9. If working shifts with non-traditional hours is unacceptable to Plaintiff because of her childcare situation or otherwise, she would not have been working for the PCSO through the date of trial, and further back pay is not appropriate for that reason as well. *See e.g. Inda v. United Air Lines, Inc*., 405 F. Supp. 426, 434 (N.D.Cal. 1975)  (periods during which plaintiff would not have worked due to health conditions, pregnancy, or other reasons, are excluded from the calculation period).

Similarly, in *EEOC v. Delight Wholesale Co*., 973 F.2d 664 (8th Cir. 1992), plaintiff quit one comparable job because she was exhausted and wanted to spend time with her daughter. *Id*. at 667.  She quit another subsequent job because she had developed heart problems. The Eight Circuit held that the trial court properly tolled plaintiff's back pay during the period after plaintiff left each of these jobs and before the next full time job because she had left for personal reasons. *See also Leidel v. Ameripride Services, Inc.,* 276 F. Supp. 2d 1138, 1145-1146 (D. Kan.

2003)(denying back pay following plaintiff's resignation from subsequent employment because of dispute with management over compensation, "when a Title VII claimant voluntarily terminates suitable interim employment without compelling reasons, he has freely chosen to incur a loss of earnings, thereby failing to use reasonable diligence in the mitigation of damages.").

Plaintiff erroneously cites *Delight Wholesale* for the proposition that back pay may continue to accrue even after a plaintiff is terminated from a subsequent employer for "misconduct." *Delight Wholesale* in no way addressed tolling of back pay when an employee is terminated from a subsequent job for misconduct. It addressed tolling of back pay following voluntary resignation and, contrary to Plaintiffs position, held that back pay should be tolled. This case undermines, not supports, Plaintiff's position.

Plaintiff's reliance on *Brady v. Thurston Motor Lines, Inc*., 753 F.2d 1269 (4th Cir. 1985) is also misplaced. There, the Fourth Circuit Court of Appeals reversed orders of back pay to two plaintiffs, holding that they were not entitled to back pay following their terminations for cause from their employers. The court explained that back pay is tolled during periods "when the quit is motivated by personal reasons unrelated to the job or as a matter of personal convenience." *Id*. at 1277. Therefore, "it would be incongruous to hold that while Title VII claimants cannot voluntarily terminate suitable, interim employment without suffering a back pay reduction, they may choose without penalty to risk the loss of similar employment by engaging in misconduct." *Id*. at 1278-1279.   Although *Brady* involved misconduct, its repeated statements that back pay is tolled after voluntary termination of employment further bolsters Defendant's argument. The court explained:

> The reason for limiting back pay liability following a voluntary termination of interim employment is drawn from the central purpose served by the granting of back pay. Back pay is essentially a "make whole" remedy, returning the claimant to the position he would have been in had the unlawful discrimination not occurred. As part of the process of making the victims of employment discrimination whole, the offending employer is made responsible only for losses suffered by the claimant as a result of the discrimination. That is, the employer's back pay liability is not to be increased s a result of losses willingly incurred by the claimant . . . To hold that employers are liable for losses incurred due to a claimant's unjustified, voluntary termination of interim employment renders the back pay obligation punitive, and abuses the intent of the remedy. *Id*. at 1278.

Likewise, *Johnson v. Spencer Press of Maine, Inc.,* 364 F.3d 368 (1st Cir. 2004), cited by Plaintiff, held that the possibility of back pay was not permanently cut off when a plaintiff is terminated for misconduct. *Id*. at 381. However, citing *Delight Wholesale* and *Brady*, *supra*, the court agreed that a plaintiff's total back pay should be reduced by the amount he would have been earning absent the termination. *Id*. at 481-182. *Johnson* is not helpful to Plaintiff. She left her job on October 1, 2014 and will earn severance through October 29. It is highly unlikely that future circumstances will restart her back pay.

Lastly, Plaintiff cites *Thurman v. Yellow Freight Systems, Inc*., 90 F.3d 1160 (6th Cir. 1996), which held that the plaintiff's back pay was not tolled following his termination for a work-related accident, because there was no evidence that the plaintiff "acted intentionally." *Id*. at 1169. Here, it appears that Plaintiff voluntarily quit her job when she did not want to work different hours. This was, unlike *Thurman*, an "intentional" act that tolls her back pay.

Even if Plaintiff could demonstrate an entitlement to back pay since leaving Blue Linx, it does not take an expert to calculate wages for the time period from October 29, 2014, through November 18, 2014. Therefore, this is not within the province of an expert. *See e.g U.S. v. Wood*,

10

207 F.3d 1222 (10th Cir. 2000) (expert testimony not admissible where it invades the province of the jury).

### iii. *Plaintiff is not entitled to front pay.*

Front pay is "money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement." *Pollard v. EI Du Pont de Nemours & Co.*, 532 US 843, 848 (2001). Front pay is within the discretion of the trial court, but a front pay award must be based on more than "mere guesswork." *Davoll v. Webb*, 194 F.3d 1116, 1143 (10th Cir. 1999).

When an employer proves failure to mitigate, "any back pay award to an aggrieved employee will be cut off or reduced beginning at the time of the employee's failure to mitigate and **any front pay award will be foreclosed**." *Ford Motor Co. v. EEOC*, 458 US 219, 1233-234 (1982). Thus, the cutting off of Plaintiff's back pay alone results in a denial of front pay. *See also Dominic v. Consolidated Edison Co. of New York*, 822 F.2d 1249, 1258 (2nd Cir. 1987); *Byers v. Augusta School District*, 33 Fed. Appx. 238, 239 (8th Cir. 2002) (refusing to award front pay where plaintiff had obtained better paying position); *Williams v. Shinsenki*, 2013 WL 1875055, *8 (N.D.Tex. 2013) (plaintiff not entitled to front pay where subsequent employment paid more than defendant and pay would have continued absent her termination from that position).

Here, as set forth above, Plaintiff conceded that her back pay terminated on July 1, 2013, so she is not entitled to front pay. Further, Plaintiff did not seek front pay in the Pre-Trial Order. Even if Plaintiff were not per se barred from recovering front pay because of the termination of her back pay, she is not entitled to front pay per the factors courts apply to make this determination.

In assessing front pay, courts consider work life expectancy, salary and benefits at the time of termination, any potential increase in salary through regular promotions and cost of living adjustment, the reasonable availability of other work opportunities, plaintiff's prior employment, and the period within which a plaintiff may become re-employed with reasonable efforts. *Davoll v. Webb*, 194 F.3d 1116, 1144 (10th Cir. 1999). The court may also consider a plaintiff's future in the position from which he was terminated[3], by considering the length of prior employment, the permanency of the position held, the nature of the work, and the age and physical condition of the employee. *Hutchins v. DirectTV Customer Service*, 2014 WL 3572045, *19 (D. Idaho. 2014). The court may also consider "the myriad other non-discriminatory factors which could validly affect the employer/employee relationship." *Downey v. Strain*, 510 F.3d 534, 544 (5th Cir. 2007); s*ee also Sandlin v. Corporate Interiors, Inc.*, 972 F.2d 1212, 1215 (10th Cir. 1992)(any award of front pay is limited by the estimated remaining tenure plaintiff would have enjoyed with his company absent the discriminatory conduct).

In terms of work life expectancy, age, and condition, Plaintiff is thirty-three years old and apparently in good health. Her youth mitigates against an award of front pay. *Baker v. John Morrell & Co*., 263 F. Supp. 2d 1161, 1184 (N.D. Iowa 2003), citing *Hybert v. Hearst Corp*., 900 F.2d 1050, 1056-57 (7th Cir. 1990)("instead of warranting a lifetime of front pay, the plaintiff's relatively young age should improve his future employment opportunities to mitigate through other employment.").

---

[3] Plaintiff resigned her employment with the PCSO on January 6, 2012. She claims that she was constructively discharged. However, it is undisputed that Sheriff Wegener did not discipline her or terminate her employment.

Plaintiff was able to obtain a better paying job shortly after her resignation from the PCSO. Therefore, it is reasonable to assume that, having elected to resign from this job, she can find another job paying equal to or more than the $32,000 per year she was making at the PCSO.

Plaintiff's employment history also renders a front pay award inappropriate. Prior to working for the PCSO, she had held only one other job in law enforcement, where she left after four months because she was not catching on quickly enough to the training. She was a deputy with the PCSO for just over two years, and this is the longest she has held any job since her graduation from college in 2003. The short tenure of all of her employment after college, in any field, mitigates against a front pay award. *See e.g. Clark v. Metro Health*, 90 F.Supp.2d 976, 989 (N.D. Ind. 2000)(long front pay award not appropriate where the longest plaintiff had worked for any employer was twenty months.)

Plaintiff's job as a dispatcher with Denver Public Schools was also brief and ended because Plaintiff could not work the night shift. Plaintiff's brief tenure in law enforcement indicates that she was not likely to keep her position with the PCSO.

Moreover, the evidence indicates that Plaintiff did not want to continue working for the PCSO. Within months of becoming a deputy at the PCSO, Plaintiff was applying for other jobs, and she agreed that dissatisfaction with pay was one reason. She continued applying to other jobs right up until her termination. This evidence indicates that Plaintiff was not likely to stay with the PCSO for long.

Further, Plaintiff appears to have no further interest in law enforcement. Her most recent job involved processing of bills and service orders for Blue Linx. She testified that she had no intent to pursue law enforcement again and no applications pending. Plaintiff has applied for a

13

wide variety of jobs, from math and science teacher to payroll officer to customer relations specialist, but nothing in law enforcement.

Cases have repeatedly held that front pay is not appropriate where the plaintiff has entered a new field entirely, as such actions demonstrate that she would not have stayed with the former employer absent the alleged discrimination. *See e.g. McKnight v. General Motors Corp.*, 973 F.2d 1366, 1372 (7th Cir. 1992) (upholding denial of front pay where plaintiff had made successful career change but had trouble keeping jobs); *Piekarski v. Home Owner Savings Bank*, 752 F. Supp. 1451, 1455 (D. Minn. 1990) (reversed on other grounds)(a claimant's right to back pay or front pay terminates if he accepts employment in a different field with the intention of "voluntarily abandoning the pursuit of employment in the career field in which he was wrongfully terminated."); *Place v. Abbott Laboratories, Inc.*, 1999 WL 301654, *16 (N. D. Ill.) (denying front pay after plaintiff's career change, "while a Title VII plaintiff is entitled to change fields . . . . damages in employment discrimination cases are not intended to insure a plaintiff's future success."). In short, each of the factors considered in awarding front pay mitigates against such an award.

### iv. Prejudice to Defendant

Plaintiff should also not be permitted to designate an expert after trial because Defendant would be prejudiced. Defendant agreed not to subpoena any records from Blue Linx because Plaintiff represented that her damages were fully mitigated and that it would interfere with her employment. To date, the only document Plaintiff has produced from Blue Linx is her separation agreement. Defendant has no way to verify the details of her job duties, her wages, or the reason for her separation from Blue Linx. Defendant also has not had the opportunity to

interview or depose any of her supervisors as to the reason for her separation. In short, two weeks before trial Plaintiff is attempting to change her claim for damages. Plaintiff's new claims for back and front pay could potentially affect the presentations of evidence, and the jury instructions, in this trial.

### III.    CONCLUSION

Plaintiff has fully mitigated her damages. She is not entitled to back pay because she obtained a better paying job and chose to resign. For the same reasons, and because the factors weight against a front pay award, she is not entitled to front pay. Therefore, allowing Plaintiff's motion to designate an expert after trial would be futile and would prejudice Defendant.

WHEREFORE, Defendant respectfully requests that the Court deny Plaintiff's Motion to Identify an Economic Expert after trial.

Dated this 22nd day of October, 2014.

Respectfully submitted,

*S/ Kristin Anderson George*
Cathy Havener Greer
Kristin Anderson George
Wells, Anderson & Race, LLC
1700 Broadway, Suite 1020
Denver, CO 80290
T: 303-820-1212
Email: cgreer@warllc.com; kageorge@warllc.com
**ATTORNEYS FOR THE DEFENDANT**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 22, 2014, a true and correct copy of the above and foregoing **DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR LEAVE TO IDENTIFY AN ECONOMIC EXPERT FOLLOWING TRIAL** was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following email addresses:

Ralph E. Lamar, Esq.
Email: ralphlamar@ymail.com

F. J. "Rick" Dindinger, II, Esq.
Email: frederick@dindingerlaw.com


*S/ Barbara McCall*
Barbara McCall
Email: bmccall@warllc.com

16