IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 13-cv-00884-PAB-KMT

ABBY MARTIN,

     Plaintiff,

v.

FRED WEGENER, in his official capacity as Sheriff of Park County, CO,

     Defendant.

_____

**ORDER**

_____

This matter is before the Court on a Motion for Summary Judgment [Docket No. 45] filed by defendant Fred Wegener, in his official capacity as Sheriff of Park County, CO. This Title VII case involves claims that plaintiff was subjected to a hostile work environment in retaliation for engaging in protected activities. This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## I. BACKGROUND

The following facts are undisputed unless stated otherwise. Plaintiff began serving as a reserve deputy with the Park County Sheriff's Office ("PCSO") on or about June 30, 2009 and became a full-time deputy on November 2, 2009. Docket No. 45 at 2, ¶ 3. In November 2009, plaintiff's field training officer ("FTO"), Corporal Kelley Reynolds, commented to plaintiff that he believed that Park County should not be hiring female deputies. *Id.* ¶ 6. Plaintiff told her then-boyfriend (later husband), Corporal Kolby Martin, who was also a patrol deputy with the PCSO, about Corporal Reynolds'

comment, *id.* at ¶¶ 4, 6, and Corporal Martin relayed plaintiff's complaint to Sergeant Mike Brown the following day. *Id.* ¶ 8. On November 18, 2009, following a staff meeting, Sergeant Brown and a number of FTOs including Corporal Reynolds, Corporal Dean Morgan, and Corporal Rick Paige, took plaintiff aside for a meeting in which they discussed plaintiff's complaint against Corporal Reynolds. Docket No. 49 at 6, ¶ 1. At that meeting, Corporal Morgan called plaintiff a "traitor" for complaining about Corporal Reynolds' comment. *Id.* The PCSO has a policy of investigating allegations of discrimination as confidentially as possible. *Id.* ¶ 2. Plaintiff believed that the investigation into her complaint against Corporal Reynolds was mishandled and that informing the other FTOs violated the confidentiality policy. Docket No. 49-2 at 6, 87:15-22.

Following Sergeant Brown's investigation into plaintiff's complaint, Corporal Reynolds was removed as plaintiff's FTO and plaintiff was reassigned to Corporal Morgan. Docket No. 45 at 3, ¶ 10. At some point before January 2010, Corporal Paige was assigned as plaintiff's FTO. Docket No. 49 at 8; *see also* Docket 49-2 at 16, 143:25-144:9. Corporal Paige learned of plaintiff's complaint against Corporal Reynolds during the November 18, 2009 meeting. Docket No. 49 at 6, ¶ 1. Plaintiff alleges that each time Corporal Paige gave her a negative mark during her training he would reference plaintiff's complaint against Corporal Reynolds. *Id.* at 8, ¶ 8. After plaintiff completed her FTO training in January 2010, she testified that Corporal Paige continued to demonstrate hostility towards her. Docket No. 49-2 at 16:144:21-23. For example, during radio communications, Corporal Paige would instruct dispatchers to

2

disregard plaintiff's requests to run license plates or assist with calls.  *Id.*; *see also*

Docket No. 49-2 at 16, 144:13-20; 145:23-146:8.  The alleged harassment during radio

communications occurred through at least the summer of 2010.  Docket No. 49-2 at 16,

144:21-23.  On one occasion, Corporal Paige called plaintiff at home to tell her that she

was in "big trouble" for making a mistake at work.  Docket No. 49 at 8, ¶ 9.  During the

summer of 2010, plaintiff claims she reported Corporal Paige's retaliation and

harassment to Master Patrol Deputy Jeff DeBerry and requested that she be assigned

to a new supervisor, but that plaintiff was not reassigned.  Docket No. 49 at 8, ¶ 12.[1]  In

June 2010, plaintiff requested a meeting with Sergeant Brown, Corporal Greg Flint,

Sergeant Glenn Hardey, and Corporal Paige to discuss plaintiff's complaint about

Corporal Paige's radio communications.[2]

In early 2010, plaintiff made a request to Sergeant Brown for rifle certification,

---

[1]Defendant admits that plaintiff complained to Deputy DeBerry, but points out that plaintiff has not produced any evidence beyond her declaration that Deputy DeBerry reported her complaint up the chain of command.  Docket No. 54 at 5, ¶ 13.

[2]Plaintiff, claims that the June 2010 meeting was intended to "get assistance to stop Paige's retaliatory harassment" and that at that meeting Sergeant Brown told plaintiff that, if she raised any more concerns, she would not make it through her probationary period.  Docket No. 49 at 9, ¶ 13.  Defendant disputes plaintiff's statement of additional material fact and argues that the cited testimony supports only that plaintiff requested a meeting to discuss Corporal Paige's radio communications.  The cited testimony supports that plaintiff requested a meeting to discuss Corporal Paige's radio communications and that plaintiff believed those communications were retaliatory.  *See* Docket No. 49-2 at 16, 145:2-14.  Regarding Sergeant Brown's alleged comments, the cited testimony consists only of a partial answer with no question that says, "If I complained, I wouldn't make my probationary period, and then I wouldn't be employed by Park County."  Docket No. 49-2 at 6, 87:1-3.  The portion of the deposition attached to plaintiff's response provides no context for this remark, and it is not clear from the cited testimony when he made the remark.  Indeed, it is not even clear from the cited testimony that this was a remark made by Sergeant Brown or any other PCSO employee rather than plaintiff's own impression of someone's comment.  *See id.*

but was not given permission for such training.  Docket No. 49-2 at 3, 65:14-20.

In June 2010, plaintiff was denied a shift for which she had bid.  Plaintiff complained to Sergeant Hardey about her shift assignment, who informed plaintiff that another officer had seniority over her.  Docket No. 49 at 9, ¶ 14.[3]  Plaintiff believed that, contrary to Sergeant Hardey's representation, she had more seniority than the officer who received the shift for which she had bid.[4]

On or about October 27, 2010, Corporal Reynolds failed to provide plaintiff with backup in a situation where dispatch reported a call concerning a man who was walking on the highway and who was possibly carrying a gun.  Docket No. 49 at 12-13, ¶¶ 31-32.  Corporal Reynolds was never disciplined.  *Id.* at 13, ¶ 33.

Sometime before December 2010 Corporal Paige left the PCSO, and Sergeant Hardey was assigned as plaintiff's direct supervisor.  Docket No. 49 at 10, ¶ 17.  According to Captain Mark Hancock, Sergeant Hardey would have been aware of plaintiff's complaint against Corporal Reynolds.  Docket No. 49-3 at 7-8, 28:15-29:2.  During this time, plaintiff testified that Sergeant Hardey did not communicate with her directly, but only through text messages or through communications with officers of

---

[3]Plaintiff also claims that she was denied overtime shifts throughout the summer of 2010 when other similarly situated deputies were given overtime shifts.  Docket No. 49 at 9, ¶ 15.  Defendant disputes this fact and argues that the cited testimony does not support it.  The Court agrees.  The cited testimony does not concern overtime shifts.  *See* Docket No. 49-2 at 10, 115:9-12.

[4]Docket No. 49-2 at 10, 116:17-117:1.  Plaintiff testified that she believed the officer in question in fact had less seniority than her, but admitted in her deposition that the officer had prior experience working in law enforcement and that she did not know whether or not that experience counted towards the officer's seniority.  *Id.* at 10-11, 118:17-119:5.

lower rank than plaintiff.  Docket No. 49-2 at 11, 121:13-19.  In December 2010,

Sergeant Hardey wrote plaintiff up for at least two incidents[5] that plaintiff believes,

based on a conversation she had with another officer, were fabricated in an attempt to

have her put on probation and eventually fired.  Docket No. 49-2 at 11, 119:21-120:16.

Captain Hancock overturned those write-ups and removed them from plaintiff's file.

Docket No. 49-3 at 7, 25:6-26:24.

In March 2011, plaintiff began serving as a School Resource Officer ("SRO")

under a new direct supervisor, Corporal Welles Tonjes.  Docket No. 45 at 3, ¶ 11.  On

May 10, 2011, plaintiff was at a middle school assisting with Career Day.  During the

career day, Park County Commissioner John Tighe, who also served as an unpaid

reserve deputy with the PCSO, spoke to the students and asked them to perform

various cheers.  Docket No. 45 at 3-4, ¶¶ 12, 17.  Mr. Tighe was participating at the

assembly in his role as County Commissioner.  Docket No. 45 at 4, ¶ 17.[6]  At the end of

Mr. Tighe's speech, he asked plaintiff to lead students in a "Barbie cheer," which

consisted of putting her right hand on her head, left hand on her hip, and saying

---

[5]The parties dispute whether Sergeant Hardey wrote plaintiff up for two or three incidents.  Plaintiff's testimony on this point is unclear.  *See* Docket No. 49-2 at 11, 119:21-120:16.

[6]Plaintiff disputes that Mr. Tighe was working only in his capacity as County Commissioner at the assembly, arguing that, according to Sergeant Brown's deposition, deputies are always on duty.  Docket No. 49 at 3, ¶ 17.  Defendant argues that plaintiff's assertion that deputies are always on duty does not properly dispute this fact because it mischaracterizes Sergeant Brown's testimony.  Docket No. 54 at 2, ¶ 17.  The Court agrees.  Sergeant Brown's testimony that "you are basically a police officer 24/7" was made with respect to the fact that an off-duty officer has a duty to aid in whatever capacity he or she can when observing a felony, and to report observed misdemeanors.  Docket No. 49-1 at 8-9, 68:21-69:1.

"hubba, hubba, hubba."  Docket No. 45 at 3, ¶ 12.  Plaintiff told Corporal Tonjes about

the incident that day, and Corporal Tonjes instructed plaintiff to submit a written

complaint to Undersheriff Monte Gore.  *Id.* ¶ 13.

Plaintiff's complaint about Mr. Tighe's actions was investigated by County

Human Resource administrator Cindy Gharst, who found that, while the action did not

rise to the level of sexual harassment, it was inappropriate.  Docket No. 45 at 3, ¶ 14.

Mr. Tighe was warned of the inappropriate nature of his conduct.  *Id.*

On or about May 26, 2011, Corporal Reynolds again failed to provide plaintiff

with requested backup, this time in response to a call that students at Platte Canyon

High School were planning to spray other students with "carbonated urine" on the last

day of school.  Docket No. 49 at 13, ¶¶ 34-35.  Plaintiff complained about Corporal

Reynolds' failure to provide backup to Corporal Tonjes and Sergeant Brown, but no

action was taken.  Docket No. 49-2 at 18, 157:16-21.

Sometime after March 2011 plaintiff suffered an off-duty back injury.  Docket No.

49 at 14, ¶ 40.  Plaintiff told Sergeant Brown that the weight of wearing a full uniform

aggravated her back injury and requested an accommodation of working as an SRO

without her full uniform on Fridays.  *Id.*  This request was denied.  *Id.*  Other SROs had

been allowed to wear modified uniforms for work in the schools in the past.  *Id.* ¶ 41.

In July 2011, plaintiff informed Corporal Tonjes that she would need to have

back surgery.  *Id.* ¶ 42.  Corporal Tonjes responded that plaintiff "might as well plan on

getting [her] walking papers because command staff is not going to put up with you

having surgery."  *Id.* ¶ 42.  Plaintiff had back surgery on July 1, 2011.  Docket No. 45 at

4, ¶ 19.

Plaintiff's doctor cleared her to return to work with restrictions on August 1, 2011, and the sheriff's office provided plaintiff with light duty work scanning documents beginning on that date.  Docket No. 45 at 4, ¶ 20.  Initially upon her return to light duty work, plaintiff rode to work with her now-husband, Kolby Martin, so that she could take pain medications in the morning without worrying about driving while medicated.  *Id.* ¶ 21.  During this time, plaintiff and her husband were not permitted to be in the office at the same time while plaintiff was working.  Docket No. 49 at 14-15, ¶ 43.  After a few weeks, Corporal Tonjes informed plaintiff that her husband would no longer be allowed to drive her to work while he was on patrol, citing concerns that it would be unsafe for a patrol officer on duty to have to worry about his unarmed spouse if an emergency situation came up while she was in the car.  Docket No. 45 at 4-5, ¶ 22.[7]  Corporal Tonjes was not aware of other patrol deputies on light duty who were permitted to ride to work with their patrol deputy spouses, Docket No. 45-7 at 9, 104:21-105:5, though plaintiff states that deputies routinely drive civilians in their patrol cars and are allowed to drive their children to school.  Docket No. 49 at 3-4, ¶ 22.

On or about August 17, 2011, after a PCSO staff meeting at a local fire station, plaintiff approached Corporal Tonjes and told him that she believed he was treating her and her husband unfairly.  Docket No. 49 at 15, ¶ 44.  Corporal Tonjes and Sergeant Brown took plaintiff to the fire station's kitchen.  *Id.*  At that meeting, Corporal Tonjes

---

[7]Plaintiff disputes Corporal Tonjes' stated reasons for changing his mind and revoking permission for plaintiff's husband to drive her to work, but does not dispute the fact that permission was revoked.

told plaintiff to "shut up."  Docket No. 49 at 15, ¶ 45.  Plaintiff complained that Corporal Tonjes had not taken seriously a complaint that plaintiff had made against another PCSO officer, Deputy Strehl,[8] and Corporal Tonjes responded by screaming and cursing at plaintiff and by slamming his hand down on the table at which plaintiff was sitting.  *Id.*  Corporal Tonjes threatened to make plaintiff work nights where she would not come into contact with anyone.  *Id.* at ¶ 46.  After the incident in the fire station, Corporal Tonjes forbade employees from talking to plaintiff on at least one occasion. Docket No. 49 at 17, ¶ 52.[9]

On September 21, 2011, plaintiff's doctor advised her that she would need another surgery.  Docket No. 45 at 6, ¶ 29.  On September 22, 2011, Corporal Tonjes informed plaintiff that, as of September 26, 2011, light duty work would no longer be available.  *Id.* ¶ 30.  Plaintiff stopped coming to work after September 22, 2011.  *Id.* ¶ 31.

On or about October 13, 2011, plaintiff's husband told her that he learned from Sergeant Brown that the PCSO was hiring for plaintiff's position at the end of November 2011.  Docket No. 49 at 18, ¶ 57.

Plaintiff had a second surgery on October 18, 2011, by which point plaintiff had exhausted all of her sick leave.  *Id.* ¶ 32.  Additionally, plaintiff would exhaust her Family Medical Leave Act ("FMLA") leave by November 22, 2011.  *Id.*  The county extended

---

[8]Apart from this one reference, neither party makes any reference to or provides any explanation of the content of plaintiff's complaint against Deputy Strehl.

[9]Plaintiff claims that Corporal Tonjes "forbade everyone in the office from talking to plaintiff" but also says that no one told a fellow PCSO employee, Ms. Sarah Kimsey, not to speak with plaintiff.  Docket No. 49 at 17, ¶ 52.

plaintiff an additional six days of FMLA leave.  *Id.* ¶ 32.

On November 2, 2011, while she was still recovering from her second surgery, plaintiff applied for an open detective position.  Docket No. 49 at 18, ¶ 59.  Ms. Gharst, the human resources employee, informed plaintiff that she would need a doctor's note stating that she could sit all day for an examination for the position.  *Id.*  Plaintiff was unable to get a note from her doctor by the date of the exam, *id.*, and the undersheriff did not agree to waive the requirement that plaintiff receive a doctor's note.  *Id.* at 19, ¶ 60.

On November 16, 2011, Sheriff Wegener wrote to plaintiff requesting that she return to light duty work on November 29, 2011.  Docket No. 45 at 6, ¶ 33.  Plaintiff returned to work on November 29 and 30, 2011, but then stopped coming to work.  *Id.* According to plaintiff, when she returned to work on November 29, she was ostracized by PCSO staff who refused to talk to her.  Docket No. 49 at 19, ¶ 61.  Additionally, when Corporal Tonjes saw plaintiff enter the office, he went into his office and slammed the door so hard it shook the pictures on the walls.  *Id.*

On December 5, 2011, plaintiff's doctor released her to come back to work on January 17, 2012 with restrictions.  Docket No. 45 at 6, ¶ 34.  On December 6, 2011, Sheriff Wegener wrote to Plaintiff that, although he had already granted plaintiff leave beyond what she was entitled to under FMLA, he approved the additional period of requested medical leave.  *Id.* at 7, ¶ 35.  Sheriff Wegener informed plaintiff, however, that he would not approve any donated sick time to cover this period, so plaintiff's leave would be unpaid.  Docket No. 45-18 at 1.

The PCSO light duty policy states that "light duty will be limited to three work weeks.  On a one-time basis only, a one-week extension may be authorized by the Sheriff, not to exceed four weeks . . . light duty does not, in any way, create a right for the employee to occupy that or any other position on a permanent basis.  Light duty positions may be deleted at any time."  Docket No. 45 at 7, ¶ 36.  Between August 1 and November 30, 2011, plaintiff received a total of 274.5 hours of light duty work, which was more than any other PCSO employee with an off-duty injury had received since at least 2002.  *Id.* ¶ 38.

On January 3, 2012, plaintiff filed a charge with the EEOC.  Docket No. 49-9 at 7.  On January 6, 2012, plaintiff's attorney wrote to the County alleging that plaintiff had been constructively discharged.  *Id.* at 1.  Sheriff Wegener took no specific steps to investigate the allegations in the January 6 letter.  Docket No. 49 at 20, ¶ 64.  On January 17, 2012, Sheriff Wegener sent a short letter to plaintiff accepting her resignation and stating that he disagreed with virtually all of plaintiff's allegations supporting her constructive discharge claim.  *Id.*

In the summer of 2013, Captain Hancock told Detective Yoshi Goto that plaintiff's child was not her husband's even though he knew the statement was not true.  Docket No. 49 at 20, ¶ 66.

## II.  STANDARD OF REVIEW

Summary judgment is warranted under Fed. R. Civ. P. 56 when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248-50 (1986).  A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim.  *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001).  Only disputes over material facts can create a genuine issue for trial and preclude summary judgment.  *Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005).  An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

However, "[w]hen, as in this case, the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim."  *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)) (internal quotation marks omitted).  "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter."  *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial."  *Celotex*, 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e).  "To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case."  *Bausman*, 252 F.3d at 1115 (citing *Hulsey v. Kmart, Inc.*, 43 F.3d 555, 557 (10th Cir. 1994)).  "In applying this standard, we view all facts

and any reasonable inferences that might be drawn from them in the light most favorable to the nonmoving party." *Henderson v. Inter-Chem Coal Co., Inc.*, 41 F.3d 567, 569 (10th Cir. 1994).

## III.  ANALYSIS

Title VII prohibits retaliation against individuals who oppose discriminatory employment practices in complaints or investigations of employment practices prohibited by Title VII.  *See* 42 U.S.C. § 2000e-3(a).  To establish a prima facie case of retaliation, a plaintiff must prove three elements: "(1) protected employee action; (2) adverse action by an employer either after or contemporaneous with the employee's protected action; and (3) a causal connection between the employee's action and the employer's adverse action."  *Jencks v. Modern Woodmen of Am.*, 479 F.3d 1261, 1264-65 (10th Cir. 2007).  As to the third element, plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Tex. Sw. Med. Center v. Nassar*, --- U.S. ----, 133 S.Ct. 2517, 2534 (2013).

Plaintiff engaged in two protected activities: (1) her November 2009 complaint regarding Corporal Reynolds' comment, and (2) her May 2011 complaint about Mr. Tighe's actions at the school assembly.  The Court addresses the remaining elements in turn.

### A.  Adverse Action

Defendant argues that plaintiff has not alleged a single material adverse action sufficient to meet her prima facie case.  Docket No. 45 at 9.  Plaintiff concedes that she

did not suffer a discrete adverse employment action in retaliation for her protected activities.  Docket No. 49 at 21-22.  Instead, plaintiff claims that she was subjected to a "lengthy course of conduct that was aimed at getting her to resign her employment."  *Id.* at 22.  As a result of this purportedly prolonged harassment, plaintiff argues that she was constructively discharged.  *Id.*

The Tenth Circuit has recognized that "co-worker hostility or retaliatory harassment, if sufficiently severe, may constitute 'adverse employment action' for purposes of a retaliation claim."  *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1264 (10th Cir. 1998).  "The behavior complained of must render the workplace permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *McGowan v. City of Eufala*, 472 F.3d 736, 743 (10th Cir. 2006).  "In addition, to succeed on a retaliation claim based on a hostile work environment, a Title VII plaintiff must present evidence that supervisory or management personnel either (1) orchestrated the harassment of the plaintiff by other employees, or (2) knew about the harassment and acquiesced in such a manner as to condone it."  *Id.* (citing *Gunnell*, 152 F.3d at 1265).  Where, as here, a plaintiff complains of acts that occurred both before and after the expiration of the applicable statute of limitations, "a court's task is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period."  *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 103 (2002).  Since plaintiff filed a complaint with both the EEOC and the Colorado

Civil Rights Division, *see* Docket No. 49-9 at 2, the evidence of record must support that one or more acts of harassment occurred after March 9, 2011, 300 days before plaintiff filed her charge of discrimination with the EEOC.  42 U.S.C. § 2000e-5(e)(1).

### 1.  Events Before March 9, 2011

To determine whether events that took place before March 9, 2011 can be considered, the Court must determine whether the acts occurring before and after that date were part of the "same hostile work environment."  *Duncan v. Manager, Dep't of Safety, City and County of Denver*, 397 F.3d 1300, 1309 (10th Cir. 2005).  The Court examines whether "the pre- and post-limitations period incidents involved the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers."  *Id.* (quoting *Morgan*, 536 U.S. at 120) (alteration marks omitted).

Before March 9, 2011, plaintiff complains of continuous harassment by Corporal Paige, one incident involving Corporal Reynolds, two incidents involving Sergeant Brown, and two incidents involving Sergeant Hardey.  Regarding Corporal Paige, plaintiff claims that, in January 2010, when serving as plaintiff's FTO, Corporal Paige referred to plaintiff's complaint against Corporal Reynolds each time he gave plaintiff a negative mark during her training. Docket No. 49 at 8, ¶ 8.  Plaintiff also claims that Corporal Paige routinely harassed her over the police radio, which other officers could hear, and told dispatch to disregard plaintiff's requests.  Id.  On one occasion, plaintiff asserts that Corporal Paige called plaintiff at home and told plaintiff that she was in "big trouble" due to a mistake she had made at work.  *Id.* ¶ 9.  Regarding Sergeant Brown, in early 2010, plaintiff alleges that he denied plaintiff's request for long gun training.

Docket No. 49-2 at 3, 65:14-20.  In June 2010, plaintiff alleges that he told her that she would not make it through her probationary period if she continued complaining about her superiors' conduct towards her.[10]  As for Corporal Reynolds, plaintiff states that, in October 2010, he failed to provide plaintiff with backup in a potentially dangerous situation and was never disciplined as a result.  Docket No. 49 at 12-13, ¶¶ 31-32.  As for Sergeant Hardey, plaintiff alleges that he refused to help when she complained of her denial of a shift bid, Docket No. 49 at 9, ¶ 14, and that he wrote plaintiff up on at least two occasions for false charges in an effort to get her fired.  Docket No. 49-2 at 11, 119:21-120:16.

After March 9, 2011, plaintiff complains of a single act committed by Corporal Reynolds, a single act committed by Sergeant Brown, a number of actions taken by Corporal Tonjes in response to plaintiff's return to work following back surgery, the PCSO's refusal to waive the requirement that plaintiff provide a doctor's note to sit for the detective's exam, and Sheriff Wegener's decision not to allow her to take any more donated leave time.

The Court finds that plaintiff fails to meet her burden of showing that the acts she complains of before and after March 9, 2011 were part of the same hostile work

---

[10]The precise context for Sergeant Brown's remark is unclear.  Plaintiff claims in her Statement of Additional Material Facts that Sergeant Brown's remark was made in a June 2010 meeting "during which [plaintiff] attempted to get assistance to stop Paige's retaliatory harassment and complained about his denial of her shift bid."  Docket No. 49 at 9, ¶ 13.  The testimony cited to support this contention, however, makes no mention of Sergeant Brown having made this remark at the meeting plaintiff requested to discuss Corporal Paige's actions.  *See* Docket No. 49-2 at 16, 145:1-25.  Elsewhere, plaintiff testified that Sergeant Brown made his remark about plaintiff not getting through her probationary period in June 2010.  *Id.* at 17-18, 154:24-155:3.

environment.  Although plaintiff has demonstrated a genuine dispute of fact regarding

Corporal Paige's apparent retaliatory harassment of her, plaintiff identifies no actions

taken by Corporal Paige after the summer of 2010.  Likewise, even if the Court were to

conclude that Sergeant Hardey's actions were a continuation of Corporal Paige's

retaliatory harassment, the evidence shows no actions taken against plaintiff by

Sergeant Hardey during the post-limitations period.  As to Sergeant Brown, plaintiff

complains of only a single act that occurred during the post-limitations period–denial of

plaintiff's request to wear a modified uniform.  That event occurred nearly a year after

plaintiff's previous complaint about Sergeant Brown.  Given the lack of temporal

proximity and the lack of direct evidence that Sergeant Brown's refusal of plaintiff's

modified uniform request had anything to do with either of plaintiff's protected activities,

no reasonable jury could conclude that this event was a continuation of the alleged

retaliation against plaintiff for her complaint about Corporal Reynolds' comment.  *See*

*Proctor v. United Parcel Service*, 502 F.3d 1200, 1209 (10th Cir. 2007) (holding that

where temporal proximity does not support an inference of retaliatory motive, additional

evidence is required).

Plaintiff also identifies two instances–one before the limitations period and one

after–where Corporal Reynolds did not provide her with backup.  While a reasonable

jury could draw the inference that Corporal Reynolds' actions were driven by a

retaliatory motive, "an employer can only be liable for co-workers' retaliatory

harassment where its supervisory or management personnel either (1) orchestrate the

harassment or (2) know about the harassment and acquiesce in it in such a manner as

to condone and encourage the co-workers' actions."  *Gunnell*, 152 F.3d at 1265

(citation omitted).  While plaintiff testified that she complained of the failure to provide backup to Corporal Tonjes and Sergeant Brown, plaintiff's testimony gives no indication that she reported that she believed Corporal Reynolds acted in retaliation for plaintiff's protected activity or even that Corporal Tonjes was aware of plaintiff's complaint against Corporal Reynolds.[11]  Moreover, there is no indication that Corporal Reynolds was plaintiff's supervisor or manager at the time he failed to provide her with backup.  Thus, there is no evidence that the plaintiff's supervisory or management personnel orchestrated the retaliatory actions or acquiesced in them.  *McGowan*, 472 F.3d at 743; *see also Farrier v. Nicholson*, 2008 WL 1882848 at *10 (W.D. Okla. Apr. 24, 2008) (rejecting retaliatory hostile work environment claim where plaintiff "has not shown that she expressed in . . . her various complaints to [supervisors] her current accusation that coworkers' conduct was retaliatory treatment for past discrimination complaints or past opposition to unlawful discrimination").

The majority of plaintiff's complaints after March 9, 2011 concern Corporal Tonjes' response to plaintiff's return from back surgery.  Plaintiff does not identify any instance during the pre-limitations period where Corporal Tonjes harassed her, and the post-limitation period events concern conduct that is unrelated to plaintiff's complaints about the actions of her supervisors in 2010.  The remaining complaints about the actions of the human resource department and Sheriff Wegener's decision not to allow

---

[11]Although plaintiff alleges in her Statement of Additional Material Facts that she informed Corporal Tonjes of her earlier complaint against Corporal Reynolds, the cited testimony does not support that she reported the failure to provide backup as "retaliatory conduct" or that she made Corporal Tonjes aware of her earlier complaint against Corporal Reynolds.  *Compare* Docket No. 49 at 13, ¶ 36 *with* Docket No. 49-2 at 18-19, 157:16-23; 159:2-3.

plaintiff to use any more donated leave time likewise bear no relationship to the acts that plaintiff complains of that occurred in the pre-limitations period.

Because the pre- and post-limitations period incidents that plaintiff complains of were not part of the same hostile work environment, the Court looks only to events that took place after March 9, 2011 to determine whether plaintiff can establish a triable issue of fact as to her retaliatory hostile work environment claim.

### 2. Events After March 9, 2011

The Court now addresses whether plaintiff has met her burden of showing that a genuine issue of fact exists as to whether plaintiff was subjected to a hostile work environment after March 9, 2011.  The Court finds that, taking the evidence in the light most favorable to plaintiff, plaintiff has met her burden with respect to Corporal Tonjes' actions following plaintiff's return from surgery.  When plaintiff informed Corporal Tonjes that she required surgery, he told her that she should "plan on getting [her] walking papers." Docket No. 49 at 14, ¶ 42.  After plaintiff complained that she believed Corporal Tonjes was treating her and her husband differently from other couples, Corporal Tonjes told plaintiff to "shut up."  *Id.* at 15, ¶ 45.  He then called a meeting at which he screamed and cursed at plaintiff, and slammed his fist on the table.  *Id.*  While plaintiff was performing light duty, Corporal Tonjes instructed other employees not to talk to plaintiff.  Docket No. 49 at 17, ¶ 52.  When Corporal Tonjes observed that plaintiff had returned from a second surgery in November 2011, he slammed his office door so violently that it shook the picture on the walls.  *Id.* at 19, ¶ 61.  Taking these actions together, a reasonable jury could conclude that Corporal Tonjes created an environment permeated with "discriminatory intimidation, ridicule, and insult" that was

18

"sufficiently severe or pervasive to alter the conditions of [plaintiff's] employment and create an abusive working environment." *McGowan v. City of Eufala*, 472 F.3d at 743.[12]

As to plaintiff's remaining allegations–denial of plaintiff's request to wear a modified uniform, the Sheriff's department's failure to terminate its relationship with Mr. Tighe, Ms. Gharst's refusal to let plaintiff sit for a detective's examination when she was not yet cleared to return to work without a doctor's note, the third-hand report that the PCSO had posted an opening for plaintiff's job, and Captain Hancock's post-resignation comment regarding whether plaintiff's child was her husband's, the Court finds that a reasonable jury could not find that they were part of this same hostile work environment.  Those incidents involved different perpetrators and were of a different character than Corporal Tonjes' treatment of plaintiff.  Nor would those incidents, which were each performed by different actors at different times, independently support plaintiff's hostile work environment claim.  *See Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 680 (10th Cir. 2007) ("A plaintiff does not make a showing of a pervasively hostile work environment by demonstrating a few isolated incidents. . . .").

**B.  Causal Connection**

Although a reasonable jury could find that Corporal Tonjes' actions towards plaintiff created an impermissibly hostile environment, plaintiff has not shown any link

---

[12]Defendant argues that efforts to ostracize plaintiff are not a materially adverse action as a matter of law.  Docket No. 54 at 16 (citing *Jones v. Wichita State University*, 528 F. Supp. 2d 1182, 1193 (D. Kan. 2007)).  While *Jones* did hold that the "cold shoulder" treatment is not an adverse action as a matter of law, the Court finds this case to be distinguishable.  In *Jones*, five of the plaintiff's co-workers were identified as having given the plaintiff the "cold shoulder" treatment.  *Jones*, 528 F. Supp. 2d at 1188.  The situation here, where plaintiff's supervisor ordered other employees not to speak to plaintiff, is substantially different.

between this hostile environment and her protected activities.

As evidence of causation, plaintiff points to (i) "the clear animosity expressed toward plaintiff by Reynolds and Paige . . . and Hardey," (ii) "the failure to investigate plaintiff's complaints", (iii) "the failure to take disciplinary action against the wrongdoers," and (4) Captain Hancock's 2013 statement to a fellow PCSO officer that plaintiff's baby was not her husband's.  Docket No. 49 at 29.

As discussed above, plaintiff's first piece of evidence is time-barred.  As to plaintiff's vague reference to failure to investigate her complaints, only two such complaints occurred after March 9, 2011: a complaint over Corporal Reynolds' failure to back plaintiff up when responding to the anticipated prank at a local school and Mr. Tighe's treatment of plaintiff during the school assembly.  There is no evidence that plaintiff reported Corporal Reynolds' failure to provide backup as a retaliatory act, and thus no evidence that plaintiff's supervisors orchestrated or acquiesced to any sort of harassing activity in retaliation for plaintiff's protected activities.  As for plaintiff's complaint about Mr. Tighe, the undisputed facts show that an investigation took place, that Mr. Tighe was told that his actions were inappropriate, and that plaintiff had no further contact with him since the incident at the middle school.  Docket No. 45 at 3, ¶ 14, *id.* at 4, ¶ 17.  Not only does plaintiff point to no evidence that suggests that defendant's failure to discipline Mr. Tighe was motivated by a retaliatory animus, the facts show that defendant in fact acted to end the harassment.  *Duncan*, 397 F.3d at 1310 ("[i]f the employer's response ends the harassment by the employee in question, we presume that the remedial action was sufficient") (citation omitted).  Moreover, plaintiff testified that Corporal Tonjes and Sergeant Brown were "appalled by what the

commissioner had asked of [her]" and that they wanted plaintiff to file a lawsuit against Mr. Tighe.  Docket No. 49-2 at 18, 157:24-158:12.  This testimony is inconsistent with plaintiff's claim that her supervisors' treatment of her was driven by retaliatory animus over the Tighe incident.

Likewise, defendant's purported failure to discipline wrongdoers does not support an inference that the hostile work environment was driven by retaliatory animus. Corporal Reynolds was promptly removed as plaintiff's FTO after plaintiff's complaint, and Mr. Tighe was told that his actions were inappropriate.  Plaintiff may have expected harsher penalties for each offender, but she points to no evidence that the measures taken by defendant were not "reasonably calculated to end the harassment."  *Adler*, 144 F.3d at 676 (citations and quotation omitted).  Finally, Captain Hancock's comment about plaintiff's pregnancy occurred during the summer of 2013, Docket No. 49-2 at 9, 113:2-6, more than three years after plaintiff's complaint against Corporal Reynolds and two and a half years after her complaint against Mr. Tighe.  This comment, while potentially reflective of personal animus against plaintiff, is too remote in time to support a causal connection with plaintiff's protected activities.  Furthermore, since the comment occurred after plaintiff resigned from the PCSO, it cannot be considered in support of plaintiff's hostile work environment claim.  *See Creamer v. Laidlaw Transit, Inc.*, 86 F.3d 167, 171 (10th Cir. 1996) ("plaintiff may only rely on evidence relating to harassment of which she was aware *during the time she was allegedly subject to a hostile work environment*") (citing *Hirase-Doi v. U.S. West Commcn's, Inc.*, 61 F.3d 777, 782 (10th Cir. 1995)) (emphasis added).

As for Corporal Tonjes, whose actions the Court found could constitute a

retaliatory hostile work environment, plaintiff provides no evidence connecting his actions to either of her protected activities.  As discussed above, plaintiff provides no evidence that Corporal Tonjes was aware of her complaint against Corporal Reynolds.  Moreover, plaintiff testified that when she reported Mr. Tighe's actions to Corporal Tonjes, Corporal Tonjes was "appalled" and wanted plaintiff to file a lawsuit.  Docket No. 49-2 at 18, 157:24-158:12.  Finally, Corporal Tonjes' outburst at the fire station meeting, during which plaintiff claims she felt afraid, was a direct response to plaintiff's comment about a complaint that she had made against Deputy Strehl.  Docket No. 49 at 15, ¶ 45.  Plaintiff has provided no details concerning her complaint about Deputy Strehl and no evidence to suggest that the complaint qualifies as a protected activity.

Because plaintiff has not pointed to evidence that supports an inference of a causal connection between her protected activities and the allegedly retaliatory hostile work environment, she cannot establish a prima facie case of retaliation.

## IV.  PLAINTIFF'S MOTION FOR ORAL ARGUMENT OR LEAVE TO FILE SURREPLY

Plaintiff brought a separate, unopposed motion requesting oral argument or, in the alternative, leave to file a surreply.  Docket No. 56.  In support of her motion, plaintiff argues that defendant made a number of new arguments in his reply and cited sixteen cases that were not cited in his motion.  *Id.* at 2.  Plaintiff does not identify with specificity any new arguments to which, in the interests of fairness, plaintiff must be allowed to respond.  Indeed, defendant's motion and reply appear substantially similar, as defendant merely adapts his position to address plaintiff's claim that she suffered from a retaliatory hostile work environment as opposed to discrete acts of retaliation.  The Court finds that it can rule on defendant's motion without relying on any new

material contained in the reply brief. *Beaird v. Seagate Technology, Inc.*, 145 F.3d 1159, 1164 (10th Cir. 1998). To the extent the Court discusses some of the same issues raised in defendant's reply, such discussion is based on the Court's "own deliberations and research." *Headrick v. Rockwell Intern. Corp.*, 24 F.3d 1272, 1278 (10th Cir. 1994) (citation and quotation omitted).

## V. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Defendant Fred Wegener's Motion for Summary Judgment [Docket No. 45] is **GRANTED**. It is further

**ORDERED** that plaintiff's claim against defendant Fred Wegener is dismissed with prejudice. It is further

**ORDERED** that plaintiff's Motion for the Court to Grant Oral Arguments on Defendant's Motion for Summary Judgment, Or Alternatively, for Leave to File a Surreply Brief [Docket No. 56] is **DENIED**. It is further

**ORDERED** that, within 14 days of the entry of judgment, defendants may have their costs by filing a bill of costs with the Clerk of the Court. It is further

**ORDERED** that this case is dismissed in its entirety.

DATED October 31, 2014.

BY THE COURT:

  s/Philip A. Brimmer                              
PHILIP A. BRIMMER
United States District Judge